CASE NO. 14-1825

IN THE

# United States Court of Appeals

FOR THE FOURTH CIRCUIT

———————

BRUCE GOLDFARB, et al.

Appellants

v.

MAYOR AND CITY COUNCIL OF BALTIMORE, et al.

Appellees

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

———————

**BRIEF OF APPELLANTS
BRUCE GOLDFARB & MICHAEL GALLAGHER**

———————

Timothy R. Henderson
RICH AND HENDERSON, P.C.
51 Franklin Street, Suite 300
Annapolis, Maryland  21401
410-267-5900
thenderson@richlaw.com

*Counsel for Appellants*

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................ 0-01

TABLE OF AUTHORITIES .................................................................. 1

PRELIMINARY STATEMENT ................................................................ 5

JURISDICTIONAL STATEMENT ............................................................. 6

ISSUES PRESENTED FOR REVIEW .......................................................... 6

STATEMENT OF THE CASE ................................................................ 7

SUMMARY OF ARGUMENT .................................................................. 15

ARGUMENT .............................................................................. 17

    I.    The District Court erred by converting Defendants'
           motions to dismiss into motions for summary judgment
           without providing Plaintiffs an opportunity to conduct
           discovery. ....................................................... 18

    II.   The District Court erred by resolving disputes of material
           fact against the Plaintiffs and by failing to consider the
           allegations pled in the complaint in a light favorable to
           the non-moving party ............................................. 19

    III.  The District Court erred in concluding that CBAC's RAP
           constitutes a legally enforceable term of the general NPDES
           discharge permit, such that RCRA's anti-duplication
           provision precludes the claims alleged ............................ 23

a.    The general NPDES discharge permit regulates non-hazardous stormwater discharges from point sources, not the handling, treatment, storage, or disposal of hazardous waste. ....................................................... 25

    1.    The CWA Regulates Discharges from Point Sources, Not General Construction Activities Involving the Handling, Treatment, Storage, or Disposal of Hazardous Waste on Land .................... 28

    2.    The Specific Terms of the General NPDES Permit Make It Clear that the Permit Does Not Authorize Activities Involving the Handling, Treatment, Storage, or Disposal of Hazardous Waste on Land ............................................... 29

    3.    RCRA's Industrial Wastewater Discharge Exclusion Only Applies to the Pollutants in the Water Discharged from a Point Source to Surface Water .......................................... 30

    4.    Erosion and sediment control and stormwater management plans adopted pursuant to state law, required as a pre-condition of authorization to discharge stormwater pursuant to a general NPDES permit, did not supercede the requirements to handle, treat, store, or dispose of solid or hazardous waste in accordance with RCRA............................................................... 33

    5.    CBAC's participation in Maryland's Voluntary Cleanup Program, including its formulation of a RAP, cannot create duplicative enforcement of federal law, nor exempt CBAC from RCRA's requirements................................................. 34

b.    There is, in any event, no duplication or regulatory inconsistency between the remedial activities outlined in the RAP and the relief requested in the complaint.............. 36

IV.    The District Court erred in concluding that the complaint failed to sufficiently state claims under 42 U.S.C. §§ 6972(a)(1)(A) and (B) ...................................................... 38

a.    The complaint sufficiently pled a claim under § 6972(a)(1)(A) ..................................................... 39

b.    The District Court erred in concluding that the complaint failed to sufficiently state a claim under 42 U.S.C. §§ 6972(a)(1)(B) ................................... 43

1.    The complaint sufficiently pled a § 6972(a)(1)(B) claim against BDC, Baltimore City, and the CBAC Defendants ........................................ 44

2.    The complaint sufficiently pled a § 6972(a)(1)(B) claim against Maryland Chemical................................. 46

CONCLUSION ........................................................................... 51

REQUEST FOR ORAL ARGUMENT ................................................ 52

CERTIFICATE OF COMPLIANCE ................................................... 54

CERTIFICATE OF SERVICE .......................................................... 55

ADDENDUM................................................................................ 56

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1825__        Caption: __Bruce Goldfarb v. Mayor & City Council of Baltimore__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Bruce Goldfarb and Michael Gallagher__
(name of party/amicus)

_____

who is _are_ ___Appellants___, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

10/28/2013 SCC                                    0

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
       financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐YES ☑NO
       If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
       If yes, identify any publicly held member whose stock or equity value could be affected
       substantially by the outcome of the proceeding or whose claims the trade association is
       pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
       If yes, identify any trustee and the members of any creditors' committee:

Signature: _____      Date: _8/20/14_

Counsel for: Appellants _____

## CERTIFICATE OF SERVICE
****************************

I certify that on _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

_____      _8/20/14_
        (signature)                       (date)

01

TABLE OF AUTHORITIES

Cases

Andrews v. Daw,
   201 F.3d 521 (4th Cir. 2000)..................................................... 20
Assateague Coastkeeper v. Maryland Dept. of Environment,
   200 Md. App. 665 (2011)................................................ 27, 28, 32, 34
Atlantic States Legal Foundation v. East Kodak Co.,
   12 F.3d 353 (2nd Cir. 1993)..................................................... 33
Bell Atlantic Corp. v. Twombly,
   550 U.S. 544 (2007)............................................................. 17
Bosiger v. U.S. Airways,
   510 F.3d 442 (4th Cir. 2007).................................................... 19
Butler v. U.S.,
   702 F.3d 749 (4th Cir. 2012).................................................... 18
Cmty. Ass'n for Restoration of the Env't, Inc. v. George & Margaret LLC,
   954 F. Supp. 2d 1151 (E.D. Wash. 2013) ................................ passim
Coleman v. Md. Ct. of,
   Apps., 626 F.3d 187 (4th Cir. 2010) ...................................... 17, 27
Community of Cambridge Environmental Health and Community Development
   Group v. City of Cambridge,
   115 F.Supp.2d 550 (D.Md. 2000) ............................................... 39
Coon v. Willet Dairy,
   2007 WL 2071746(N.D.N.Y. July 17, 2007),................................... 24
Corporate Healthcare Financing, Inc. v. BCI Holdings Co.,
   444 F.Supp.2d 423 (D.Md. 2006) ............................................... 17
Covington v. Jefferson Cty.,
   358 F.3d 626 (9th Cir. 2004).................................................... 39
Delaney v. Town of Carmel,
   55 F.Supp.2d 237 (S.D.N.Y. 1999).............................................. 46
E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.,
   637 F.3d 435 (4th Cir. 2011)............................................ 17, 18, 22
Egelston v. State Univ. College at Geneseo,
   535 F.2d 752 (2nd Cir. 1976).................................................... 18
Funk v. Stryker Corp.,
   631 F.3d 777 (5th Cir. 2011).................................................... 20
Gay v. Wall,
   761 F.2d 175 (4th Cir. 1985).................................................... 18

1

Greater Baltimore Center for Pregnancy Concerns v. Mayor and City Council of
     Baltimore,
     721 F.3d 264 (4th Cir. 2013)................................................ 19, 20, 25
Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,
     484 U.S. 49 (1987) ................................................................ 39
Humbolt Baykeeper v. Union Pacific R. Co.,
     2006 WL 3411877 (N.C. Cal. 2006)....................................... 28
Inland Steel Co. v. United States EPA,
     901 F.2d 1419 (7th Cir. 1990).............................................. 32
Interfaith Cmty. Org.,
     188 F.Supp.2d at 502............................................................ 43
Interfaith Community Organization v. Honeywell International, Inc.,
     399 F.3d 248 (3rd Cir. 2005) ................................................ 37
Keller Transp. Inc. v. Wagner Enters., LLC,
     873 F.Supp.2d 1342 (D.Mont. 2012)..................................... 37
Lee v. City of Los Angeles,
     250 F.3d 668 (9th Cir. 2001)................................................ 22
Marcas, LLC v. Bd. of Cty. Commissioners of St. Mary's Cty.,
     977 F.Supp.2d 487 (2013)................................................ 36, 37
Meghrig v. KFC W., Inc.,
     516 U.S. 479 (1996) .............................................................. 26
Morton v. Mancari,
     417 U.S. 535 (1974) .............................................................. 24
Natural Res. Def. Council, Inc. v. Costle,
     568 F.2d 1369 (D.C.Cir.1977) .............................................. 26
Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,
     591 F.3d 250 (4th Cir. 2009)................................................ 38
NPDES permits.,
     57 Fed. Reg. 43,733 4 ........................................................... 27
Nunez v. Allstate Ins. Co.,
     604 F.3d 840 (5th Cir. 2010)................................................ 25
Nurad, Inc. v. Willam E. Hooper & Sons Co.,
     966 F.2d 837 (4th Cir. 1992)................................................ 46
Oregon Natural Resources Council v. U.S. Forest Service,
     834 F.2d 842 (9th Cir. 1987)................................................ 28
Piney Run Preservation Ass'n v. Cty Com'rs of Carroll Cty,
     268 F.3d 255 (4th Cir. 2001)........................................... 26, 27
Potomac Riverkeeper, Inc. v. National Capital Skeet & Trap, Inc.,
     388 F.Supp.2d 582 (D. Md. 2005) ......................... 26, 39, 44, 47

2

Prisco v. A&D Carting Corp.,
  168 F.3d 593 (2nd Cir. 1999).................................................................. 44
Raritan Baykeeper, Inc. v. N.L. Industries, Inc.,
  No. 09-CV-4117, 2013 WL 103880 (D.N.J. Jan. 8, 2013)..................... 19, 37, 44
Safe Air for Everyone v. Meyer,
  373 F.3d 1035 (9th Cir. 2004).................................................................. 23
Scheuer v. Rhodes,
  416 U.S. 232 (1974) ................................................................................. 18
Spillane v. Commonwealth Edison Co.,
  291 F.Supp.2d 728 (N.D.Ill. 2003) ......................................................... 36
SPS Ltd. P'ship, LLLP v. Severstal Sparrows Point, LLC,
  808 F.Supp.2d 794 (D. Md. 2011) ........................................................... 26
State v. PVS Chemicals,
  50 F.Supp.2d 171 (W.D.N.Y. 1998) ........................................................ 32
Town & Country Co-Op, Inc. v. Akron Products Co.,
  No. 11-CV-2578, 2012 WL 1668154 (N.D. Ohio May 11, 2012) ...................... 47
U.S. v. Dean,
  969 F.2d 187 (6th Cir. 1992).................................................................... 32
U.S. v. Vineland Chem. Co., Inc.,
  692 F. Supp. 415 (D.N.J. 1988) .............................................................. 24
U.S. v. Waste Industries,
  734 F.2d 159 (4th Cir. 1984).................................................................... 47
Waterkeeper Alliance v. U.S. EPA,
  399 F.3d 486 (2nd Cir. 2005).............................................................. 28, 32
Waterkeepers N. California v. AG Indus. Mfg., Inc.,
  375 F.3d 913 (9th Cir. 2004).................................................................... 11
Westfarm Ass. P'ship v. International Fabricare Institute,
  846 F.Supp. 422 (D. Md. 1993) .............................................................. 26

  Statutes
42 U.S.C. § 6905(a) ....................................................................................... 24
42 U.S.C. § 6972(a)(1)(B) ....................................................................... passim
42 U.S.C. § 6972(a)(1)(A) and (B) ..................................................... 12, 13, 16, 38
28 U.S.C. § 1291 ............................................................................................. 6
28 U.S.C. § 1331 ............................................................................................. 6
33 U.S.C. § 1342(k) ...................................................................................... 56
33 U.S.C. § 1362(14) ................................................................................. 28, 56
33 U.S.C. § 1251 et seq. ............................................................................. 23, 52
42 U.S.C. § 6901 et seq. ................................................................................ 52
42 U.S.C. § 6903(27) ................................................................................ 30, 56

42 U.S.C. § 6903(3) ........................................................................... 56
42 U.S.C. § 6905 .......................................................................... passim
42 U.S.C. § 6972 ........................................................................... 6, 56
42 U.S.C. § 6972(a)(1)(A) and §6972(a)(1)(B) ..................... 7, 14, 39, 43
42 U.S.C. § 6905(b) ............................................................................ 24

Rules
Fed. R. Civ. Pro. 12(b)(1) and 12(b)(6) ..................... 6, 12, 17, 18, 56
Fed. R. Civ. Pro. 12(d) ..................................................................... 18
Fed. R. App. Pro. 32(a) .................................................................... 53

Regulations
40 C.F.R. § 260.10 ............................................................................. 42
40 C.F.R. § 261.2 ............................................................................... 40
40 C.F.R. §§ 122.26(a)(1)(ii) & (b)(14)(x) ...................................... 56
40 C.F.R. §§ 260.10, 261.3, 261.33 .................................................. 50
40 C.F.R. §§ 262.20 through 260.44 ................................................. 42
40 C.F.R. 122.26(a)(1)(ii) ................................................................. 29
40 C.F.R. 122.26(b)(14)(x) ............................................................... 29
40 C.F.R. 261.4(a)(2) .................................................................. 31, 56
40 CFR 123.1(i)(2) ............................................................................ 34
40 CFR 262.11 ............................................................................ 40, 42
40 CFR 262.20 through 260.44 ......................................................... 40
COMAR § 26.08.04.09A. ................................................................... 27
COMAR 26.08.01.00 .................................................................... 27, 56
COMAR 26.08.04.09(A) ..................................................................... 56
COMAR 26.08.04.09A(5) ................................................................... 33
COMAR 26.13.01.03B ........................................................................ 50
COMAR 26.13.01.03B, 26.13.02.02, and 26.13.02.03 ....................... 40
COMAR 26.13.01.03B ........................................................................ 42
COMAR 26.13.02.03 .......................................................................... 50
COMAR 26.13.02.19 ..................................................................... 50, 56
COMAR 26.13.03.01 through 26.13.03.06 ......................................... 42
COMAR 26.13.03.01 through 26.13.06.06 ......................................... 40
COMAR 26.13.03.02 ..................................................................... 40, 42
COMAR 26.13.05.01 through 26.13.05.05 ..................................... 42, 43
COMAR 26.13.07.01 ..................................................................... 42, 43
COMAR 26.13.07.01A. ....................................................................... 43

Other Authorities
EPA, *Interpretation of Industrial Wastewater Discharge Exclusion from the
Definition of Solid Waste*, 1995 WL 911821 (OSWER) ............... 32, 56

4

## PRELIMINARY STATEMENT

On July 16, 2014, the District Court for the District of Maryland, Judge Richard D. Bennett presiding, granted the Defendants' motions to dismiss the complaint filed in this case.[1] Appx. at 3, 92-93; Dock. No. 35. In so doing, the Court selectively ignored pertinent facts alleged by Plaintiffs and inappropriately accepted as true a multiplicity of facts raised by Defendants in their motions to dismiss. The first sentence of the Court's opinion illustrates its misunderstanding of the issues presented in this case and underscores why its decision should be overturned: "This case is yet another lawsuit challenging the siting and construction of the Horseshoe Casino in Baltimore, Maryland." Appx. at 42. In fact, the complaint includes no challenge to either the siting or construction of the Casino, and the relief it requests remains available with or without completion of the Casino facilities. Appx. at 5-41.

Instead, as the complaint makes clear, Plaintiffs seek to halt the unlawful mismanagement of unsafe levels of environmental contamination at the Casino Site that have hitherto been ignored by Defendants and which, without proper remediation, will continue to pose an imminent and substantial endangerment to

---

[1] As we explain in more detail below, the Defendants are the Maryland Chemical Company, Inc. ("Maryland Chemical"), the Mayor and City Council of Baltimore ("Baltimore City" or the "City"), the City of Baltimore Development Corporation ("BDC"), CBAC Gaming, LLC ("CBAC Gaming"), and CBAC Borrower, LLC ("CBAC Borrower"). Appx. at 5-6, ¶¶ 1-2.

the health and safety of those using the contaminated areas as well as to the aquatic life in the Middle Branch of the Patapsco River. Appx. 6-7; Pls. Opp. Mot. Dismiss, at 1. The requested relief falls exclusively within the purview of the Resource Conservation and Recovery Act ("RCRA") and analogous state laws, and not, as the District Court found, under the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"). *See* Appx. at 6-7, 32-39.

JURISDICTIONAL STATEMENT

This is an appeal from a final judgment of the United States District Court for the District of Maryland issued on July 16, 2014 dismissing all counts against all defendants. Appx. at 3, 92-93. The action was filed pursuant to RCRA's citizen suit provision, § 7002, which is codified at 42 U.S.C. § 6972. The contaminated properties and the imminent and substantial endangerment that are the subject of this action are located in Baltimore City, and Defendants' alleged hazardous waste violations have taken place in Baltimore City. The District Court had subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 6972. This appeal was timely filed on August 13, 2014. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. Appx. at 3; Dock. No. 37.

ISSUES PRESENTED FOR REVIEW

I. Did the District Court err by converting a Fed. R. Civ. Pro. 12(b)(6) motion to dismiss into a motion for summary judgment prior to the conduct of discovery?

6

II. Did the District Court err by accepting as true facts (including facts set forth in exhibits attached to the motions) proffered by Defendants that are disputed and outside the scope of the complaint?

III. Did the District Court err in concluding that RCRA's anti-duplication provision, codified at 42 U.S.C. § 6905, precluded as a matter of law the relief sought in the complaint?

IV. Did the District Court err in concluding that the complaint failed to set forth sufficient facts to establish claims under RCRA, 42 U.S.C. § 6972(a)(1)(A) and §6972(a)(1)(B)?

## STATEMENT OF THE CASE

### The Contaminated Sites

There are three groups of contaminated parcels at issue in this case (collectively the "Site"). *See* Appx. at 41, Ex. 1 (map of the Site). The first group consists of the Russell Street Properties, which are located at 1501, 1525, and 1551 Russell Street. From 1952 to 2008, Maryland Chemical operated a chemical manufacturing and/or chemical storage, repackaging and distribution facility on the site of the Russell Street Properties. Appx. at 14, 18, ¶¶ 25-26, 49-50. During the operation of this facility, Maryland Chemical spilled or released into the soil, subsoil, and surrounding areas toxic and hazardous substances, including polycyclic aromatic hydrocarbons ("PAHs"), volatile organic compound ("VOCs"), and heavy metals, among other harmful substances. Appx. at 18-19, 35-37, ¶¶ 50-52, 132-35, 141. Subsequently conducted environmental assessments and studies show that this contamination is migrating in a south and southeasterly

7

direction, toward the Middle Branch of the Patapsco River. Appx. at 18-19, 31, ¶¶ 52-53, 107-110. The City, the current owner of the Russell Street Properties, leases use of the properties to CBAC Gaming for purposes of constructing and operating the Horseshoe Casino. Appx. at 16, ¶ 37.

The second group of parcels consists of the Warner Street Properties, which are located next to the Russell Street Properties at 1501, 1601, 1629, 1633, and 1645 Warner Street, 2119 Haines Street, 2104 Worcester Street, and 2102 Oler Street. Appx. at 16, ¶ 37. All or most of these properties were, like the Russell Street Properties, the site of industrial operations that resulted in the contamination of the soil, subsoil, and groundwater at and around the parcels. CBAC Borrower, an indirectly wholly-owned subsidiary of CBAC Gaming, is the present owner of the properties.[2] Appx. at 16, ¶ 36. Together, the Russell Street and Warner Street Properties make up the Casino Site—i.e., the site of the Horseshoe Casino and its related facilities.

Due to a variety of factors, including the gradient of the Casino Site and the shallow depth of the groundwater flow in the area, the environmental contamination present at and beneath the Russell and Warner Street Properties has

---

[2] The City acquired ownership of the Russell Street and Warner Street Properties through four separate transactions in 1976, 2005, 2008, and 2009. Appx. at 14-15, ¶¶ 28, 30. Ownership of the Warner Street Properties was subsequently transferred to CBAC Borrower. Appx. at 16, ¶ 37.

and will continue to contaminate the soil, subsoil, and groundwater of and release vapors into the air above, the six parcels located between the Casino Site and the Middle Branch of the Patapsco River.[3] Appx. at 18-24, ¶¶ 48-71. These are the Waterfront Parcels[4] referenced in the complaint. *Id.* They contain more than nine acres of recreational open space, feature an asphalt bike path that connects to the greater Gwynns Falls Trail System, and provide habitat for migratory birds and marine and other species. Appx. at 17, ¶¶ 42-44. The contamination of all three groups of properties pose an imminent and substantial endangerment to the environment and the health and safety of those utilizing the recreational opportunities afforded by the Waterfront Parcels. Appx. at 17, 21, 30-32, ¶¶ 45-47, 63, 102-06, 110-15.

### CBAC's and the City's Voluntary Cleanup Program Application and Response Action Plans Verify the Contamination in the Soil and Groundwater

In April 2008 and June 2009, the City and BDC submitted applications to the Maryland Voluntary Cleanup Program, a remediation program administered by the Maryland Department of the Environment ("MDE"). Appx. at 23, ¶ 72. The environmental assessments conducted as part of the application process verified that various pollutants, including PAHs, VOCs, and heavy metals, continue to

---

[3] As noted on Exhibit 1 to the complaint, there are two finger-shaped indentations on the Middle Branch shore bordering the Casino Site.
[4] The City acquired ownership of the Waterfront Parcels through three separate transactions in 1978, 1994, and 1996. Appx. at 14, ¶ 29.

contaminate the soil, subsoil, and groundwater at and in the areas surrounding the Casino Site, including at levels sufficient to render the contaminated soil and subsoil a hazardous waste. The assessments verified that these contaminants continue to migrate down gradient toward the Waterfront Parcels and the Middle Branch of the Patapsco River. Appx. at 23-26, 31-32, ¶¶ 73-80, 107-110.

In October 2012, CBAC Gaming entered into an agreement with the City to construct and operate the Horseshoe Casino. Pursuant to the terms of this agreement, CBAC Gaming entered the Voluntary Cleanup Program ("MVCP") and submitted a Response Action Plan ("RAP") to clean up/remediate the contamination of the Casino Site (but not the Waterfront Parcels). Appx. at 25-26, ¶¶ 81-84; Des. Ex. at 73; RAP at 8. The remedy was limited to placing a cement cap over a portion of the site, installing a vapor system under the primary structure, and recording a groundwater use restriction in the land records. Des. Ex. at 73; RAP at 8.[5] The RAP did not propose to investigate, remediate, or remove any contaminated soil or subsoil at the Casino Site or the Waterfront Parcels, nor did it include measures to mitigate the migration of pollutants from the Russell and Warner Street Properties to the Waterfront Parcels and the Middle Branch. Appx. at 26, 29, 36, ¶¶ 83-84, 100, 138; *cf.* Des. Ex. at 73; RAP at 8. As a result, contaminated soil and subsoil has been and/or will be excavated, backfilled, and

_____

[5] We will cite to Appellee's Designated Exhibits as "Des. Ex."

otherwise intermixed with non-contaminated soil and subsoil at the Casino Site, actions that will not only exacerbate the level of contamination at the site but will also have the corollary effect of increasing the level of contamination migrating to the Waterfront Parcels. Appx. at 27-29, 33, ¶¶ 85-88, 93-98, 101, 137, 140.

The RAP would be of little relevance but for its mention in CBAC Gaming's erosion and sediment control and stormwater management plans.[6] Des. Ex. at 9. Those plans are, in turn, referenced in the National Pollution Discharge Elimination System ("NPDES") "General Permit for Stormwater Associated with Construction Activity."[7] Des. Ex. at 4. Although neither the RAP nor the NPDES permit were attached to the complaint, the District Court relied heavily on this chain of reference in its decision to dismiss the case against CBAC, a reliance which, as we explain more fully below, was wrong as a matter of law and inappropriate in light of the procedural posture of this case. Appx. at 33-41.

---

[6] The documents state: "[t]he contractor shall follow all guidelines set forth in the RAP and its amendments for all construction related activities on the site." This statement is contained in the "general construction notes" section on three of the forty-eight pages attached to CBAC's motion as exhibit 6. *See* CBAC Mem Supp. Mot. Dismiss Ex. 6 at 2, 5 & 20; Des. Ex. at 9.

[7] "States may issue individual permits to industrial dischargers or may cover many dischargers under the terms of one general permit." *Waterkeepers N. California v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 915-16 (9th Cir. 2004). Maryland has issued a general NPDES permit to cover stormwater discharges from construction sites. It is this general permit that is at issue in this case.

### Procedural History

On September 19, 2013, Plaintiffs filed the instant two-count complaint in the District Court for the District of Maryland, seeking injunctive relief and penalties against Defendants pursuant to RCRA §§ 6972(a)(1)(A) and (B). Appx. at 32-39, ¶¶ 116-143. The complaint sought to halt Defendants' collective failure to adequately and properly mitigate, abate, remove, and/or remediate the contamination located at and below the Russell and Warner Street Properties, which is migrating and will continue to migrate into and contaminate the Waterfront Parcels. *Id.* The complaint also sought to prevent the Defendants from, among other activities, unlawfully and improperly excavating, moving, mixing, backfilling and/or grading contaminated soil, subsoil, and groundwater, including the unlawful removal, storage, and transport of drums and underground storage tanks containing hazardous waste. Appx. at 28-20, 33, ¶¶ 91-98, 101, 137, 140. It identified the threat to human health created from exposure to the contaminants in the soil, groundwater, and air caused by the activities. Appx. at 30-31, ¶¶ 102-106.

On October 15, 2013, prior to the commencement or completion of discovery, Defendants filed motions to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(1) and 12(b)(6), asserting that the District Court lacked subject matter

jurisdiction over the claims and that the complaint failed to state a claim upon which relief could be granted.[8] Appx. at 2; Dock. No. 20-22.

As set forth in its July 2014 opinion, the District Court's grant of CBAC's motion to dismiss was premised on RCRA's anti-duplication provision, codified at 42 U.S.C. § 6905, which precludes the inconsistent application of RCRA to an activity or substance which is the subject of the Clean Water Act. Appx. at 33-41. Accepting as true the proffer of facts set forth in CBAC's motion and attached exhibits, the District Court concluded that because the RAP was mentioned in CBAC Gaming's erosion and sediment control and stormwater management plans, and those plans were, in turn, referenced in the general NPDES discharge permit, the anti-duplication provision "shielded" CBAC from application of RCRA §§ 6972(a)(1)(A) and (B). *Id.* The Court explained:

> any stormwater discharge from the Site is clearly covered by the [NPDES]. The somewhat closer question is whether the CBAC Defendants' construction activities themselves are regulated under the Clean Water Act and could be further regulated under RCRA without the creation of a regulatory consistency. This Court has already determined that the CBAC Defendants must comply with certain construction and remediation requirements [contained in the RAP] due to the incorporation of the [RAP] into the sediment control and stormwater management plans and, thereby, the NPDES permit. As such, further remedial requirements imposed under RCRA would be inconsistent with the remedial activities already deemed appropriate

---

[8] Defendants also raised arguments related to standing and notice. The District Court rejected those contentions, *see* Appx. at 62-71, and they are not at issue in this appeal.

13

for the Site as part of the obligations imposed by [MDE] in connection to sediment control and stormwater management regulations.

Appx. at 81-82.[9]

The District Court granted the City, BDC, and Maryland Chemical's motions on two grounds. With respect to Count I (under RCRA § 6972(a)(1)(A)), the Court noted that the complaint expressly identifies "a number of regulations that the Defendants have allegedly violated" by excavating, moving, mixing, stockpiling, and backfilling contaminated soil and subsoil, among other activities, and that the complaint references multiple environmental assessments supporting its allegations. But, despite these observations, the Court concluded that the complaint failed to provide sufficient detail in support of its allegations and that dismissal was appropriate. Appx. at 83-86.

With respect to Count II (under RCRA § 6972(a)(1)(B), the Court determined that a claim under § 6972(a)(1)(B) required "contribution" or "some degree of active human conduct" related to the disposal of hazardous waste—in other words, that the defendant "must have contributed to the situation giving rise to the health or environmental hazard." Appx. at 87. The Court found that because the known contaminants at the site could have been placed there unintentionally (which is, in any event, still a form of contribution), dismissal of this count was

---

[9] As did the District Court, we will refer to CBAC Gaming and CBAC Borrower collectively as "CBAC" unless noted otherwise.

14

also appropriate. In so concluding, the Court resolved factual disputes against the non-moving party by rejecting Plaintiffs' assertion that the excavating, moving, mixing, etc., of contaminated soil and subsoil by CBAC, the City and BDC increased the level of contamination at the Casino Site and the Waterfront Parcels, Appx. at 87-90, and that over fifty years of operations by the Maryland Chemical Company on the Russell Street Properties contributed to the contaminants identified. Appx. at 88-89; *see* Appx. at 18-20, 23-24, 35, ¶¶ 49-56, 73, 132-35.

This appeal followed.

<u>SUMMARY OF ARGUMENT</u>

In dismissing the complaint, the District Court made a series of procedural, legal, and factual errors that warrant that its decision be vacated and this case be remanded for additional proceedings.

First, the Court improperly converted Defendants' motions to dismiss into motions for summary judgment by considering facts and exhibits outside the confines of those contained in the complaint. This conversion was improper because the parties had not yet had an opportunity to engage in discovery, a limitation especially prejudicial to Plaintiffs because the District Court applied an incredibly high factual standard in assessing the sufficiently of Plaintiffs' claims. *See* Part I.

Second, the District Court erred by failing to consider the allegations in the complaint in a light favorable to Plaintiffs as the non-moving party, and instead resolved several factual disputes in favor of Defendants. *See* Part II.

Third, the District Court erred by conflating the purposes and requirements of the CWA, RCRA, and MVCP and the plans and permits formulated and issued under these distinct statutory schemes and program. The Court improperly concluded that RCRA's anti-duplication provision was triggered by the reference in the general NPDES discharge permit to its erosion and sediment control and stormwater plans, which in turn referenced the RAP formulated by CBAC as part of its participation in the MVCP. The general NPDES discharge permit, however, regulates only the discharge of nonhazardous stormwater from point sources to surface water from the construction site; it does not authorize or regulate activities involving the handling, treatment, storage, or disposal of hazardous waste on land, which are the purview of RCRA. Thus, the chain of reference relied on by the District Court is inapposite. Moreover, as the statute's text makes clear, RCRA's anti-duplication provision is triggered only by duplicative or inconsistent remedial orders, and the relief requested in the complaint was not duplicative or inconsistent with the limited remediation activities identified in CBAC's RAP. *See* Part III.

Lastly, the District Court erred by applying a heightened factual standard in assessing the sufficiency of Plaintiffs claims under 42 U.S.C. §§ 6972(a)(1)(A) and

16

(B). In its assessment, the District Court improperly misconstrued the allegations in the complaint, improperly isolated parts of the complaint from the whole, and improperly applied the law to the facts at hand. *See* Part IV.

All of these errors independently warrant that the District Court's decision dismissing the complaint be vacated.

## ARGUMENT

The Fourth Circuit Court of Appeals reviews *de novo* a District Court's grant of a motion to dismiss pursuant to Rule 12(b)(6). *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). In so reviewing, the Court accepts "as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences in favor of the plaintiff." *E.I. du Pont*, 637 F.3d at 440. If, after application of these standards, the complaint contains sufficient facts to state a claim that is "plausible on its face," the motion should be denied. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This is because "a complaint 'need only give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *E.I. du Pont*, 637 F.3d at 440 (quoting *Coleman v. Md. Ct. of Apps.*, 626 F.3d 187, 190 (4th Cir. 2010)). Indeed, a motion to dismiss is properly granted "only when 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Corporate Healthcare Financing, Inc. v. BCI Holdings Co.*, 444

F.Supp.2d 423, 428 (D.Md. 2006) (citation omitted). "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint . . . not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Butler v. U.S.*, 702 F.3d 749, 752 (4th Cir. 2012) (quotations and citations omitted).

I.    <u>The District Court erred by converting Defendants' motions to dismiss into motions for summary judgment without providing Plaintiffs an opportunity to conduct discovery.</u>

In dismissing the complaint, the District Court relied on facts proffered in Defendants' motions to dismiss and accompanying exhibits. *See, e.g.,* Appx. at 78 (quoting from and relying on CBAC Ex. 6). By so doing, the Court converted Defendants' motions into ones for summary judgment. Rule 12(d); *E.I. du Pont*, 637 F.3d at 448. The conversion of a motion to dismiss into one for summary judgment is improper where, as here, the plaintiffs did not have an opportunity to conduct discovery. *See E.I. du Pont*, 637 F.3d at 448 ("[C]onversion . . . is not appropriate where the parties have not had an opportunity for reasonable discovery."); *Gay v. Wall*, 761 F.2d 175, 177-78 (4th Cir. 1985) ("[T]he lack of a reasonable opportunity for discovery . . . made conversion of the Rule 12(b)(6) motion [into one for summary judgment] 'wholly inappropriate.'"); *Egelston v. State Univ. College at Geneseo*, 535 F.2d 752, 754 (2nd Cir. 1976) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ("Dismissal of a complaint before any discovery has taken place . . . must not be employed unless, taking as true the

allegations pleaded, it 'appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" )); *see, e.g., Cmty. Ass'n for Restoration of the Env't, Inc. v. George & Margaret LLC,* 954 F. Supp. 2d 1151, 1160 (E.D. Wash. 2013) (allowing the parties to engage in discovery before assessing whether activities at issue were precluded under RCRA's anti-duplication provision) (citing *Raritan Baykeeper, Inc. v. N.L. Industries, Inc*., No. 09-CV-4117, 2013 WL 103880, *10 (D.N.J. Jan. 8, 2013)).

The District Court erred by converting Defendants' motions to dismiss into ones for summary judgment prior to Plaintiffs being afforded an opportunity to conduct reasonable discovery. On this ground alone, the judgment entered against Plaintiffs should respectfully be vacated and the case remanded to allow the parties to engage in discovery and conduct further proceedings.[10]

II.   <u>The District Court erred by resolving disputes of material fact against the Plaintiffs and by failing to consider the allegations pled in the complaint in a light favorable to the non-moving party.</u>

The District Court's "role in deciding a motion for summary judgment is to identify factual issues, not to resolve them." *Greater Baltimore Center for*

---

[10] The error is not harmless. *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007) (an improper conversion is harmless only "if the parties had a full and fair opportunity to provide the court with discovery and disclosure materials suitable for summary judgment, or if the complaint would not have withstood the motion to dismiss on its face." (citations omitted)). As we explain in greater detail in Parts III and IV, the complaint, on its face, sufficiently alleged facts in support of the causes of action set forth in counts I and II.

*Pregnancy Concerns v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (citation omitted). In other words, the court's "function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.*

In the instant case, not only did the District Court prematurely consider the facts and exhibits attached to CBAC, the City, BDC, and Maryland Chemical's motions in rendering its decision, it also improperly resolved all disputes of fact raised by the motion in favor of the Defendants. For example, the District Court accepted CBAC's interpretation of the facts contained in, among other documents: 1) CBAC's RAP, attached to the motion as Ex. 13; Des. Ex. at 59-158; 2) CBAC's erosion and sediment control and stormwater management plans, attached as Ex. 6; Des. Ex. at 7-54; and 3) the general NPDES discharge permit, attached as Ex. 26; Des. Ex. at 159-180.[11] *See* Appx. at 74-82. Citing to these exhibits, the Court accepted as true CBAC's assertions: 1) that "***all of***" the construction activities

---

[11]These documents are not the proper subject of judicial notice as they contain disputed facts and are subject to multiple interpretations. *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) ("[A] court may not take judicial notice of a fact that is subject to dispute" even if the fact is stated within a public record); *see also Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir. 2000); *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011). Even if CBAC's exhibits could be construed as public records, the District Court still erred because it prematurely accepted the truth of the facts contained within the attached permits and approvals, including that CBAC's RAP was "incorporated by reference" into its erosion and sediment control and stormwater management plans. We will further discuss the application of these documents to the allegations of this case in Parts III and IV.

20

targeted in the complaint "are authorized by and subject to the NPDES [Permit]";
2) that "Plaintiffs have identified no activities on the part of CBAC that are outside
the scope of the NPDES permit coverage"; 3) that CBAC's RAP "is incorporated
into erosion and sediment control plans and stormwater management plans that are,
in turn, incorporated into an NPDES permit issued by MDE"; and 4) that, in light
of the above observations, the RAP's proposition for some (albeit inadequate)
remedial actions at the site precludes application of RCRA's requirements to
CBAC's activities. Appx. at 74-82; CBAC Mem. Supp. Mot. Dismiss at 14-15;
CBAC Reply to Pls. Opp. Mot. Dismiss at 5-8, 10-11.

Plaintiffs disputed these proffered facts and interpretations in the District
Court. Pls. Opp. Mot. Dis. at 45-49. Plaintiffs explained that the references to the
voluntary RAP in the erosion and sediment control and stormwater management
plans were insufficient to render mandatory the obligations set forth therein.[12] Pls.
Mem. in Supp. Sur-Reply at 2-6; *cf.* Des. Ex. at 59-158. Plaintiffs also argued that
the general NPDES discharge permit, by its terms, did not apply to the movement
and excavation of contaminated soil, subsoil, groundwater, and hazardous waste at
the Casino Site, *see* Pls. Mem. in Opp. CBAC's Motion at 48-50, and that the relief
requested in the complaint prayed for the imposition of remedial activities above

---

[12]The most likely reason for including the RAP references in the erosion and
sediment control and stormwater management plans is for the convenience of
CBAC's contractors (as the plans indicate). Des. Ex. at 9.

21

and beyond those limited and inadequate measures set forth in the RAP. *Id.* at 45-49; Appx. at 27, 29, ¶¶ 85, 97, 98.

Indeed, the Court's resolution of disputed facts permeates its decision. In addition to premising its analysis on CBAC's view of the authorizations contained in the general NPDES discharge permit, the Court without explanation accepted BDC and the City's contentions that their activities at the Casino Site have not exacerbated the contamination at that site or the Waterfront Parcels, *see* Appx. at 45-46 n. 44, as well as Maryland Chemical's contentions that it neither caused nor contributed to the contamination of the Russell Street Properties which is now migrating to the Waterfront Properties and the Middle Branch. *See* Appx. at 89; *cf. Cmty. Ass'n for Restoration of the Env't*, 954 F. Supp. 2d at 1160 (declining to engage in factual assessments of this variety when ruling on a motion to dismiss and instead allowing the parties to engage in discovery).

The District Court erred by prematurely resolving disputes of fact in favor of Defendants. *See, e.g., E.I. du Pont,* 637 F.3d at 449-50 (district court erred by considering facts beyond those contained in the complaint and construing those facts in favor of the moving party.); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-90 (9th Cir. 2001) (district court erred by assuming as true facts proffered by the defendants, taking judicial notice of disputed facts, and construing the plaintiffs'

22

allegations against them). [13] The District Court's decision ignores well-established principles of law, and, as a result, its judgment should respectfully be vacated.

III.   **The District Court erred in concluding that CBAC's RAP constitutes a legally enforceable term of the general NPDES discharge permit, such that RCRA's anti-duplication provision precludes the claims alleged.**

We begin with RCRA's anti-duplication provision, which provides:

**(a) Application of chapter**

Nothing in this chapter shall be construed to apply to (or to authorize any State, interstate, or local authority to regulate) any activity or substance which is subject to the Federal Water Pollution Control Act [33 U.S.C.A. § 1251 *et seq.*] [or other enumerated Acts] . . . except to the extent that such application (or regulation) is not inconsistent with the requirements of such Acts.

**(b) Integration with other Acts**

(1) The Administrator shall integrate all provisions of this chapter for purposes of administration and enforcement and shall avoid duplication, to the maximum extent practicable, with the appropriate provisions of . . . the Federal Water Pollution Control Act [33 U.S.C.A. § 1251 *et seq.*] . . . [and other enumerated Acts], and such other Acts of Congress as grant

---

[13]The inappropriateness of the resolution of the factual issues presented in Defendants' motions remains constant even if the issues are deemed jurisdictional in nature, as CBAC maintained before the District Court. *See Safe Air for Everyone v.* Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004) ("[A] [j]urisdictional finding of genuinely disputed facts is inappropriate when 'the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action.'"). In any event, there exists no authority in support of the notion that a RCRA citizen suit can be dismissed for lack of jurisdiction based on the applicability of RCRA's anti-duplication provision. RCRA's citizen suit provision, § 7002, does not list the anti-duplication provision as a limitation on a district court's jurisdiction.

> regulatory authority to the Administrator. Such integration shall
> be effected only to the extent that it can be done in a manner
> consistent with the goals and policies expressed in this chapter
> and in the other acts referred to in this subsection.
> (2) ****

42 U.S.C. § 6905 (emphasis added).

By its plain meaning, § 6905(a) is designed to prevent the simultaneous and inconsistent regulation of a particular activity or substance under RCRA and another federal environmental statute, such as the CWA.[14] *See Coon v. Willet Dairy,* 2007 WL 2071746, *6 (N.D.N.Y. July 17, 2007), *aff'd sub nom., Coon ex rel. Coon v. Willet Dairy*, 536 F.3d 171 (2d Cir. 2008). Section 6905(b) is a directive to the EPA to "avoid unnecessary and overlapping regulation" and not a "right in defendants to resist regulation." *U.S. v. Vineland Chem. Co., Inc.*, 692 F. Supp. 415, 420 (D.N.J. 1988).[15]

---

[14] *Cf. Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("When there are two acts upon the same subject, the rule is to give effect to both if possible...."); *Cmty. Ass'n for Restoration of the Env't*, 954 F.Supp.2d at 1160 ("[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.).")

[15] As explained *infra*, EPA implemented this directive in 40 C.F.R. 261.4(a)(2) by differentiating the activities involving wastewater, conducted on land, in a facility, from the point source discharge of the wastewater to waters of the U.S. EPA, to avoid duplication, exempted the permitted water discharge from RCRA hazardous waste regulation. The so-called "permit shield" referred to by the District Court in the CWA is consistent with the RCRA regulation. 33 U.S.C. § 1342(k). It also focuses on discharges of pollutants to surface waters which comply with the permit limits: "if a permit holder discharges pollutants precisely in accordance with the terms of its permit, the permit will 'shield' its holder from CWA liability." *Piney*

In order for the District Court to conclude that the RCRA anti-duplication provision applied in this case, it had to accept facts in dispute about what activities the general NPDES permit for construction projects covers, agree with CBAC that its erosion and sediment control and stormwater management plans and RAP adopted pursuant to Maryland law became part of the general NPDES permit by reference, and that their terms became enforceable under the federal Clean Water Act. This is precisely the type of mix of errors of law and erroneous assessment of evidence that federal courts have found to require the reversal and remand of District Court decisions. *See Greater Baltimore Center*, 721 F.3d at 280-81 (District Court "abuses its discretion when it makes an error of law"); *Nunez v. Allstate Ins. Co.*, 604 F.3d 840, 844 (5th Cir. 2010) (District Court abuses its discretion when it makes "a clearly erroneous assessment of the evidence."

> a. *The general NPDES discharge permit regulates non-hazardous stormwater discharges from point sources, not the handling, treatment, storage, or disposal of hazardous waste.*

The complaint alleged violations related to the handling, treatment, storage, and disposal of solid and hazardous waste and the threats to health and the environment posed by the release of contaminants to the land surface, groundwater, surface water and air. *See* Appx. at 32-39, ¶¶ 116-143. These

---

*Run Preservation Ass'n Cty. v. Cty. Comm'rs of Carroll Cty.*, 268 F.3d 255, 266 (4th Cir. 2001).

allegations fall within the exclusive purview of RCRA and its permitting requirements. *See Potomac Riverkeeper, Inc. v. National Capital Skeet & Trap, Inc.*, 388 F.Supp.2d 582, 587 (D. Md. 2005) ("RCRA is a comprehensive environmental statute that governs the treatment, storage and disposal of solid and hazardous waste."); *SPS Ltd. P'ship, LLLP v. Severstal Sparrows Point, LLC*, 808 F.Supp.2d 794, 800 (D. Md. 2011) (*quoting Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996) ("RCRA's primary purpose is to 'reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated....'")); *Westfarm Ass. P'ship v. International Fabricare Institute*, 846 F.Supp. 422, 434 (D. Md. 1993) ("RCRA established a program for the management of hazardous waste from its origin to its ultimate disposal . . . to ensure that the means of disposal of hazardous waste will prevent escape of those wastes into the environment").

The CWA, in comparison, regulates water pollution by prohibiting the discharge of pollutants into the nation's navigable waterways except as authorized by an NPDES permit. *See Piney Run Preservation Ass'n v. Cty Com'rs of Carroll Cty*, 268 F.3d 255, 264-65 (4th Cir. 2001) (*quoting Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1374 (D.C.Cir.1977) (". . . Congress intended the NPDES permit to be the only means by which a discharger from a point source may escape the total prohibition of [other provisions of the CWA]")). The EPA has

authorized Maryland to issue NPDES permits to individual facilities, and also to promulgate general NPDES permits.[16] 57 Fed. Reg. 43,733, 43,734–35 (1992). MDE, on behalf of the State, administers the NPDES permit program and adopted through rule-making the general NPDES discharge permit for stormwater from construction sites, which CBAC agreed to comply with in order to discharge stormwater from the Casino construction site.[17] Md. Code Ann. Envir. § 9-253(b); COMAR § 26.08.04.09A. Importantly, NPDES permits, whether an individual or a general permit, authorize only the discharge of water containing pollutants from point sources. *Piney Run*, 268 F.3d at 265-75; *Assateague Coastkeeper v. Maryland Dept. of Environment*, 200 Md. App. 665, 671-72 (2011). Contrary to the District Court's conclusions, they have no relationship to the handling, treatment, storage, or disposal of solid or hazardous waste on the land.

---

[16]Of note, Maryland's water pollution control law is broader than the CWA. For example, Maryland "regulates discharges to groundwater and surface water, whereas federal law regulates only discharges to surface water." *Assateague Coastkeeper*, 300 Md. App. at 678 (comparing 33 U.S.C. § 1362(14) with Md. Code. Ann. Envir. §§ 9-101(1)(1) and 9-322).

[17]The Maryland NPDES program, which is set out in Title 26, Subtitle 08 of COMAR, was developed under the authority of Title 9 of the Maryland Environmental Article. COMAR 26.08.01.00.

1. <u>The CWA regulates discharges from point sources, not general construction activities involving the handling, treatment, storage, or disposal of hazardous waste on land.</u>

The Clean Water Act regulates the water *discharged* from point sources, not the activities conducted at the point source facilities themselves. *Assateague Coastkeeper*, 200 Md. App. at 673 (quoting *Waterkeeper Alliance v. U.S. EPA*, 399 F.3d 486, 504-06 (2nd Cir. 2005) ("CWA gives EPA [and in turn MDE] jurisdiction to regulate and control only *actual* discharges, not potential discharges, and certainly not point sources themselves.")); *Humbolt Baykeeper v. Union Pacific R. Co.*, 2006 WL 3411877 (N.C. Cal. 2006) ("[T]he CWA only regulates discharges from point sources." (citing *Oregon Natural Resources Council v. U.S. Forest Service*, 834 F.2d 842, 849 (9th Cir. 1987)).

Point sources are discernible, confined, and discrete sources of conveyance, which may exist on a construction site, but do not include the entire site nor all of the activities being conducted on the site. S*ee* 33 U.S.C. § 1362(14) (defining "point source" as "any *discernible, confined and discrete conveyance*, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, [etc.] . . . from which pollutants are or may be discharged." (emphasis added)). The general NPDES discharge permit incorporates a version of this definition by defining "stormwater associated with construction activity" to mean

28

"the discharge *from any conveyance* which is *used for collecting and conveying stormwater. . . .*" Part IX(13); Des. Ex. at 180 (emphasis added).

In other words, CBAC's general construction activities including its moving, mixing, handling, disposing, etc., of contaminated soil, subsoil, and groundwater are not point sources, and, therefore, are not authorized by the general NPDES discharge permit.[18]

> 2. <u>The specific terms of the General NPDES Discharge Permit make it clear that the permit does not authorize activities involving the handling, treatment, storage, or disposal of hazardous waste on land</u>.

By its express terms, the general NPDES discharge permit did not authorize CBAC to engage in activities involving solid or hazardous waste. It expressly states that "[a]ll discharges covered by this permit shall be composed entirely of stormwater [with exceptions not here relevant]." Permit, Part III(A)(1), Des. Ex. at 172. It defines stormwater to mean "precipitation runoff, snowmelt runoff, and surface runoff and drainage." Part IX(12); Des Ex. at 180. "[S]tormwater associated with construction activity" is defined to mean "the discharge from any conveyance which is used for collecting and conveying stormwater and which is

_____

[18] The District Court misconstrued the scope of the reference to "clearing, grading and excavation" activities in 40 C.F.R. 122.26(a)(1)(ii) and 40 C.F.R. 122.26(b)(14)(x). Those references identify which types of operations require permission prior to generating and discharging stormwater to surface waters. They do not to regulate the activities themselves, and instead act to appropriately limit the jurisdiction of EPA to the stormwater that runs off such sites.

directly related to clearing, grading, and/or excavation activities." Part IX(13); Des

Ex. at 180. Thus, contrary to the District Court's conclusions, the general NPDES

discharge permit does not authorize the mixing, moving, disposing, or spreading of

contaminated soil or subsoil, the discharge of contaminated *groundwater*, or even

the discharge of stormwater containing additional components, such as hazardous

waste. It certainly does not extend to vapor emissions and airborne particulates.

Indeed, by its express terms, "[d]ischarges of hazardous substances and oil

resulting from on-site spills are not authorized by this permit." Part III(C)(2); Des.

Ex. at 173. Moreover, the permit expressly states that, "No condition of this

general permit shall release the permittee from any responsibility or requirements

under other environmental statutes or regulations," which would include the

permitting requirements of RCRA. Part III(C)(3); Des. Ex. at 173.[19]

3. RCRA's industrial wastewater discharge exclusion only applies to the
   pollutants in the water discharged from a point source to surface water.

The District Court misinterpreted the industrial wastewater discharge

exclusion contained in the definition of "solid waste" in RCRA § 1004(27), 42

---

[19] *See also* Des. Ex. at 177, Part VI(M) ("Nothing in this permit shall be construed
to preclude the institution of any legal action or relieve the permittee from any
responsibilities, liabilities, or penalties to which the permittee is or may be subject
under … any applicable state or Federal law…."). By failing to acknowledge the
limitations of the permit's scope as set by its terms and by applicable
environmental laws, the District Court effectively nullified RCRA's applicability
to any hazardous waste management activity at a facility or property conducted
under the cover of a general NPDES discharge permit.

U.S.C. § 6903(27), in concluding that the "construction activity" provisions in the NPDES permit authorized the handling, treating, storing, and disposing of hazardous waste without a RCRA permit during construction. *See* Appx. at 75-77, ¶¶ 116-143. The exclusion, as described in the federal regulations, states that "solid wastes" do not include "industrial wastewater discharges that are point source discharges subject to the regulation under [the applicable provisions of the CWA]." 40 C.F.R. 261.4(a)(2).

EPA's comments on the regulation explain the limit of the exclusion to "point source discharges":

> This exclusion applies only to the actual point source discharge. It does not exclude industrial wastewaters while they are being collected, stored or treated before discharge, nor does it exclude sludges that are generated by industrial wastewater treatment.

40 C.F.R. 261.4(a)(2), cmt (emphasis added). In its interpretative guidance document on the exclusion, EPA elaborates:

> The obvious purpose of the industrial point source discharge exclusion in section 1004(27) was to avoid duplicative regulation of point source discharges under RCRA and the Clean Water Act. Without such a provision, the discharge of wastewater into navigable waters would be 'disposal' of solid waste, and potentially subject to regulation under both the Clean Water Act and RCRA Subtitle C. These considerations do not apply to industrial wastewaters prior to discharge since most of the environmental hazards posed by wastewaters in treatment and holding facilities—primarily groundwater contamination—cannot be controlled under the Clean Water Act or other EPA statutes.
>
> …

31

> Thus, EPA based this exclusion on the need to avoid duplicative regulation under two statutes <u>for discharges that occur at the end-of-the-pipe (i.e., discharges directly to surface water)</u>.

EPA, Office of Solid Waste and Emergency Response, *Interpretation of Industrial Wastewater Discharge Exclusion from the Definition of Solid Waste* 2 (1995) (quoting 45 Fed. Reg. 33098 (May 19, 1980)), reprinted at 1995 WL 911821 (OSWER) (emphasis in original removed, new emphasis added); *see also U.S. v. Dean*, 969 F.2d 187, 194 (6th Cir. 1992) (observing that the exclusion "applies only to the actual point source discharge"); *State v. PVS Chemicals*, 50 F.Supp.2d 171, 179 (W.D.N.Y. 1998) (same); *Inland Steel Co. v. United States EPA*, 901 F.2d 1419, 1423 (7th Cir. 1990) (the purpose of the industrial wastewater discharge exclusion "is to avoid duplicative regulation, not to create a regulatory hole through which billions of gallons of hazardous wastes can be pumped into the earth without any controls").

The exclusion clearly applies only to the pollutants in the effluent discharged from point sources permitted by an NPDES permit.[20] It does not authorize CBAC's construction activities involving hazardous waste.

---

[20] The scope of the exclusion is generally consistent with the CWA's regulation of water discharged from point sources. *Cf. Assateague Coastkeeper*, 200 Md. App. at 673; *Waterkeeper Alliance*, 399 F.3d at 504-06.

4. <u>Erosion and sediment control and stormwater management plans adopted pursuant to state law, required as a pre-condition of authorization to discharge stormwater pursuant to a general NPDES permit, did not supercede the requirements to handle, treat, store, or dispose of solid or hazardous waste in accordance with RCRA.</u>

The references to the RAP in CBAC's erosion and sediment control and stormwater management plans create no inconsistency between the CWA permit requirement for discharges of stormwater from point sources at construction sites and the RCRA permit requirement for the treatment, storage or disposal of hazardous waste on the construction site.

The District Court is correct that Maryland regulations governing general NPDES permits require permittees to "comply with requirements to obtain approval for (a) erosion and sediment control plans required under Environmental Article, Title 4, Subtitle 1, Annotated Code of Maryland; and (b) stormwater management plans required under Environmental Article, Title 4, Subtitle 2, Annotated Code of Maryland." Appx. at 77 (citing COMAR 26.08.04.09A(5)); *see also* Des. Ex. 169. But, the District Court erred in assuming that Title 4 bears any connection to the federal CWA. Rather, Maryland's water pollution control program derives its authority from Title 9 of the Environmental Article. The erosion and sediment control and stormwater management plans referenced are not subject to the CWA and are not federally enforceable. They, therefore, cannot create any inconsistency with RCRA. *See Atlantic States Legal Foundation v. East*

33

*Kodak Co.*, 12 F.3d 353, 356 (2nd Cir. 1993) (recognizing that federal enforcement actions cannot be brought to enforce a provision broader than the requirements of the federal NPDES permit program); *Assateague Coastkeeper*, 200 Md. App. at 713 (recognizing that provisions broader in scope than those required by the CWA are not subject to federal enforcement); 40 CFR 123.1(i)(2) ("If an approved State program has greater scope of coverage than required by Federal law the additional coverage is not part of the Federally approved program."); *see also Cmty. Ass'n for Restoration of the Envt,* Inc., 954 F.Supp.2d at 1160 (observing that RCRA's anti-duplication provision did not automatically preclude RCRA citizen suit where prior consent order had been entered into pursuant to the Safe Drinking Water Act because RCRA was broader in scope).

5. <u>CBAC's participation in Maryland's Voluntary Cleanup Program, including its formulation of a RAP, cannot create duplicative enforcement of federal law, nor exempt CBAC from RCRA's requirements</u>.

The Maryland Voluntary Cleanup Program ("MVCP") is an independent and voluntarily entered state adopted and implemented program, not an enforcement-focused regulatory scheme. *See* Md. Code Ann. Envir. § 7-501 *et. seq.* The program is designed to, among other purposes, "[e]ncourage the investigation of eligible properties with known or perceived contamination" and "[a]ccelerate cleanup of eligible properties." Md. Code Ann. Envir. § 7-503. A participant must formulate a RAP as part of its participation in the program. *Id.* at § 7-508. A

participant may also withdraw from the program pursuant to § 7-512. The requirements for withdrawal vary depending on whether the participant has been deemed an "inculpable person" under § 7-501 (defining inculpable person as someone who meets certain ownership requirements and "[h]as not caused or contributed to the contamination" at the site) and § 7-505 (establishing parameters for the liability of an inculpable person).[21]

Referring to the RAP developed under the state program and approved by a state agency in a general NPDES discharge permit does not subject its terms and conditions to the jurisdiction of the CWA or any of the other federal acts listed in RCRA's anti-duplication provision, 42 U.S.C. § 6905. Therefore, it cannot pre-empt or preclude enforcement of RCRA's handling, treatment, storage, and disposal requirements. The MDE approved RAP concedes the point by directing CBAC to "comply with all local, state and federal laws and regulations by obtaining all necessary approvals and permits to conduct the activities pursuant to an approved RAP." Des. Ex. at 66; RAP, at 1.

Section 6905, by its plain terms, could only preclude enforcement of RCRA requirements when the activities are already subject to other federal regulatory

---

[21] "Inculpable person" status does not absolve that person from liability for "new contamination that [he or she] causes or contributes to" at the site, or for the "exacerbation of existing contamination at the eligible property." Md. Code Ann. Envir. § 7-501(c).

35

schemes, and, thus, federal enforcement.[22] The MVCP, a voluntarily-entered state-run program, is not such a scheme.

> **b.** *There is, in any event, no duplication or regulatory inconsistency between the remedial activities outlined in the RAP and the relief requested in the complaint.*

As its text makes plain, RCRA's anti-duplication provision precludes only the duplicative or inconsistent enforcement of remedial obligations at a given site. It does not bar the imposition of ***additional*** remedial measures not yet implemented. *See, e.g., Marcas, LLC v. Bd. of Cty. Commissioners of St. Mary's Cty.*, 977 F.Supp.2d 487, 502 (2013). Indeed, federal courts have often ordered citizen suit defendants to undertake remedial measures in addition to those already undertaken in order to address imminent and substantial endangerments. For example, in reaching this same conclusion, the District Court for Maryland recently explained:

> "Even where an approved remediation plan exists, and remediation activities are taking place pursuant to that plan, a party may still advance a claim under the Act [i.e., RCRA] to require a defendant to install additional remediation systems, or to perform remediation activities that the original party has not yet undertaken."

---

[22] Moreover, remedial activities undertaken on a voluntary basis do not preclude RCRA actions. *See, e.g., See Spillane v. Commonwealth Edison Co.*, 291 F.Supp.2d 728, 736-37 (N.D.Ill. 2003) (The "voluntary, self-funded participation in a state program does not preclude a simultaneous federal [RCRA] suit").

*Marcas,* 977 F.Supp.2d at 502 (quoting *Keller Transp. Inc. v. Wagner Enters., LLC,* 873 F.Supp.2d 1342, 1351 (D.Mont. 2012)); *see also, e.g., Interfaith Community Organization v. Honeywell International, Inc.,* 399 F.3d 248, 264-267 (3rd Cir. 2005) (ordering defendant to excavate and replace over 1.5 million tons of contaminated soil in addition to capping and other remedial measures already undertaken); *Raritan Baykeeper,* 2013 WL 103880 at 10 ("[E]ven though NJPEP has taken certain remedial actions, like approving [Remedial Action Work Plans], a RCRA suit may exist in spite of other actions having been taken to resolve the same matter").

In a similar fashion, Plaintiffs' complaint requested relief in the form of additional remedial measures beyond those identified in the RAP, measures that Defendants have not yet taken. For example, the complaint requested that Defendants be ordered "to conduct a comprehensive environmental investigation and assessment at the Casino Site and Waterfront Parcels" in order to "determine the nature and extent of contamination which is migrating off-site. . . ." and "to determine the nature and scope of the endangerment to human health and/or the environment" presented by the site's contamination. Appx. at 37-39, ¶ 143(d). The complaint additionally requested that Defendants be ordered "to take any and all remedial measures necessary to control, abate, prevent or mitigate the ongoing migration of contamination from the Casino Site," Appx. 37-39, ¶ 143(d), and "to

37

take any and all remedial measures necessary to remedy all contamination which has contribution to and is contributing to the contamination of the Waterfront Parcels and Middle Branch." Appx. 37-39, ¶¶ 143(e) and (f). These measures are distinct from and in addition to the capping and vapor system measures described in the RAP.

IV.    **The District Court erred in concluding that the complaint failed to sufficiently state claims under 42 U.S.C. §§ 6972(a)(1)(A) and (B).**

The complaint more than adequately met the test for surviving a motion to dismiss. "[A] complaint must contain 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009) (citations omitted).

> Facial plausibility is established once the factual content of a complaint allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. In other words, the complaint's factual allegations must produce an inference of liability strong enough to nudge the plaintiff's claims across the line from conceivable to plausible. *** Satisfying this context-specific test ***does not*** require detailed factual allegations. The complaint must, however, plead sufficient facts to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct.

*Id.* at 256 (emphasis added, formatting altered, internal citations and quotation marks omitted).

38

The District Court adopted a more stringent, and therefore, inappropriate test to dismiss the complaint's §§ 6972(a)(1)(A) and 6972(a)(1)(B) allegations. In the process it made several misstatements of law and fact which warrant reversal.

a.  *The complaint sufficiently pled a claim under § 6972(a)(1)(A).*

In order to properly plead a claim under § 6972(a)(1)(A), a plaintiff must sufficiently allege that the defendant is in continuing violation of a permit, standard, regulation, condition, requirement, prohibitions or order of RCRA. 42 U.S.C. § 6972(a)(1)(A); *see Potomac Riverkeeper,* 388 F. Supp. 2d at 586-87. The claim should: 1) identify the statute and/or regulation that the complaint alleges the defendant has violated, and 2) contain sufficient factual allegations to support a finding of liability for each violation if proven to be true. *See Covington v. Jefferson Cty.*, 358 F.3d 626, 643 (9th Cir. 2004); *Community of Cambridge Environmental Health and Community Development Group v. City of Cambridge*, 115 F.Supp.2d 550, 557, n.5 (D.Md. 2000) (*citing Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 66 (1987)).

The District Court conceded that the complaint identified "a number of regulations that Defendants have allegedly violated" (enumerated in paragraphs 118 through 124 of the complaint and the references incorporated therein) by excavating, moving, mixing, stockpiling, and backfilling contaminated soil, subsoil and groundwater at the Casino Site. Appx. at 83; *see* Appx. at 33-37, ¶¶ 122-23

39

(alleging that the CBAC Defendants and the City violated, among other statutory and regulatory violations, 40 CFR 262.11; 40 CFR 262.20 through 260.44; Md. Code Ann. Envir. §§ 7-224, 7-232, 7-244; COMAR 26.13.03.02; and COMAR 26.13.03.01 through 26.13.06.06). The complaint explained that these activities occurred and continued to occur in and around "known hot spots of PCE, TCE and heavy metals." Appx. at 28-29, ¶¶ 137-140. It said that the City's own environmental assessments had concluded that these "hot spots" would "render the soils to be considered 'hazardous waste'" under applicable law "once excavated." Appx. at 24, ¶¶ 77, 91, 117-124, 132-134; *see also* Appx. at 19-20, 23-25, ¶¶ 52-55, 73-80. Finally, the complaint explained that "by virtue of [their] construction activities," Baltimore City and the CBAC Defendants had "generated 'solid waste' and/or 'hazardous waste,'" as those terms are defined in 40 C.F.R. § 261.2, Md. Code Ann. Envir. § 7-201, and COMAR 26.13.01.03B, 26.13.02.02, and 26.13.02.03. Appx. 24, ¶ 71.

Yet the District Court dismissed these allegations as insufficient, and inaccurately characterized others to conclude that the complaint was deficient. First, the District Court found that Plaintiffs had failed to provide "factual details pertaining to the alleged storage and abandonment of leaky drums" and had failed to "identify the specific contaminants associated with that alleged 'disposal.'" Appx. at 86. That conclusion ignores the details about specific activities of each

40

Defendant in the complaint, which the District Court acknowledged included the removal of drums and USTs, and involved a list of contaminants, including polycyclic aromatic hydrocarbons ("PAHs"), volatile organic compound ("VOCs"), and heavy metals, among others. Appx. at 18-19, 35-36, ¶¶ 50-52, 132-35, 141. As the District Court observed, the complaint alleged that the hazardous waste-containing drums and USTs being removed, handled, and transported were leaking or spilling—i.e., their contents were being spread at the site as a result of the City and CBAC's construction activities. Appx. at 28, ¶ 91.

Second, the District Court found that "Plaintiffs have not made any plausible factual allegations indicating that the migration of contaminants at the Site occurred during the City's ownership of the Site." Appx. at 86. This ignores the assertion that the City has owned parts of what is now the Casino Site since 1976, acquiring the remainder in 2005, 2008, and 2009. Appx. at 14-16, ¶¶ 28, 30, 37. The complaint cites studies supporting the conclusion that the contaminants at the Casino Site have and will continue to migrate through groundwater and other means to the Waterfront Parcels. *See* Appx. at 19-20, 23-25, ¶¶ 52-55, 73-80. It explains that Defendants' construction activities have exacerbated the contamination at the Casino Site as well as at the Waterfront Parcels. Appx. at 6-7, 20, 30, 32-37, ¶¶ 2, 56, 87, 101-03, 116-43. The complaint is clear that exacerbation and increased migration of contaminants has occurred since the City

41

acquired an interest in the Casino Site in 1976. Appx. at 6-7, 20, 30, ¶¶ 2, 56, 102-03. The complaint alleges that the violations described therein "have never been remedied and therefore, are ongoing." Appx. at 34, ¶¶ 125-29. As current owners and/or operators of the Casino Site, the City and CBAC are required to obtain a permit and comply with the facility standards set forth at Md. Code Ann., Envir., §§ 7-224 and 7-232, COMAR 26.13.05.01 through 26.13.05.05 and COMAR 26.13.07.01, and they are yet to do so. Appx. at 32-34, ¶¶ 117, 121, 123-37.

The complaint additionally alleges the following specific violations:

119.   After generating solid waste and/or hazardous waste during the construction activities described in paragraphs 90 through 100 above, Baltimore City and CBAC Gaming failed to determine whether the waste was hazardous, in violation of 40 CFR § 262.11 and COMAR 26.13.03.02.

120.   By virtue of the construction activities described in paragraphs 90 through 100 above (including, but not limited to, mixing, moving, stockpiling, grading and/or backfilling contaminated soils and/or groundwater), Baltimore City and CBAC Gaming "treated", "stored" and/or "disposed" of hazardous waste at the Casino Site, as those terms are defined in 40 C.F.R. § 260.10 and COMAR 26.13.01.03B.

121.   The Casino Site is not, and has never been, a permitted hazardous waste treatment, storage or disposal facility.

122.   Baltimore City and CBAC Gaming treated, stored, disposed of, and/or transported hazardous wastes during the construction activities described in paragraphs 90 through 100 above, without complying with the applicable generator standards, in violation of 40 C.F.R. §§ 262.20 through 260.44; COMAR 26.13.03.01 through 26.13.03.06, and Md. Code Ann., Envir., § 7-224.

42

123.   Baltimore City, CBAC Gaming and CBAC Borrower have not and have never obtained a permit to own and/or operate a hazardous waste treatment, storage or disposal facility at the Casino Site as required by Md. Code Ann., Envir., § 7-232 and COMAR 26.13.07.01A.

124.   By virtue of the construction activities described in paragraphs 90 through 100 above, Baltimore City, CBAC Borrower and CBAC Gaming owned/or operated an unpermitted hazardous waste treatment, storage or disposal facility without complying with the applicable facility standards and permit requirements, in violation of Md. Code Ann., Envir., §§ 7-224, 7-232; COMAR 26.13.05.01 through 26.13.05.05 and COMAR 26.13.07.01.

Appx. 33-34.

The allegations in the complaint are sufficient to make out at claim under § 6972(a)(1)(A) against Baltimore City and the CBAC Defendants. The District Court erred in dismissing Count I for failure to state a claim.

   b.   *The District Court erred in concluding that the complaint failed to sufficiently state a claim under 42 U.S.C. § 6972(a)(1)(B).*

Section 6972(a)(1)(B) provides that a civil action may be brought:

against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment[.]

"[T]hese requirements are very broad and encompass practically any conduct relating to hazardous waste by practically any individual or entity." *Interfaith*

*Cmty. Org.,* 188 F.Supp.2d at 502; *see also Prisco v. A&D Carting Corp.*, 168 F.3d 593, 608 (2nd Cir. 1999); *Potomac Riverkeeper*, 388 F.Supp.2d at 588.

> 1. *The complaint sufficiently pled a § 6972(a)(1)(B) claim against BDC, Baltimore City, and the CBAC Defendants.*

The District Court concluded that the complaint failed to sufficiently allege a claim under § 6972(a)(1)(B) against BDC and the City. The Court concluded:

> With respect to the City, Plaintiffs allege contribution by means of the 'excavating, moving, mixing, backfilling and/or grading contaminated soils and/or groundwater' performed at the Casino Site. Pls.' Compl. ¶ 137. Essentially, Plaintiffs contend that the City contributed to the contamination hazard by redistributing the contaminated soils and/or groundwater around the Site by means of their earth-moving activities. Several courts have held that similar types of activities constitute 'active' conduct that may give rise to liability under § 6972(a)(1)(B). *See, e.g., Raritan Baykeeper, Inc. v. NL Industries, Inc.*, Civ. A. No. 09-cv-4117 (JAP), 2013 WL 103880, at *13 (D.N.J. Jan. 8, 2013) (holding that defendants' activities at site, including on-site remediation, excavation, and capping, constituted active conduct). ***Nevertheless, as explained in Part IV.B.1, Plaintiffs have failed to state any plausible factual allegations with respect to disposal of hazardous waste*** (as opposed to removal of contaminated soil and other remedial activities) at the Site.

Appx. 90 (emphasis added).

The District Court's analysis is inaccurate in several important respects.

First, "disposal of hazardous waste" is not a prima facie element of a claim under §

6972(a)(1)(B).[23] As the text of § 6972(a)(1)(B) makes clear, that provision applies to any person who has contributed to the past or present handling, treatment, storage, *or* disposal of hazardous or solid waste at the site. Thus, "disposal" of waste is only one type of waste management activity that may give rise to liability under RCRA. Moreover, a § 6972(a)(1)(B) claim may be predicated on *either* hazardous waste *or* solid waste.

Secondly, the complaint more than sufficiently alleges each element of a plausible § 6972(a)(1)(B) claim. The complaint alleges in detail the actors (including Maryland Chemical, CBAC, BDC, and the City) who have historically and are presently contributing to the handling, storage, disposal, etc., of solid and hazardous waste at the Casino Site as well as the Waterfront Parcels. Appx. at 16-27, ¶¶ 38-88. The complaint alleges, in detail, the negative health effects of the contaminants present at these sites, and how exposure to those chemicals presents an imminent and substantial endangerment to the health and safety of those using and inhabiting the sites. Appx. at 7, 18, 30, 36, ¶¶ 3, 47, 104-05, 138. The complaint alleges how Defendants are handling, storing, disposing, etc., the waste—without the proper permits—by removing leaky drums and underground

---

[23] "Disposal" is broadly defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste ... may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

storage tanks containing such waste as well as by mixing, moving, etc. contaminated soil, subsoil, and groundwater. Appx. at 28, 34-42, ¶¶ 91, 119-124. These allegations are sufficient to state a plausible cause of action against Defendants under § 6972(a)(1)(B).

> ### 2. The complaint sufficiently pled a § 6972(a)(1)(B) claim against Maryland Chemical.

In granting Maryland Chemical's motion to dismiss, the District Court faults the complaint for a lack of factual details concerning the events that precipitated the alleged releases. It concludes that "the Complaint contains inadequate factual allegations to determine whether the alleged releases during Maryland Chemical's ownership/operations of the Site constitute sufficient affirmative action so as to give rise to liability under § 6972(a)(1)(B)." Appx. 89. In support, the court cites *Nurad, Inc. v. Willam E. Hooper & Sons Co.*, 966 F.2d 837, 845 (4th Cir. 1992), for the proposition that "hazardous waste may leak or spill without any active human participation," and *Delaney v. Town of Carmel*, 55 F.Supp.2d 237, 256 (S.D.N.Y. 1999), for the proposition that the statute's use of the "term ['contributed to'] has been universally held to infer something more than mere ownership of a site; some level of causation between the contamination and the party held to liable must be established." Appx. 89.

The Court's conclusions ignore the fact that the complaint explains in length how Maryland Chemical's past *affirmative* conduct as a past generator of hazardous waste—i.e., unlawfully disposing of hazardous and solid waste at the Casino Site—*has caused* and *contributed to* the current contamination and imminent and substantial endangerment present at the site. *See* Appx. 18-23, 34-37, ¶¶ 48-71, 130-142. Unlawfully disposing of hazardous waste at a site is diametrically opposed to mere passive ownership and, in any event, such a view contradicts established authority on the subject. *See U.S. v. Waste Industries*, 734 F.2d 159, 165 (4th Cir. 1984) ("Limiting the government's enforcement prerogatives to cases involving active human conduct would open a gaping hole in the overall protection of the environment envisioned by Congress. . . ."); *Potomac Riverkeeper*, 388 F.Supp. 2d at 587 (observing that "'disposal' does not require 'active human conduct'") (quoting *Waste Industries*, 734 F.2d at 164-65);[24] *see, e.g., Town & Country Co-Op, Inc. v. Akron Products Co.*, No. 11-CV-2578, 2012

---

[24] In *Waste Industries*, the Court further explained that:

> The inclusion of "leaking" as one of the diverse definitional components of "disposal" demonstrates that Congress intended "disposal" to have a range of meanings, including conduct, a physical state, and an occurrence. Discharging, dumping, and injection (conduct), hazardous waste reposing (a physical state) and movement of the waste after it has been placed in a state of repose (an occurrence) are all encompassed in the broad definition of "disposal."

734 F.2d at 164.

WL 1668154, *4 (N.D. Ohio May 11, 2012) (the complaint pled sufficient factual matter supporting the claim that Akron Products used TCE in its paint-dipping operations, and failed to treat the TCE before unlawfully disposing of it on its property. Thus, the Court cannot dismiss the claim against Akron Products on this basis.").[25] The complaint's allegations sufficiently pled the contribution element of a § 6972(a)(1)(B) claim and are in fact more detailed than necessary to show the causation between Maryland Chemical's past unlawful hazardous waste activities and the current contamination and imminent and substantial endangerment present at the Site.

In addition to the specific instances of spills and releases by Maryland Chemical recognized by the District Court in paragraph 51 of the complaint, paragraphs 49, 50 and 52-56 explain:

> 49. The Russell Street Properties were occupied by Maryland Chemical for chemical manufacturing and/or bulk chemical storage, repackaging and distribution purposes since at least 1952 through on or around November 2008.
>
> 50. Maryland Chemical's operations at the Russell Street Properties involved a variety of chlorinated VOCs, metals, acids, bases and other organic and inorganic compounds including, but not limited to, trichloroethylene ("TCE"), [and] tetrachloroethylene ("PCE") …

---

[25] Moreover, the court's interpretation of the complaint's allegations against Maryland Chemical as constituting "passive ownership" rather than active hazardous waste disposal, once again, improperly draws inferences against Plaintiffs, improperly decides a disputed issue of fact without providing the parties with an opportunity for discovery, and is wrong as a matter of law.

...

52.    According to environmental assessments prepared on behalf of Maryland Chemical from on or around May 1997 through December 2000 (the "Glose Environmental Assessments"), prior PCE spills and/or releases at the Russell Street Properties created a 'plume of chlorinated VOC contamination' consisting of PCE and its breakdown constituents (TCE, DCE, DCA, chloroform and vinyl chloride) (hereinafter the "PCE plume") in the groundwater beneath 1551 Russell Street at concentrations of more than **5,800 times** the applicable federal and state cleanup standards.

53.    The Glose Environmental Assessments determined that the PCE plume was migrating in the groundwater in a south and southeasterly direction off-site and towards the Waterfront Parcels and Middle Branch of the Patapsco River.

54.    The Glose Environmental Assessments also identified petroleum compounds containing DROs in the groundwater beneath the southern portion of 1501 Russell Street at concentrations which were more than **40 times** the applicable federal and state cleanup standards.

55.    Notwithstanding the contamination identified in the Glose Environmental Assessments, including the migrating PCE plume at 1551 Russell Street, Maryland Chemical has not taken any action to control, mitigate, abate, remediate or remove the groundwater and soil contamination at the Russell Street Properties.

56.    ***The VOCs and petroleum compounds containing DROs and PAHs in the soils and groundwater*** at and under the Russell Street Properties ***are a continuing source of contamination at the Casino Site*** which has migrated and continues to migrate off-site and into the Waterfront Parcels and the Middle Branch.

...

73.    The environmental assessments prepared as part of the BDC VCP Applications confirmed that the unremediated spills and/or releases of VOCs and petroleum compounds containing DROs and PAHs during Maryland Chemical's past operations at the Russell

49

Street Properties *are continuing sources of contamination in the groundwater, soil and/or soil vapor at and around the Casino Site* at levels well above applicable federal and state cleanup standards and/or regulatory limits.

Appx. 18-20 (emphasis added).

Count II of the complaint, in turn, alleges in paragraphs 132-135:

132. Maryland Chemical is the past operator of the Russell Street Properties and a past generator of hazardous waste at the Russell Street Properties.

133. By virtue of the releases and/or spills described in paragraph 51 above, *Maryland Chemical disposed of hazardous waste*, as those terms are defined in 40 C.F.R. §§ 260.10, 261.3, 261.33; COMAR 26.13.01.03B, COMAR 26.13.02.03 and COMAR 26.13.02.19, at a facility that was not, and has never been, a permitted hazardous waste treatment, storage or disposal facility.

134. *Maryland Chemical's past operations at the Russell Street Properties caused and/or contributed to the imminent and substantial endangerment to human health and the environment* which is present at the Casino Site and the Waterfront Parcels *by unlawfully spilling, releasing, and/or disposing of hazardous wastes* and/or hazardous substances in the soils and groundwater at the Casino Site (including, but not limited to, PCE, TCE, and petroleum compounds containing DROs [and PAHs]…) and by failing to address and/or remediate the contamination thereafter.

135. The continued presence of VOCs and petroleum compounds containing DROs and PAH constituents which have remained in the surface and subsurface soils, soil vapors and/or groundwater at and beneath the Casino Site are a direct result of the acts and/or omissions of Maryland Chemical as described in paragraphs 132 through 134 above.

Appx. 35 (emphasis added).

50

These allegations, in combination, provide ample details concerning events that "precipitated Maryland Chemical's releases" and are sufficient to establish a § 6972(a)(1)(B) claim against Maryland Chemical under the governing plausibility standard. They explain how Maryland Chemical's past operations contributed to the current contamination of VOCs and PAHs and other substances at the Casino Site and that those same contaminants currently present an imminent and substantial endangerment to the human health and the environment. These allegations, if proven true, would subject Maryland Chemical to liability under 42 U.S.C. § 6972(a)(1)(B).[26]

## CONCLUSION

For the above reasons, the District Court erred in dismissing in the complaint in this case. Plaintiffs respectfully request that this Court vacate the decision of the District Court and remand this matter for further proceedings.

---

[26]As explained above, the question of whether and how Defendants contributed to the current contamination at the site is, at minimum, a disputed issue of material fact that should not have been resolved in a motion to dismiss. *See Cmty. Ass'n for Restoration of the Env't*, 954 F. Supp. 2d at 1160.

Respectfully submitted this 29th day of September, 2014.


_____/s/_____
TIMOTHY R. HENDERSON
RICH & HENDERSON, P.C.
51 Franklin Street, Suite 300
P.O. Box 589
Annapolis, Maryland  21404-0589
(410) 267-5900
thenderson@richlaw.com
Federal Bar No. 12569

Attorneys for Appellants


## REQUEST FOR ORAL ARGUMENT

Appellants request oral arguments in this matter.  The Clean Water Act (33 U.S.C. § 1251 *et seq*.) interpretations and application in the District Court Opinion raises issues of first impression in this Court and have long-reaching effects on the implementation of State discharge permitting programs throughout the Fourth Circuit and beyond.  The District Court misapplied the scope of the State sediment and erosion control general permit for construction sites to override solid and hazardous waste management and disposal requirements of the Resource Conservation and Recovery Act (42 U.S.C. § 6901 *et seq*.)

In addition, the distinctions between Federal and State statutory authority over surface waters and ground water were not maintained, resulting in factual and

legal errors. These matters are crucial for control of both discharges to surface and groundwater as well as the safe handling and disposal of solid and hazardous wastes.

Likewise, it is Appellants' belief that, given the factual complexity and legal distinctions spelled out above, the Court would benefit from discussions at oral argument.

_____/s/_____
TIMOTHY R. HENDERSON

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedures, this brief has been prepared with proportionally spaced type: Times New Roman 14 point font.

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. <u>14-1825</u>     Caption: <u>Goldfarb,et al. v. Mayor & City Council of Baltimore,et al</u>

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the  type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓]  this brief contains ____12,140____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]  this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓]  this brief has been prepared in a proportionally spaced typeface using
   <u>Word</u>_____ [*identify word processing program*] in
   <u>Times New Roman 14</u>_____ [*identify font size and type style*]; **or**

   [ ]  this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s)_____

Attorney for <u>Apellants</u>_____

Dated: <u>9/29/14</u>_____

## CERTIFICATE OF SERVICE

I certify that on September 29, 2014 the foregoing document was served on all parties or their counsel of record through the CM/ECF system as they are registered users.


_____/s/_____                    September 29, 2014
Timothy R. Henderson                                    Date

# **ADDENDUM**

STATUES

33 U.S.C. § 1342(k)...................................................................... 1

33 U.S.C. § 1362(14)..................................................................... 3

42 U.S.C. § 6903(3)....................................................................... 5

42 U.S.C. § 6903(27)..................................................................... 6

42 U.S.C. § 6905 ........................................................................... 7

42 U.S.C. § 6972 ........................................................................... 9

Md. Code Ann. Envir. § 7-501 ................................................... 14

Md. Code Ann. Envir. § 7-503 ................................................... 18

Md. Code Ann. Envir. §7-508 .................................................... 19

Md. Code Ann. Envir. §7-512 .................................................... 22

Md. Code. Ann. Envir. § 9-253(b) .............................................. 24

Md. Code. Ann. Envir. § 9-322 ................................................... 25

REGULATIONS

40 C.F.R. §§ 122.26(a)(1)(ii) & (b)(14)(x) ................................. 26

40 C.F.R. § 123.1(i)(2) ................................................................ 35

40 C.F.R. § 261.4(a)(2) ............................................................... 37

COMAR 26.08.01.00 ................................................................... 38

COMAR 26.08.04.09(A) .............................................................. 39

COMAR 26.13.02.19 ................................................................... 40

RULES

Fed. R. Civ. Pro. 12(b)(1), 12(b)(6) and 12(d).......................... 64

Fed. R. App. Pro. 32(a) .............................................................. 72

<u>OTHER</u>

EPA, Office of Solid Waste and Emergency Response, *Interpretation of Industrial Wastewater Discharge Exclusion from the Definition of Solid Waste*, 1995 WL 911821 (OSWER) ................................................................. 76

§ 1342. National pollutant discharge elimination system, 33 USCA § 1342

| United States Code Annotated |
| Title 33. Navigation and Navigable Waters (Refs & Annos) |
| Chapter 26. Water Pollution Prevention and Control (Refs & Annos) |
| Subchapter IV. Permits and Licenses (Refs & Annos) |

33 U.S.C.A. § 1342

§ 1342. National pollutant discharge elimination system

Effective: February 7, 2014

Currentness

(a) Permits for discharge of pollutants

**(1)** Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

**(2)** The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.

**(3)** The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

**(4)** All permits for discharges into the navigable waters issued pursuant to section 407 of this title shall be deemed to be permits issued under this subchapter, and permits issued under this subchapter shall be deemed to be permits issued under section 407 of this title, and shall continue in force and effect for their term unless revoked, modified, or suspended in accordance with the provisions of this chapter.

**(5)** No permit for a discharge into the navigable waters shall be issued under section 407 of this title after October 18, 1972. Each application for a permit under section 407 of this title, pending on October 18, 1972, shall be deemed to be an application for a permit under this section. The Administrator shall authorize a State, which he determines has the capability of administering a permit program which will carry out the objective of this chapter to issue permits for discharges into the navigable waters within the jurisdiction of such State. The Administrator may exercise the authority granted him by the preceding sentence only during the period which begins on October 18, 1972, and ends either on the ninetieth day after the

ADD. 1

§ 1342. National pollutant discharge elimination system, 33 USCA § 1342

of competent jurisdiction to restrict or prohibit the introduction of any pollutant into such treatment works by a source not utilizing such treatment works prior to the finding that such condition was violated.

(i) Federal enforcement not limited

Nothing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title.

(j) Public information

A copy of each permit application and each permit issued under this section shall be available to the public. Such permit application or permit, or portion thereof, shall further be available on request for the purpose of reproduction.

(k) Compliance with permits

Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1312, 1316, 1317, and 1343 of this title, except any standard imposed under section 1317 of this title for a toxic pollutant injurious to human health. Until December 31, 1974, in any case where a permit for discharge has been applied for pursuant to this section, but final administrative disposition of such application has not been made, such discharge shall not be a violation of (1) section 1311, 1316, or 1342 of this title, or (2) section 407 of this title, unless the Administrator or other plaintiff proves that final administrative disposition of such application has not been made because of the failure of the applicant to furnish information reasonably required or requested in order to process the application. For the 180-day period beginning on October 18, 1972, in the case of any point source discharging any pollutant or combination of pollutants immediately prior to such date which source is not subject to section 407 of this title, the discharge by such source shall not be a violation of this chapter if such a source applies for a permit for discharge pursuant to this section within such 180-day period.

(l) Limitation on permit requirement

(1) Agricultural return flows

The Administrator shall not require a permit under this section for discharges composed entirely of return flows from irrigated agriculture, nor shall the Administrator directly or indirectly, require any State to require such a permit.

(2) Stormwater runoff from oil, gas, and mining operations

The Administrator shall not require a permit under this section, nor shall the Administrator directly or indirectly require any State to require a permit, for discharges of stormwater runoff from mining operations or oil and gas exploration,

ADD. 2

§ 1362. Definitions, 33 USCA § 1362

| United States Code Annotated |
| Title 33. Navigation and Navigable Waters (Refs & Annos) |
| Chapter 26. Water Pollution Prevention and Control (Refs & Annos) |
| Subchapter V. General Provisions |

33 U.S.C.A. § 1362

§ 1362. Definitions

Effective: July 29, 2008 to September 30, 2014

Currentness

Except as otherwise specifically provided, when used in this chapter:

(1) The term "State water pollution control agency" means the State agency designated by the Governor having responsibility for enforcing State laws relating to the abatement of pollution.

(2) The term "interstate agency" means an agency of two or more States established by or pursuant to an agreement or compact approved by the Congress, or any other agency of two or more States, having substantial powers or duties pertaining to the control of pollution as determined and approved by the Administrator.

(3) The term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the Trust Territory of the Pacific Islands.

(4) The term "municipality" means a city, town, borough, county, parish, district, association, or other public body created by or pursuant to State law and having jurisdiction over disposal of sewage, industrial wastes, or other wastes, or an Indian tribe or an authorized Indian tribal organization, or a designated and approved management agency under section 1288 of this title.

(5) The term "person" means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body.

(6) The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. This term does not mean (A) "sewage from vessels or a discharge incidental to the normal operation of a vessel of the Armed Forces" within the meaning of section 1322 of this title; or (B) water, gas, or other material which is injected into a well to facilitate production of oil or gas, or water derived in association with oil or gas production and disposed of in a well, if the well used either to facilitate production or for disposal purposes is approved by authority of the State in which the well is located, and if such State determines that such injection or

§ 1362. Definitions, 33 USCA § 1362

disposal will not result in the degradation of ground or surface water resources.

(7) The term "navigable waters" means the waters of the United States, including the territorial seas.

(8) The term "territorial seas" means the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of three miles.

(9) The term "contiguous zone" means the entire zone established or to be established by the United States under article 24 of the Convention of the Territorial Sea and the Contiguous Zone.

(10) The term "ocean" means any portion of the high seas beyond the contiguous zone.

(11) The term "effluent limitation" means any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance.

(12) The term "discharge of a pollutant" and the term "discharge of pollutants" each means (A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft.

(13) The term "toxic pollutant" means those pollutants, or combinations of pollutants, including disease-causing agents, which after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will, on the basis of information available to the Administrator, cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring.

(14) The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

(15) The term "biological monitoring" shall mean the determination of the effects on aquatic life, including accumulation of pollutants in tissue, in receiving waters due to the discharge of pollutants (A) by techniques and procedures, including sampling of organisms representative of appropriate levels of the food chain appropriate to the volume and the physical, chemical, and biological characteristics of the effluent, and (B) at appropriate frequencies and locations.

ADD. 4

§ 6903. Definitions, 42 USCA § 6903

| United States Code Annotated |
| Title 42. The Public Health and Welfare |
| Chapter 82. Solid Waste Disposal (Refs & Annos) |
| Subchapter I. General Provisions |

42 U.S.C.A. § 6903

§ 6903. Definitions

Currentness

As used in this chapter:

**(1)** The term "Administrator" means the Administrator of the Environmental Protection Agency.

**(2)** The term "construction," with respect to any project of construction under this chapter, means (A) the erection or building of new structures and acquisition of lands or interests therein, or the acquisition, replacement, expansion, remodeling, alteration, modernization, or extension of existing structures, and (B) the acquisition and installation of initial equipment of, or required in connection with, new or newly acquired structures or the expanded, remodeled, altered, modernized or extended part of existing structures (including trucks and other motor vehicles, and tractors, cranes, and other machinery) necessary for the proper utilization and operation of the facility after completion of the project; and includes preliminary planning to determine the economic and engineering feasibility and the public health and safety aspects of the project, the engineering, architectural, legal, fiscal, and economic investigations and studies, and any surveys, designs, plans, working drawings, specifications, and other action necessary for the carrying out of the project, and (C) the inspection and supervision of the process of carrying out the project to completion.

**(2A)** The term "demonstration" means the initial exhibition of a new technology process or practice or a significantly new combination or use of technologies, processes or practices, subsequent to the development stage, for the purpose of proving technological feasibility and cost effectiveness.

**(3)** The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

**(4)** The term "Federal agency" means any department, agency, or other instrumentality of the Federal Government, any independent agency or establishment of the Federal Government including any Government corporation, and the Government Printing Office.

ADD. 5

§ 6903. Definitions, 42 USCA § 6903

converting to energy, or otherwise separating and preparing solid waste for reuse.

**(25)** The term "regional authority" means the authority established or designated under section 6946 of this title.

**(26)** The term "sanitary landfill" means a facility for the disposal of solid waste which meets the criteria published under section 6944 of this title.

**(26A)** The term "sludge" means any solid, semisolid or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, water supply treatment plant, or air pollution control facility or any other such waste having similar characteristics and effects.

**(27)** The term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of Title 33, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923) [42 U.S.C.A. § 2011 et seq.].

**(28)** The term "solid waste management" means the systematic administration of activities which provide for the collection, source separation, storage, transportation, transfer, processing, treatment, and disposal of solid waste.

**(29)** The term "solid waste management facility" includes--

    **(A)** any resource recovery system or component thereof,

    **(B)** any system, program, or facility for resource conservation, and

    **(C)** any facility for the collection, source separation, storage, transportation, transfer, processing, treatment or disposal of solid wastes, including hazardous wastes, whether such facility is associated with facilities generating such wastes or otherwise.

**(30)** The terms "solid waste planning", "solid waste management", and "comprehensive planning" include planning or management respecting resource recovery and resource conservation.

ADD. 6

§ 6905. Application of chapter and integration with other Acts, 42 USCA § 6905

| United States Code Annotated |
| Title 42. The Public Health and Welfare |
| Chapter 82. Solid Waste Disposal (Refs & Annos) |
| Subchapter I. General Provisions |

42 U.S.C.A. § 6905

§ 6905. Application of chapter and integration with other Acts

Currentness

(a) Application of chapter

Nothing in this chapter shall be construed to apply to (or to authorize any State, interstate, or local authority to regulate) any activity or substance which is subject to the Federal Water Pollution Control Act [33 U.S.C.A. § 1251 et seq.], the Safe Drinking Water Act [42 U.S.C.A. § 300f et seq.], the Marine Protection, Research and Sanctuaries Act of 1972 [16 U.S.C.A. §§ 1431 et seq., 1447 et seq., 33 U.S.C.A. §§ 1401 et seq., 2801 et seq.], or the Atomic Energy Act of 1954 [42 U.S.C.A. § 2011 et seq.] except to the extent that such application (or regulation) is not inconsistent with the requirements of such Acts.

(b) Integration with other Acts

(1) The Administrator shall integrate all provisions of this chapter for purposes of administration and enforcement and shall avoid duplication, to the maximum extent practicable, with the appropriate provisions of the Clean Air Act [42 U.S.C.A. § 7401 et seq.], the Federal Water Pollution Control Act [33 U.S.C.A. § 1251 et seq.], the Federal Insecticide, Fungicide, and Rodenticide Act [7 U.S.C.A. § 136 et seq.], the Safe Drinking Water Act [42 U.S.C.A. § 300f et seq.], the Marine Protection, Research and Sanctuaries Act of 1972 [16 U.S.C.A. §§ 1431 et seq., 1447 et seq., 33 U.S.C.A. §§ 1401 et seq., 2801 et seq.], and such other Acts of Congress as grant regulatory authority to the Administrator. Such integration shall be effected only to the extent that it can be done in a manner consistent with the goals and policies expressed in this chapter and in the other acts referred to in this subsection.

(2)(A) As promptly as practicable after November 8, 1984, the Administrator shall submit a report describing--

(i) the current data and information available on emissions of polychlorinated dibenzo-p-dioxins from resource recovery facilities burning municipal solid waste;

(ii) any significant risks to human health posed by these emissions; and

ADD. 7

(iii) operating practices appropriate for controlling these emissions.

(B) Based on the report under subparagraph (A) and on any future information on such emissions, the Administrator may publish advisories or guidelines regarding the control of dioxin emissions from such facilities. Nothing in this paragraph shall be construed to preempt or otherwise affect the authority of the Administrator to promulgate any regulations under the Clean Air Act [42 U.S.C.A. § 7401 et seq.] regarding emissions of polychlorinated dibenzo-p-dioxins.

(3) Notwithstanding any other provisions of law, in developing solid waste plans, it is the intention of this chapter that in determining the size of a waste-to-energy facility, adequate provisions shall be given to the present and reasonably anticipated future needs, including those needs created by thorough implementation of section 6962(h) of this title, of the recycling and resource recovery interests within the area encompassed by the solid waste plan.

(c) Integration with the Surface Mining Control and Reclamation Act of 1977

(1) No later than 90 days after October 21, 1980, the Administrator shall review any regulations applicable to the treatment, storage, or disposal of any coal mining wastes or overburden promulgated by the Secretary of the Interior under the Surface Mining and Reclamation Act of 1977 [30 U.S.C.A. § 1201 et seq.]. If the Administrator determines that any requirement of final regulations promulgated under any section of subchapter III of this chapter relating to mining wastes or overburden is not adequately addressed in such regulations promulgated by the Secretary, the Administrator shall promptly transmit such determination, together with suggested revisions and supporting documentation, to the Secretary.

(2) The Secretary of the Interior shall have exclusive responsibility for carrying out any requirement of subchapter III of this chapter with respect to coal mining wastes or overburden for which a surface coal mining and reclamation permit is issued or approved under the Surface Mining Control and Reclamation Act of 1977 [30 U.S.C.A. § 1201 et seq.]. The Secretary shall, with the concurrence of the Administrator, promulgate such regulations as may be necessary to carry out the purposes of this subsection and shall integrate such regulations with regulations promulgated under the Surface Mining Control and Reclamation Act of 1977.

**CREDIT(S)**

(Pub.L. 89-272, Title II, § 1006, as added Pub.L. 94-580, § 2, Oct. 21, 1976, 90 Stat. 2802; amended Pub.L. 96-482, § 3, Oct. 21, 1980, 94 Stat. 2334; Pub.L. 98-616, Title I, § 102, Title V, § 501(f)(2), Nov. 8, 1984, 98 Stat. 3225, 3276.)

Notes of Decisions (12)

42 U.S.C.A. § 6905, 42 USCA § 6905
Current through P.L. 113-163 (excluding P.L. 113-128) approved 8-8-14

    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

ADD. 8

§ 6972. Citizen suits, 42 USCA § 6972

---

| United States Code Annotated |
| Title 42. The Public Health and Welfare |
| Chapter 82. Solid Waste Disposal (Refs & Annos) |
| Subchapter VII. Miscellaneous Provisions |

42 U.S.C.A. § 6972

§ 6972. Citizen suits

Currentness

(a) In general

Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf--

(1)(A) against any person (including (a) the United States, and (b) any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; or

(B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment; or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

Any action under paragraph (a)(1) of this subsection shall be brought in the district court for the district in which the alleged violation occurred or the alleged endangerment may occur. Any action brought under paragraph (a)(2) of this subsection may be brought in the district court for the district in which the alleged violation occurred or in the District Court of the District of Columbia. The district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce the permit, standard, regulation, condition, requirement, prohibition, or order, referred to in paragraph (1)(A), to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both, or to order the Administrator to perform the act or duty referred to in paragraph (2), as the case may be, and to apply any appropriate civil penalties under section 6928(a) and (g) of this title.

---

ADD. 9

§ 6972. Citizen suits, 42 USCA § 6972

(b) Actions prohibited

**(1)** No action may be commenced under subsection (a)(1)(A) of this section--

**(A)** prior to 60 days after the plaintiff has given notice of the violation to--

**(i)** the Administrator;

**(ii)** the State in which the alleged violation occurs; and

**(iii)** to any alleged violator of such permit, standard, regulation, condition, requirement, prohibition, or order,

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of subchapter III of this chapter; or

**(B)** if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with such permit, standard, regulation, condition, requirement, prohibition, or order.

In any action under subsection (a)(1)(A) of this section in a court of the United States, any person may intervene as a matter of right.

**(2)(A)** No action may be commenced under subsection (a)(1)(B) of this section prior to ninety days after the plaintiff has given notice of the endangerment to--

**(i)** the Administrator;

**(ii)** the State in which the alleged endangerment may occur;

**(iii)** any person alleged to have contributed or to be contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in subsection (a)(1)(B) of this section,

ADD. 10

§ 6972. Citizen suits, 42 USCA § 6972

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of subchapter III of this chapter.

**(B)** No action may be commenced under subsection (a)(1)(B) of this section if the Administrator, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment--

**(i)** has commenced and is diligently prosecuting an action under section 6973 of this title or under section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C.A. § 9606],¹

**(ii)** is actually engaging in a removal action under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C.A. § 9604];

**(iii)** has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C.A. § 9604] and is diligently proceeding with a remedial action under that Act [42 U.S.C.A. § 9601 et seq.]; or

**(iv)** has obtained a court order (including a consent decree) or issued an administrative order under section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 980² [42 U.S.C.A. § 9606] or section 6973 of this title pursuant to which a responsible party is diligently conducting a removal action, Remedial Investigation and Feasibility Study (RIFS), or proceeding with a remedial action.

In the case of an administrative order referred to in clause (iv), actions under subsection (a)(1)(B) of this section are prohibited only as to the scope and duration of the administrative order referred to in clause (iv).

**(C)** No action may be commenced under subsection (a)(1)(B) of this section if the State, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment--

**(i)** has commenced and is diligently prosecuting an action under subsection (a)(1)(B) of this section;

**(ii)** is actually engaging in a removal action under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C.A. § 9604]; or

**(iii)** has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C.A. § 9604] and is diligently proceeding with a remedial action under that Act [42 U.S.C.A. § 9601 et seq.].

ADD. 11

§ 6972. Citizen suits, 42 USCA § 6972

**(D)** No action may be commenced under subsection (a)(1)(B) of this section by any person (other than a State or local government) with respect to the siting of a hazardous waste treatment, storage, or a disposal facility, nor to restrain or enjoin the issuance of a permit for such facility.

**(E)** In any action under subsection (a)(1)(B) of this section in a court of the United States, any person may intervene as a matter of right when the applicant claims an interest relating to the subject of the action and he is so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest, unless the Administrator or the State shows that the applicant's interest is adequately represented by existing parties.

**(F)** Whenever any action is brought under subsection (a)(1)(B) of this section in a court of the United States, the plaintiff shall serve a copy of the complaint on the Attorney General of the United States and with the Administrator.

(c) Notice

No action may be commenced under paragraph (a)(2) of this section prior to sixty days after the plaintiff has given notice to the Administrator that he will commence such action, except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of subchapter III of this chapter. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation. Any action respecting a violation under this chapter may be brought under this section only in the judicial district in which such alleged violation occurs.

(d) Intervention

In any action under this section the Administrator, if not a party, may intervene as a matter of right.

(e) Costs

The court, in issuing any final order in any action brought pursuant to this section or section 6976 of this title, may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party, whenever the court determines such an award is appropriate. The court may, if a temporary restraining order or preliminary injunction is sought, require the filing of a bond or equivalent security in accordance with the Federal Rules of Civil Procedure.

(f) Other rights preserved

Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or requirement relating to the management of solid waste or hazardous waste, or to seek any other relief (including relief against the Administrator or a State agency).

ADD. 12

§ 6972. Citizen suits, 42 USCA § 6972

(g) Transporters

A transporter shall not be deemed to have contributed or to be contributing to the handling, storage, treatment, or disposal, referred to in subsection (a)(1)(B) of this section taking place after such solid waste or hazardous waste has left the possession or control of such transporter, if the transportation of such waste was under a sole contractual arrangement arising from a published tariff and acceptance for carriage by common carrier by rail and such transporter has exercised due care in the past or present handling, storage, treatment, transportation and disposal of such waste.

**CREDIT(S)**

(Pub.L. 89-272, Title II, § 7002, as added Pub.L. 94-580, § 2, Oct. 21, 1976, 90 Stat. 2825; amended Pub.L. 95-609, § 7(p), Nov. 8, 1978, 92 Stat. 3083; Pub.L. 98-616, Title IV, § 401, Nov. 8, 1984, 98 Stat. 3268.)

Notes of Decisions (418)

Footnotes

1

     So in original. The comma probably should be a semicolon.

2

     So in original. Probably should be "1980".

42 U.S.C.A. § 6972, 42 USCA § 6972
Current through P.L. 113-163 (excluding P.L. 113-128) approved 8-8-14

**End of Document**          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

ADD. 13

§ 7-501. Definitions, MD ENVIR § 7-501

| West's Annotated Code of Maryland |
| Environment |
| Title 7. Hazardous Materials and Hazardous Substances (Refs & Annos) |
| Subtitle 5. Voluntary Cleanup Program (Refs & Annos) |

MD Code, Environment, § 7-501

§ 7-501. Definitions

Effective: July 1, 2012

Currentness

(a) In this subtitle the following words have the meanings indicated.

(b)(1) "Active enforcement" means after the Department has issued a notice of violation, order, consent order, or other enforcement action of the Department and until completion of activities required by that action.

(2) For purposes of paragraph (1) of this subsection, "other enforcement action" does not include a site complaint.

(c) "Applicant" means a person who applies to participate in the Voluntary Cleanup Program.

(d) "Background level" means the level of a substance occurring naturally at the site prior to any manmade spill or release.

(e) "Contamination" means a release, discharge, or threatened release of:

(1) A controlled hazardous substance, as defined in § 7-201 of this title; or

(2) Oil, as defined in § 4-401 of this article.

(f) "Eligible applicant" means:

ADD. 14

§ 7-501. Definitions, MD ENVIR § 7-501

(1) A responsible person who has not knowingly or willfully violated any law or regulation concerning controlled hazardous substances; or

(2) An inculpable person.

(g)(1) "Eligible property" means property that is contaminated or perceived to be contaminated.

(2) "Eligible property" does not include property that is:

(i) On the national priorities list under § 105 of the federal act;

(ii) Except as provided in paragraph (3)(i) of this subsection, under active enforcement; or

(iii) Subject to a controlled hazardous substances permit issued in accordance with this title.

(3)(i) "Eligible property" includes a site under active enforcement if:

1. All applications filed in connection with the property are filed by inculpable persons; and

2. Any response action plan and cleanup criteria approved by the Department under this subtitle is at least as protective of public health and the environment as the requirements of any outstanding active enforcement action.

(ii) "Eligible property" includes sites listed on the Comprehensive Environmental Response, Compensation, and Liability Information System.

(h) "Federal act" has the meaning stated in § 7-201(j) of this title.

(i) "Imminent and substantial endangerment" means a release or threatened release of a hazardous substance that may pose a risk of significant harm to the public health or the environment at some foreseeable time in the future and is not limited to an emergency situation.

ADD. 15

(j)(1) "Inculpable person" means a person who:

  (i) Has no prior or current ownership interest in an eligible property at the time of application to participate in the Voluntary Cleanup Program; and

  (ii) Has not caused or contributed to contamination at the eligible property at the time of application to participate in the Voluntary Cleanup Program.

  (2) "Inculpable person" includes:

  (i) A successor in interest in an eligible property acquired from an inculpable person, as defined in paragraph (1) of this subsection, if the successor in interest does not have a prior ownership interest in the eligible property and, other than by virtue of ownership of the eligible property, is not otherwise a responsible person at the eligible property; and

  (ii) Notwithstanding paragraph (1)(i) of this subsection, a person who is not considered a responsible person under § 7-201(t)(2) of this title.

(k) "Participant" means an applicant accepted into the Voluntary Cleanup Program.

(l) "Previously undiscovered contamination" means contamination at an eligible property which was not identified or addressed in a notice of no further requirements or response action plan.

(m) "Program" means the Voluntary Cleanup Program established under this subtitle.

(n) "Responsible person" has the meaning stated in § 7-201(t) of this title.

## Credits

Added by Acts 1997, c. 1, § 1, eff. Feb. 25, 1997; Acts 1997, c. 2, § 1, eff. Feb. 25, 1997. Amended by Acts 2004, c. 72, § 1, eff. Oct. 1, 2004; Acts 2004, c. 73, § 1, eff. Oct. 1, 2004; Acts 2006, c. 44, § 6, eff. April 8, 2006; Acts 2012, c. 66, § 6, eff. April 10, 2012.

ADD. 16

§ 7-501. Definitions, MD ENVIR § 7-501

(C) 2014 Thomson Reuters. No Claim to Orig. US Gov.Works.
MD Code, Environment, § 7-501, MD ENVIR § 7-501
Current through chapters effective July 1, 2014, of the 2014 Regular Session of the General Assembly.

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

ADD. 17

§ 7-503. Voluntary Cleanup Program, MD ENVIR § 7-503

| West's Annotated Code of Maryland |
| Environment |
| Title 7. Hazardous Materials and Hazardous Substances (Refs & Annos) |
| Subtitle 5. Voluntary Cleanup Program (Refs & Annos) |

MD Code, Environment, § 7-503

§ 7-503. Voluntary Cleanup Program

Currentness

(a) There is a Voluntary Cleanup Program in the Department.

(b) The purpose of the Voluntary Cleanup Program is to:

   (1) Encourage the investigation of eligible properties with known or perceived contamination;

   (2) Protect public health and the environment where cleanup projects are being performed or need to be performed;

   (3) Accelerate cleanup of eligible properties; and

   (4) Provide predictability and finality to the cleanup of eligible properties.

**Credits**

Added by Acts 1997, c. 1, § 1, eff. Feb. 25, 1997; Acts 1997, c. 2, § 1, eff. Feb. 25, 1997.

(C) 2014 Thomson Reuters. No Claim to Orig. US Gov.Works.

MD Code, Environment, § 7-503, MD ENVIR § 7-503

Current through chapters effective July 1, 2014, of the 2014 Regular Session of the General Assembly.

**End of Document**                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

ADD. 18

West's Annotated Code of Maryland
   Environment
      Title 7. Hazardous Materials and Hazardous Substances (Refs & Annos)
        Subtitle 5. Voluntary Cleanup Program (Refs & Annos)

MD Code, Environment, § 7-508

§ 7-508. Requirements of response action plan

Currentness

(a) After the Department approves an application in accordance with § 7-506 of this subtitle, the participant shall develop a response action plan that includes:

   (1) A plan for all work necessary to perform the proposed response action plan, including long-term monitoring and maintenance of the site, if necessary;

   (2) A demonstration to the satisfaction of the Department that the proposed response action plan:

      (i) Will achieve the appropriate criteria under subsection (b) of this section; and

      (ii) Will protect public health and the environment;

   (3) A certified written statement that the property meets all applicable county and municipal zoning requirements; and

   (4) Any other information related to the proposed response action plan that the Department may reasonably require to determine that the plan meets the requirements of this subtitle.

(b) A participant shall select one or more of the following criteria that protects public health and the environment, as may be appropriate when proposing a response action plan:

   (1) Uniform numeric risk-based standards;

   (2) Measurable standards based on site-specific risk assessments;

   (3) Background levels;

   (4) Federal or State soil standards or water quality standards;

§ 7-508. Requirements of response action plan, MD ENVIR § 7-508

(5) Standards based on federal or State maximum contaminant levels (MCLs); or

(6) Any other federal or State standards.

(c) The response action plan shall:

(1) Enumerate the responsibilities and duties of the Department and the participant;

(2) Include a schedule for the implementation and completion of the response action plan;

(3) Include a written agreement that if the response action plan is approved, the participant agrees, subject to the withdrawal provisions set forth in § 7-512 of this subtitle, to comply with the provisions of the plan; and

(4) Include a proposal for the filing of a performance bond or other security in accordance with the requirements of subsection (d) of this section.

(d)(1) A participant shall file a performance bond or other security with the Department within 10 days after receiving the Department's approval of a response action plan and before the participant may perform any work on the site.

(2)(i) The performance bond required under paragraph (1) of this subsection shall be in an amount determined by the Department to be necessary to secure and stabilize the site if the response action plan is not completed.

(ii) The market value of other security deposited under this section may not be less than the amount specified in subparagraph (i) of this paragraph.

(3) The obligation of the bond filed under this section shall be void upon the issuance of a certificate of completion to the participant or, if the participant withdraws from the Program, 16 months after the date of withdrawal.

(4) The obligation of the participant under the bond or other security shall become due and payable upon notification by the Department that actions must be taken to fulfill the requirements of § 7-512 of this subtitle to the extent the requirements of § 7-512 of this subtitle apply to the participant.

(e)(1) The Department may adopt uniform numeric risk-based standards by regulation based on residential and industrial uses under subsection (b) of this section.

(2) The Department shall review uniform numeric risk-based standards every 4 years and may revise the standards.

ADD. 20[2]

§ 7-508. Requirements of response action plan, MD ENVIR § 7-508

(f) This section may not be construed to eliminate or otherwise affect any other provision of law requiring a person to report a release or a threat of a release of a controlled hazardous substance.

**Credits**

Added by Acts 1997, c. 1, § 1, eff. Feb. 25, 1997; Acts 1997, c. 2, § 1, eff. Feb. 25, 1997; Acts 2013, c. 43, § 5.

(C) 2014 Thomson Reuters. No Claim to Orig. US Gov.Works.

MD Code, Environment, § 7-508, MD ENVIR § 7-508

Current through chapters effective July 1, 2014, of the 2014 Regular Session of the General Assembly.

**End of Document**    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

West's Annotated Code of Maryland
   Environment
      Title 7. Hazardous Materials and Hazardous Substances (Refs & Annos)
         Subtitle 5. Voluntary Cleanup Program (Refs & Annos)

MD Code, Environment, § 7-512

§ 7-512. Withdrawal provisions; failure to comply with schedule

Currentness

(a) Except as provided in subsections (b) and (c) of this section, a participant may withdraw from the Program at the time of a pending application or response action plan, or after receiving a certificate of completion, and may not be obligated to complete an application or a response action plan if the participant:

   (1) Provides 10 days' written notice of the anticipated withdrawal to the Department;

   (2) Stabilizes and secures the eligible property to the satisfaction of the Department to ensure protection of the public health and the environment; and

   (3) Forfeits any application fees.

(b)(1) Except as provided in paragraph (2) of this subsection, an inculpable person who withdraws from the Program may not be required by the Department to clean up the eligible property.

   (2) If an inculpable person withdraws from the Program, the inculpable person shall be liable for new contamination or the exacerbation of existing contamination at the eligible property as provided in § 7-505 of this subtitle.

(c) If a responsible person withdraws from the Program, the Department may take any applicable enforcement action authorized under this title.

(d) If a participant fails to meet the schedule for implementation and completion of the response action plan that is set forth in the plan, the Department may:

   (1) Reach an agreement with the participant to revise the schedule of completion in the response action plan; or

   (2) If an agreement cannot be reached under paragraph (1) of this subsection, withdraw approval of the response action plan.

(e)(1) Except as provided in paragraph (2) of this subsection, if the Department withdraws approval of an inculpable person's response action plan under subsection (d)(2) of this section, the inculpable person may not be required by the Department to complete the response action plan.

(2) If the Department withdraws approval of an inculpable person's response action plan under subsection (d)(2) of this section, the inculpable person:

    (i) Shall stabilize and secure the eligible property to ensure protection of the public health and the environment; and

    (ii) Shall be liable for new contamination or the exacerbation of existing contamination at the eligible property as provided in § 7-505 of this subtitle.

(3) If the Department withdraws approval of a responsible person's response action plan:

    (i) The responsible person shall stabilize and secure the eligible property to ensure protection of the public health and the environment; and

    (ii) The Department may take any applicable enforcement action authorized under this title.

(f) If an application, a response action plan, or a certificate of completion is withdrawn under this section:

    (1) Any letter or certificate of completion issued to an applicant or a participant under this subtitle shall be void; and

    (2) Any bond or other security shall be maintained for a period not to exceed 16 months from the date the response action plan is withdrawn.

**Credits**

Added by Acts 1997, c. 1, § 1, eff. Feb. 25, 1997; Acts 1997, c. 2, § 1, eff. Feb. 25, 1997. Amended by Acts 1998, c. 21, § 1, eff. April 14, 1998; Acts 2004, c. 72, § 1, eff. Oct. 1, 2004; Acts 2004, c. 73, § 1, eff. Oct. 1, 2004; Acts 2013, c. 43, § 5.

(C) 2014 Thomson Reuters. No Claim to Orig. US Gov.Works.

MD Code, Environment, § 7-512, MD ENVIR § 7-512

Current through chapters effective July 1, 2014, of the 2014 Regular Session of the General Assembly.

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

§ 9-253. State water pollution control agency - WestlawNext                    Page 1 of 1

WestlawNext™

**§ 9-253. State water pollution control agency**
West's Annotated Code of Maryland   Environment   *(Approx. 2 pages)*

**NOTES OF DECISIONS (3)**

In general
Review

West's Annotated Code of Maryland
    Environment
        Title 9. Water, Ice, and Sanitary Facilities (Refs & Annos)
            Subtitle 2. Regulation by State (Refs & Annos)
                Part IV. Miscellaneous Provisions

MD Code, Environment, § 9-253

§ 9-253. State water pollution control agency

Currentness

(a) For purposes of the Federal Water Pollution Control Act,[1] the Secretary is the State water pollution control agency in this State.

(b) The Secretary has all powers that are necessary to comply with and represent this State under the Federal Water Pollution Control Act.

(c) Another unit of the State government may not exercise any power given to the Secretary under this section.

**Credits**
Acts 1987, c. 612, § 2.

| Notes of Decisions (3) |
| --- |

(C) 2014 Thomson Reuters. No Claim to Orig. US Gov.Works.

| Footnotes |
| --- |

1        June 30, 1948, ch. 758, 62 Stat. 1155, codified at 33 U.S.C.A. § 1251 et seq.

MD Code, Environment, § 9-253, MD ENVIR § 9-253
Current through chapters effective July 1, 2014, of the 2014 Regular Session of the General Assembly.

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 THOMSON REUTERS

ADD. 24

§ 9-322. Discharges into waters prohibited, MD ENVIR § 9-322

| West's Annotated Code of Maryland |
| Environment |
| Title 9. Water, Ice, and Sanitary Facilities (Refs & Annos) |
| Subtitle 3. Water Pollution Control |
| Part IV. Discharge Permits (Refs & Annos) |

MD Code, Environment, § 9-322

§ 9-322. Discharges into waters prohibited

Currentness

Except as provided in this subtitle and Subtitle 4 of Title 4 of this article and the rules and regulations adopted under those subtitles, a person may not discharge any pollutant into the waters of this State.

**Credits**

Acts 1982, c. 240, § 2; Acts 1987, c. 306, § 15; Acts 1988, c. 6, § 11.

**Formerly** Art. 27, § 583.

Notes of Decisions (4)

(C) 2014 Thomson Reuters. No Claim to Orig. US Gov.Works.
MD Code, Environment, § 9-322, MD ENVIR § 9-322
Current through chapters effective July 1, 2014, of the 2014 Regular Session of the General Assembly.

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

ADD. 25

§ 122.26 Storm water discharges (applicable to State NPDES..., 40 C.F.R. § 122.26

| Code of Federal Regulations |
| --- |
| Title 40. Protection of Environment |
| Chapter I. Environmental Protection Agency (Refs & Annos) |
| Subchapter D. Water Programs |
| Part 122. EPA Administered Permit Programs: the National Pollutant Discharge Elimination System (Refs & Annos) |
| Subpart B. Permit Application and Special NPDES Program Requirements |

40 C.F.R. § 122.26

§ 122.26 Storm water discharges (applicable to State NPDES programs, see § 123.25).

Effective: January 7, 2013
Currentness

<For statute(s) affecting validity, see: The Clean Water Act, 33 USCA § 1251 et seq.>

(a) Permit requirement.

(1) Prior to October 1, 1994, discharges composed entirely of storm water shall not be required to obtain a NPDES permit except:

(i) A discharge with respect to which a permit has been issued prior to February 4, 1987;

(ii) A discharge associated with industrial activity (see § 122.26(a)(4));

(iii) A discharge from a large municipal separate storm sewer system;

(iv) A discharge from a medium municipal separate storm sewer system;

(v) A discharge which the Director, or in States with approved NPDES programs, either the Director or the EPA Regional Administrator, determines to contribute to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States. This designation may include a discharge from any conveyance or system of conveyances used for collecting and conveying storm water runoff or a system of discharges from municipal separate storm sewers, except for those discharges from conveyances which do not require a permit under paragraph (a)(2) of this section or agricultural storm water runoff which is exempted from the definition of point source at § 122.2.

The Director may designate discharges from municipal separate storm sewers on a system-wide or jurisdiction-wide basis. In making this determination the Director may consider the following factors:

(A) The location of the discharge with respect to waters of the United States as defined at 40 CFR 122.2.

(B) The size of the discharge;

(C) The quantity and nature of the pollutants discharged to waters of the United States; and

(D) Other relevant factors.

(2) The Director may not require a permit for discharges of storm water runoff from the following:

(i) Mining operations composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation runoff and which are not contaminated by contact with or that have not come into contact with, any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations, except in accordance with paragraph (c)(1)(iv) of this section.

(ii) All field activities or operations associated with oil and gas exploration, production, processing, or treatment operations or transmission facilities, including activities necessary to prepare a site for drilling and for the movement and placement of drilling equipment, whether or not such field activities or operations may be considered to be construction activities, except in accordance with paragraph (c)(1)(iii) of this section. Discharges of sediment from construction activities associated with oil and gas exploration, production, processing, or treatment operations or transmission facilities are not subject to the provisions of paragraph (c)(1)(iii)(C) of this section.

Note to paragraph (a)(2)(ii): EPA encourages operators of oil and gas field activities or operations to implement and maintain Best Management Practices (BMPs) to minimize discharges of pollutants, including sediment, in storm water both during and after construction activities to help ensure protection of surface water quality during storm events. Appropriate controls would be those suitable to the site conditions and consistent with generally accepted engineering design criteria and manufacturer specifications. Selection of BMPs could also be affected by seasonal or climate conditions.

(3) Large and medium municipal separate storm sewer systems.

(i) Permits must be obtained for all discharges from large and medium municipal separate storm sewer systems.

(ii) The Director may either issue one system-wide permit covering all discharges from municipal separate storm sewers within a large or medium municipal storm sewer system or issue distinct permits for appropriate categories of discharges within a large or medium municipal separate storm sewer system including, but not limited to: all discharges owned or operated by the same municipality; located within the same jurisdiction; all discharges within a system that discharge to the same watershed; discharges within a system that are similar in nature; or for individual discharges from municipal separate storm sewers within the system.

(iii) The operator of a discharge from a municipal separate storm sewer which is part of a large or medium municipal separate storm sewer system must either:

(A) Participate in a permit application (to be a permittee or a co-permittee) with one or more other operators of discharges from the large or medium municipal storm sewer system which covers all, or a portion of all, discharges from the municipal separate storm sewer system;

(B) Submit a distinct permit application which only covers discharges from the municipal separate storm sewers for which the operator is responsible; or

(C) A regional authority may be responsible for submitting a permit application under the following guidelines:

(1) The regional authority together with co-applicants shall have authority over a storm water management program that is in existence, or shall be in existence at the time part 1 of the application is due;

(2) The permit applicant or co-applicants shall establish their ability to make a timely submission of part 1 and part 2 of the municipal application;

(3) Each of the operators of municipal separate storm sewers within the systems described in paragraphs (b)(4)(i), (ii), and (iii) or (b)(7)(i), (ii), and (iii) of this section, that are under the purview of the designated regional authority, shall comply with the application requirements of paragraph (d) of this section.

(iv) One permit application may be submitted for all or a portion of all municipal separate storm sewers within adjacent or interconnected large or medium municipal separate storm sewer systems. The Director may issue one system-wide permit covering all, or a portion of all municipal separate storm sewers in adjacent or interconnected large or medium municipal separate storm sewer systems.

(v) Permits for all or a portion of all discharges from large or medium municipal separate storm sewer systems that are issued on a system-wide, jurisdiction-wide, watershed or other basis may specify different conditions relating to different discharges covered by the permit, including different management programs for different drainage areas which contribute storm water to the system.

(vi) Co-permittees need only comply with permit conditions relating to discharges from the municipal separate storm sewers for which they are operators.

(4) Discharges through large and medium municipal separate storm sewer systems. In addition to meeting the requirements of paragraph (c) of this section, an operator of a storm water discharge associated with industrial activity which discharges through a large or medium municipal separate storm sewer system shall submit, to the operator of the municipal separate storm sewer system receiving the discharge no later than May 15, 1991, or 180 days prior to commencing such discharge: the name of the facility; a contact person and phone number; the location of the discharge; a description, including Standard Industrial Classification, which best reflects the principal products or services provided by each facility; and any existing NPDES permit number.

(5) Other municipal separate storm sewers. The Director may issue permits for municipal separate storm sewers that are designated under paragraph (a)(1)(v) of this section on a system-wide basis, jurisdiction-wide basis, watershed basis or other appropriate basis, or may issue permits for individual discharges.

(6) Non-municipal separate storm sewers. For storm water discharges associated with industrial activity from point sources which discharge through a non-municipal or non-publicly owned separate storm sewer system, the Director, in his discretion, may issue: a single NPDES permit, with each discharger a co-permittee to a permit issued to the operator of the portion of the system that discharges into waters of the United States; or, individual permits to each discharger of storm water associated with industrial activity through the non-municipal conveyance system.

(i) All storm water discharges associated with industrial activity that discharge through a storm water discharge system that is not a municipal separate storm sewer must be covered by an individual permit, or a permit issued to the operator of the portion of the system that discharges to waters of the United States, with each discharger to the non-municipal conveyance a co-permittee to that permit.

(ii) Where there is more than one operator of a single system of such conveyances, all operators of storm water discharges associated with industrial activity must submit applications.

(iii) Any permit covering more than one operator shall identify the effluent limitations, or other permit conditions, if any, that apply to each operator.

(7) Combined sewer systems. Conveyances that discharge storm water runoff combined with municipal sewage are point sources that must obtain NPDES permits in accordance with the procedures of § 122.21 and are not subject to the provisions of this section.

(8) Whether a discharge from a municipal separate storm sewer is or is not subject to regulation under this section shall have no bearing on whether the owner or operator of the discharge is eligible for funding under title II, title III or title VI of the Clean Water Act. See 40 CFR part 35, subpart I, appendix A(b)H.2.j.

(9)(i) On and after October 1, 1994, for discharges composed entirely of storm water, that are not required by paragraph (a)(1) of this section to obtain a permit, operators shall be required to obtain a NPDES permit only if:

(A) The discharge is from a small MS4 required to be regulated pursuant to § 122.32;

(B) The discharge is a storm water discharge associated with small construction activity pursuant to paragraph (b)(15) of this section;

(C) The Director, or in States with approved NPDES programs either the Director or the EPA Regional Administrator, determines that storm water controls are needed for the discharge based on wasteload allocations that are part of "total maximum daily loads" (TMDLs) that address the pollutant(s) of concern; or

(D) The Director, or in States with approved NPDES programs either the Director or the EPA Regional Administrator, determines that the discharge, or category of discharges within a geographic area, contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

(ii) Operators of small MS4s designated pursuant to paragraphs (a)(9)(i)(A), (a)(9)(i)(C), and (a)(9)(i)(D) of this section shall seek coverage under an NPDES permit in accordance with §§ 122.33 through 122.35. Operators of non-municipal sources designated pursuant to paragraphs (a)(9)(i)(B), (a)(9)(i)(C), and (a)(9)(i)(D) of this section shall seek coverage under an NPDES permit in accordance with paragraph (c)(1) of this section.

(iii) Operators of storm water discharges designated pursuant to paragraphs (a)(9)(i)(C) and (a)(9)(i)(D) of this section shall apply to the Director for a permit within 180 days of receipt of notice, unless permission for a later date is granted by the Director (see § 124.52(c) of this chapter).

(b) Definitions.

(1) Co-permittee means a permittee to a NPDES permit that is only responsible for permit conditions relating to the discharge for which it is operator.

(2) Illicit discharge means any discharge to a municipal separate storm sewer that is not composed entirely of storm water except discharges pursuant to a NPDES permit (other than the NPDES permit for discharges from the municipal separate storm sewer) and discharges resulting from fire fighting activities.

(3) Incorporated place means the District of Columbia, or a city, town, township, or village that is incorporated under the laws of the State in which it is located.

(4) Large municipal separate storm sewer system means all municipal separate storm sewers that are either:

(i) Located in an incorporated place with a population of 250,000 or more as determined by the 1990 Decennial Census by the Bureau of the Census (Appendix F of this part); or

(ii) Located in the counties listed in appendix H, except municipal separate storm sewers that are located in the incorporated places, townships or towns within such counties; or

(iii) Owned or operated by a municipality other than those described in paragraph (b)(4)(i) or (ii) of this section and that are designated by the Director as part of the large or medium municipal separate storm sewer system due to the interrelationship between the discharges of the designated storm sewer and the discharges from municipal separate storm sewers described under paragraph (b)(4)(i) or (ii) of this section. In making this determination the Director may consider the following factors:

(A) Physical interconnections between the municipal separate storm sewers;

(B) The location of discharges from the designated municipal separate storm sewer relative to discharges from municipal separate storm sewers described in paragraph (b)(4)(i) of this section;

(C) The quantity and nature of pollutants discharged to waters of the United States;

(D) The nature of the receiving waters; and

(E) Other relevant factors; or

(iv) The Director may, upon petition, designate as a large municipal separate storm sewer system, municipal separate storm sewers located within the boundaries of a region defined by a storm water management regional authority based on a jurisdictional, watershed, or other appropriate basis that includes one or more of the systems described in paragraph (b)(4)(i), (ii), (iii) of this section.

(5) Major municipal separate storm sewer outfall (or "major outfall") means a municipal separate storm sewer outfall that discharges from a single pipe with an inside diameter of 36 inches or more or its equivalent (discharge from a single conveyance other than circular pipe which is associated with a drainage area of more than 50 acres); or for municipal separate storm sewers that receive storm water from lands zoned for industrial activity (based on comprehensive zoning plans or the equivalent), an outfall that discharges from a single pipe with an inside diameter of 12 inches or more or from its equivalent (discharge from other than a circular pipe associated with a drainage area of 2 acres or more).

(6) Major outfall means a major municipal separate storm sewer outfall.

(7) Medium municipal separate storm sewer system means all municipal separate storm sewers that are either:

(i) Located in an incorporated place with a population of 100,000 or more but less than 250,000, as determined by the 1990 Decennial Census by the Bureau of the Census (appendix G of this part); or

(ii) Located in the counties listed in appendix I, except municipal separate storm sewers that are located in the incorporated places, townships or towns within such counties; or

(iii) Owned or operated by a municipality other than those described in paragraph (b)(7)(i) or (ii) of this section and that are designated by the Director as part of the large or medium municipal separate storm sewer system due to the interrelationship between the discharges of the designated storm sewer and the discharges from municipal separate storm sewers described under paragraph (b)(7)(i) or (ii) of this section. In making this determination the Director may consider the following factors:

(A) Physical interconnections between the municipal separate storm sewers;

(B) The location of discharges from the designated municipal separate storm sewer relative to discharges from municipal separate storm sewers described in paragraph (b)(7)(i) of this section;

(C) The quantity and nature of pollutants discharged to waters of the United States;

(D) The nature of the receiving waters; or

(E) Other relevant factors; or

(iv) The Director may, upon petition, designate as a medium municipal separate storm sewer system, municipal separate storm sewers located within the boundaries of a region defined by a storm water management regional authority based on a jurisdictional, watershed, or other appropriate basis that includes one or more of the systems described in paragraphs (b)(7) (i), (ii), (iii) of this section.

(8) Municipal separate storm sewer means a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains):

(i) Owned or operated by a State, city, town, borough, county, parish, district, association, or other public body (created by or pursuant to State law) having jurisdiction over disposal of sewage, industrial wastes, storm water, or other wastes, including special districts under State law such as a sewer district, flood control district or drainage district, or similar entity, or an Indian tribe or an authorized Indian tribal organization, or a designated and approved management agency under section 208 of the CWA that discharges to waters of the United States;

(ii) Designed or used for collecting or conveying storm water;

(iii) Which is not a combined sewer; and

(iv) Which is not part of a Publicly Owned Treatment Works (POTW) as defined at 40 CFR 122.2.

(9) Outfall means a point source as defined by 40 CFR 122.2 at the point where a municipal separate storm sewer discharges to waters of the United States and does not include open conveyances connecting two municipal separate storm sewers, or pipes, tunnels or other conveyances which connect segments of the same stream or other waters of the United States and are used to convey waters of the United States.

(10) Overburden means any material of any nature, consolidated or unconsolidated, that overlies a mineral deposit, excluding topsoil or similar naturally-occurring surface materials that are not disturbed by mining operations.

(11) Runoff coefficient means the fraction of total rainfall that will appear at a conveyance as runoff.

(12) Significant materials includes, but is not limited to: raw materials; fuels; materials such as solvents, detergents, and plastic pellets; finished materials such as metallic products; raw materials used in food processing or production; hazardous substances designated under section 101(14) of CERCLA; any chemical the facility is required to report pursuant to section 313 of title III of SARA; fertilizers; pesticides; and waste products such as ashes, slag and sludge that have the potential to be released with storm water discharges.

(13) Storm water means storm water runoff, snow melt runoff, and surface runoff and drainage.

(14) Storm water discharge associated with industrial activity means the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant. The term does not include discharges from facilities or activities excluded from the NPDES program under this part 122. For the categories of industries identified in this section, the term includes, but is not limited to, storm water discharges from industrial plant yards; immediate access roads and rail lines used or traveled by carriers of raw materials, manufactured products, waste material, or by-products used or created by the facility; material handling sites; refuse sites; sites used for the application or disposal of process waste waters (as defined at part 401 of this chapter); sites used for the storage and maintenance of material handling equipment; sites used for residual treatment, storage, or disposal; shipping and receiving areas; manufacturing buildings; storage areas (including tank farms) for raw materials, and intermediate and final products; and areas where industrial activity has taken place in the past and significant materials remain and are exposed to storm water. For the purposes of this paragraph, material handling activities include storage, loading and unloading, transportation, or conveyance of any raw material, intermediate product, final product, by-product or waste product. The term excludes areas located on plant lands separate from the plant's industrial activities, such as office buildings and accompanying parking lots as long as the drainage from the excluded areas is not mixed with storm water drained from the above described areas. Industrial facilities (including industrial facilities that are federally, State, or municipally owned or operated that meet the description of the facilities listed in paragraphs (b)(14)(i) through (xi) of this section) include those facilities designated under the provisions of paragraph (a)(1)(v) of this section. The following categories of facilities are considered to be engaging in "industrial activity" for purposes of paragraph (b)(14):

(i) Facilities subject to storm water effluent limitations guidelines, new source performance standards, or toxic pollutant effluent standards under 40 CFR subchapter N (except facilities with toxic pollutant effluent standards which are exempted under category (xi) in paragraph (b)(14) of this section);

(ii) Facilities classified within Standard Industrial Classification 24, Industry Group 241 that are rock crushing, gravel washing, log sorting, or log storage facilities operated in connection with silvicultural activities defined in 40 CFR 122.27(b)(2)-(3) and Industry Groups 242 through 249; 26 (except 265 and 267), 28 (except 283), 29, 311, 32 (except 323), 33, 3441, 373; (not included are all other types of silviculture facilities);

(iii) Facilities classified as Standard Industrial Classifications 10 through 14 (mineral industry) including active or inactive mining operations (except for areas of coal mining operations no longer meeting the definition of a reclamation area under 40 CFR 434.11(1) because the performance bond issued to the facility by the appropriate SMCRA authority has been released, or except for areas of non-coal mining operations which have been released from applicable State or Federal reclamation requirements after December 17, 1990) and oil and gas exploration, production, processing, or treatment operations, or transmission facilities that discharge storm water contaminated by contact with or that has come into contact with, any overburden, raw material, intermediate products, finished products, byproducts or waste products located on the site of such operations; (inactive mining operations are mining sites that are not being actively mined, but which have an identifiable owner/operator; inactive mining sites do not include sites where mining claims are being maintained prior

§ 122.26 Storm water discharges (applicable to State NPDES..., 40 C.F.R. § 122.26

to disturbances associated with the extraction, beneficiation, or processing of mined materials, nor sites where minimal activities are undertaken for the sole purpose of maintaining a mining claim);

(iv) Hazardous waste treatment, storage, or disposal facilities, including those that are operating under interim status or a permit under subtitle C of RCRA;

(v) Landfills, land application sites, and open dumps that receive or have received any industrial wastes (waste that is received from any of the facilities described under this subsection) including those that are subject to regulation under subtitle D of RCRA;

(vi) Facilities involved in the recycling of materials, including metal scrapyards, battery reclaimers, salvage yards, and automobile junkyards, including but limited to those classified as Standard Industrial Classification 5015 and 5093;

(vii) Steam electric power generating facilities, including coal handling sites;

(viii) Transportation facilities classified as Standard Industrial Classifications 40, 41, 42 (except 4221–25), 43, 44, 45, and 5171 which have vehicle maintenance shops, equipment cleaning operations, or airport deicing operations. Only those portions of the facility that are either involved in vehicle maintenance (including vehicle rehabilitation, mechanical repairs, painting, fueling, and lubrication), equipment cleaning operations, airport deicing operations, or which are otherwise identified under paragraphs (b)(14) (i)–(vii) or (ix)–(xi) of this section are associated with industrial activity;

(ix) Treatment works treating domestic sewage or any other sewage sludge or wastewater treatment device or system, used in the storage treatment, recycling, and reclamation of municipal or domestic sewage, including land dedicated to the disposal of sewage sludge that are located within the confines of the facility, with a design flow of 1.0 mgd or more, or required to have an approved pretreatment program under 40 CFR part 403. Not included are farm lands, domestic gardens or lands used for sludge management where sludge is beneficially reused and which are not physically located in the confines of the facility, or areas that are in compliance with section 405 of the CWA;

(x) Construction activity including clearing, grading and excavation, except operations that result in the disturbance of less than five acres of total land area. Construction activity also includes the disturbance of less than five acres of total land area that is a part of a larger common plan of development or sale if the larger common plan will ultimately disturb five acres or more;

(xi) Facilities under Standard Industrial Classifications 20, 21, 22, 23, 2434, 25, 265, 267, 27, 283, 285, 30, 31 (except 311), 323, 34 (except 3441), 35, 36, 37 (except 373), 38, 39, and 4221–25;

(15) Storm water discharge associated with small construction activity means the discharge of storm water from:

(i) Construction activities including clearing, grading, and excavating that result in land disturbance of equal to or greater than one acre and less than five acres. Small construction activity also includes the disturbance of less than one acre of total land area that is part of a larger common plan of development or sale if the larger common plan will ultimately disturb equal to or greater than one and less than five acres. Small construction activity does not include routine maintenance that is

Code of Federal Regulations
   Title 40. Protection of Environment
      Chapter I. Environmental Protection Agency (Refs & Annos)
         Subchapter D. Water Programs
            Part 123. State Program Requirements (Refs & Annos)
               Subpart A. General

40 C.F.R. § 123.1

§ 123.1 Purpose and scope.

Currentness

(a) This part specifies the procedures EPA will follow in approving, revising, and withdrawing State programs and the requirements State programs must meet to be approved by the Administrator under sections 318, 402, and 405(a) (National Pollutant Discharge Elimination System--NPDES) of the CWA. This part also specifies the procedures EPA will follow in approving, revising, and withdrawing State programs under section 405(f) (sludge management programs) of the CWA. The requirements that a State sewage sludge management program must meet for approval by the Administrator under section 405(f) are set out at 40 CFR part 501.

(b) These regulations are promulgated under the authority of sections 304(i), 101(e), 405, and 518(e) of the CWA, and implement the requirements of those sections.

(c) The Administrator will approve State programs which conform to the applicable requirements of this part. A State NPDES program will not be approved by the Administrator under section 402 of CWA unless it has authority to control the discharges specified in sections 318 and 405(a) of CWA. Permit programs under sections 318 and 405(a) will not be approved independent of a section 402 program.

(d)(1) Upon approval of a State program, the Administrator shall suspend the issuance of Federal permits for those activities subject to the approved State program. After program approval EPA shall retain jurisdiction over any permits (including general permits) which it has issued unless arrangements have been made with the State in the Memorandum of Agreement for the State to assume responsibility for these permits. Retention of jurisdiction shall include the processing of any permit appeals, modification requests, or variance requests; the conduct of inspections, and the receipt and review of self-monitoring reports. If any permit appeal, modification request or variance request is not finally resolved when the federally issued permit expires, EPA may, with the consent of the State, retain jurisdiction until the matter is resolved.

(2) The procedures outlined in the preceding paragraph (d)(1) of this section for suspension of permitting authority and transfer of existing permits will also apply when EPA approves an Indian Tribe's application to operate a State program and a State was the authorized permitting authority under § 123.23(b) for activities within the scope of the newly approved program. The authorized State will retain jurisdiction over its existing permits as described in paragraph (d)(1) of this section absent a different arrangement stated in the Memorandum of Agreement executed between EPA and the Tribe.

(e) Upon submission of a complete program, EPA will conduct a public hearing, if interest is shown, and determine whether to approve or disapprove the program taking into consideration the requirements of this part, the CWA and any comments received.

§ 123.1 Purpose and scope., 40 C.F.R. § 123.1

(f) Any State program approved by the Administrator shall at all times be conducted in accordance with the requirements of this part.

(g)(1) Except as may be authorized pursuant to paragraph (g)(2) of this section or excluded by § 122.3, the State program must prohibit all point source discharges of pollutants, all discharges into aquaculture projects, and all disposal of sewage sludge which results in any pollutant from such sludge entering into any waters of the United States within the State's jurisdiction except as authorized by a permit in effect under the State program or under section 402 of CWA. NPDES authority may be shared by two or more State agencies but each agency must have Statewide jurisdiction over a class of activities or discharges. When more than one agency is responsible for issuing permits, each agency must make a submission meeting the requirements of § 123.21 before EPA will begin formal review.

(2) A State may seek approval of a partial or phased program in accordance with section 402(n) of the CWA.

(h) In many cases, States (other than Indian Tribes) will lack authority to regulate activities on Indian lands. This lack of authority does not impair that State's ability to obtain full program approval in accordance with this part, i.e., inability of a State to regulate activities on Indian lands does not constitute a partial program. EPA will administer the program on Indian lands if a State (or Indian Tribe) does not seek or have authority to regulate activities on Indian lands.

Note: States are advised to contact the United States Department of the Interior, Bureau of Indian Affairs, concerning authority over Indian lands.

(i) Nothing in this part precludes a State from:

(1) Adopting or enforcing requirements which are more stringent or more extensive than those required under this part;

(2) Operating a program with a greater scope of coverage than that required under this part. If an approved State program has greater scope of coverage than required by Federal law the additional coverage is not part of the Federally approved program.

Note: For example, if a State requires permits for discharges into publicly owned treatment works, these permits are not NPDES permits.

**Credits**
[54 FR 256, Jan. 4, 1989; 54 FR 18784, May 2, 1989; 58 FR 67981, Dec. 22, 1993; 59 FR 64343, Dec. 14, 1994; 63 FR 45122, Aug. 24, 1998]

SOURCE: 45 FR 33456, May 19, 1980, as amended at 48 FR 14178, Apr. 1, 1983, unless otherwise noted.

AUTHORITY: Clean Water Act, 33 U.S.C. 1251 et seq.

| Code of Federal Regulations |
| Title 40. Protection of Environment |
| Chapter I. Environmental Protection Agency (Refs & Annos) |
| Subchapter I. Solid Wastes |
| Part 261. Identification and Listing of Hazardous Waste (Refs & Annos) |
| Subpart A. General |

40 C.F.R. § 261.4

§ 261.4 Exclusions.

Effective: March 4, 2014

Currentness

<For statute(s) affecting validity, see: Solid Waste Disposal Act, § 3004(q), 42 USCA § 6924(q).>

(a) Materials which are not solid wastes. The following materials are not solid wastes for the purpose of this part:

(1)(i) Domestic sewage; and

(ii) Any mixture of domestic sewage and other wastes that passes through a sewer system to a publicly-owned treatment works for treatment. "Domestic sewage" means untreated sanitary wastes that pass through a sewer system.

(2) Industrial wastewater discharges that are point source discharges subject to regulation under section 402 of the Clean Water Act, as amended.

[Comment: This exclusion applies only to the actual point source discharge. It does not exclude industrial wastewaters while they are being collected, stored or treated before discharge, nor does it exclude sludges that are generated by industrial wastewater treatment.]

(3) Irrigation return flows.

(4) Source, special nuclear or by-product material as defined by the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 et seq.

(5) Materials subjected to in-situ mining techniques which are not removed from the ground as part of the extraction process.

(6) Pulping liquors (i.e., black liquor) that are reclaimed in a pulping liquor recovery furnace and then reused in the pulping process, unless it is accumulated speculatively as defined in § 261.1(c) of this chapter.

(7) Spent sulfuric acid used to produce virgin sulfuric acid, unless it is accumulated speculatively as defined in § 261.1(c) of this chapter.

(8) Secondary materials that are reclaimed and returned to the original process or processes in which they were generated where they are reused in the production process provided:

ADD. 37

> Code of Maryland Regulations
>   Title 26. Department of the Environment
>     Subtitle 08. Water Pollution
>       Chapter 01. General

COMAR T. 26, Subt. 08, Ch. 01, Refs & Annos
Currentness

**Editors' Notes**

Authority: Environment Article, §§9-313-9-316, 9-319, 9-320, 9-325, 9-327, and 9-328, Annotated Code of Maryland

Complete through Maryland Register Vol. 41, Issue 16, dated August 8, 2014.

**End of Document**                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Code of Maryland Regulations
   Title 26. Department of the Environment
     Subtitle 08. Water Pollution
       Chapter 04. Permits (Refs & Annos)

COMAR 26.08.04.09

.09. General Discharge Permits.

Currentness

A. General Discharge Permit for Storm Water Discharge Associated with Construction Activity.

(1) Exception. Construction activity excluded under the Federal Act and regulated under COMAR 26.09.02 is not covered under this general permit.

(2) Activities Covered. Activities covered under this general permit are new and existing storm water discharges that are composed in whole or in part of discharges associated with construction activity as regulated under the Federal Act and Environment Article, Title 4, Subtitles 1 and 2, Annotated Code of Maryland.

(3) Need for Additional Permits. Storm water discharges which result from the completed construction authorized under this regulation may require additional authorization under other general permit regulations or an individual permit.

(4) Application. Before the initiation of an activity covered under this permit, an applicant shall make application to the Department, including the payment of any fees.

(5) Specific Requirements. A permittee shall comply with requirements to obtain approval for:

(a) Erosion and sediment control plans required under Environment Article, Title 4, Subtitle 1, Annotated Code of Maryland; and

(b) Storm water management plans required under Environment Article, Title 4, Subtitle 2, Annotated Code of Maryland.

B. General Discharge Permit for Storm Water Discharges Associated with Industrial Activity.

(1) Exceptions. The following activities are not regulated under this general permit:

(a) Industrial storm water discharges with federal effluent guideline limitations;

Appeal: 14-1825     Doc: 27     Filed: 10/15/2014     Pg: 103 of 140

Try Another Page | Return to Search Page

*26.13.02.19*

## .19 Discarded Commercial Chemical Products, Off-Specification Species, Containers, and Spill Residues of These.

The following materials or items are hazardous wastes if and when they are discarded or intended to be discarded as described in Regulation .02A(2)(a) of this chapter, when they are mixed with waste oil or used oil or other material and applied to the land for dust suppression or road treatment, when they are otherwise applied to the land instead of their original intended use or when they are contained in products that are applied to the land instead of their original intended use or when, instead of their original intended use, they are produced for use as (or as a component of) a fuel, distributed for use as a fuel, or burned as a fuel:

A. Any commercial chemical product, or manufacturing chemical intermediate, having the generic name listed in §E, F, G, or H of this regulation.

B. Any off-specification commercial chemical product or manufacturing chemical intermediate which, if it met specifications, would have the generic name listed in §E, F, G, or H of this regulation.

C. Any residue remaining in a container or inner liner removed from a container that has been used to hold any commercial chemical product or manufacturing chemical intermediate having the generic name listed in §E, F, G, or H of this regulation unless the container or inner liner is empty as defined in Regulation .07B of this chapter.

D. Any residue or contaminated soil, water, or other debris resulting from the cleanup of a spill, into or on any land or water, of any commercial chemical product or manufacturing chemical product or manufacturing chemical intermediate having the generic name listed in §E or G or mixtures containing polychlorinated biphenyls (PCBs) at concentrations greater than 50 ppm. The hazardous waste number for these mixtures is MX 01.

E. The commercial chemical products, or manufacturing chemical intermediates, or off-specification commercial chemical products or manufacturing chemical intermediates referred to in §§A—D of this regulation are identified as acute hazardous wastes (H) and are subject to the small quantity exclusion defined in Regulation .05C of this chapter. These wastes and their corresponding EPA Hazardous Waste Numbers are:

| Hazardous Waste Number | Substance* |
|---|---|
|  | 1080 see P058 |
|  | 1081 see P057 |
|  | (Acetato) phenylmercury see P092 |
|  | Acetone cyanohydrin see P069 |
| P001 | 2H-1-Benzopyran-2-one, 4-hydroxy-3-(3-oxo-1-phenylbutyl)- and salts when present at concentrations greater than 0.3 percent |
| P002 | 1-Acetyl-2-thiourea |
| P003 | Acrolein |
|  | Agarin see P007 |
|  | Agrosan GN 5 see P092 |
|  | Aldicarb see P070 |
|  | Aldicarb sulfone see P203 |
|  | Aldifen see P048 |
| P004 | Aldrin |
|  | Alginycin see P092 |

ADD. 40

9/26/2014

| P005 | Allyl alcohol |
|------|---------------|
| P006 | Aluminum phosphide (R,T) |
|      | ALVIT see P037 |
|      | Aminoethylene see P054 |
| P007 | 5-(Aminomethyl)-3-isoxazolol |
| P008 | 4-Aminopyridine |
|      | N-(Aminothioxomethyl)-acetamide see P002 |
|      | Ammonium metavanadate see P119 |
| P009 | Ammonium picrate (R) |
|      | Ammonium vanadate see P119 |
|      | ANTIMUCIN WDR see P092 |
|      | ANTURAT see P073 |
|      | AQUATHOL see P088 |
|      | ARETIT see P020 |
|      | Argentate (1-), bis(cyano-C)-, potassium see P099 |
| P010 | Arsenic acid |
| P011 | Arsenic pentoxide |
| P012 | Arsenic trioxide |
|      | Athrombin see P001 |
|      | AVITROL see P008 |
|      | Aziridene see P054 |
|      | AZOFOS see P061 |
|      | Azophos see P061 |
|      | BANTU see P072 |
| P013 | Barium cyanide |
|      | BASENITE see P020 |
|      | BCME see P016 |
| P014 | Benzenethiol |
|      | Benzoepin see P050 |
|      | 7-Benzofuranol, 2,3-dihydro-2,2-dimethyl-, methylcarbamate see P127 |
|      | Benzoic acid, 2-hydroxy-, compd. with (3aS-cis)-1,2,3,3a,8,8a-hexahydro-1,3a,8-trimethylpyrrolo[2,3- b] indol-5-yl methylcarbamate ester (1:1) see P188 |
|      | Benzyl chloride see P028 |
| P015 | Beryllium powder |
| P016 | Bis(chloromethyl) ether |
|      | BLADAN-M see P017 |
| P017 | Bromoacetone |
|      | 1-Bromo-2-propanone see P017 |
| P018 | Brucine |
|      | BUFEN see P092 |
|      | Butaphene see P020 |
| P020 | 2-sec-Butyl-4, 6-dinitrophenol |

ADD. 41

| P021 | Calcium cyanide |
| | CALDON see P020 |
| | Carbamic acid, [(dibutylamino)- thio]methyl-, 2,3-dihydro-2,2-dimethyl-7-benzofuranyl ester see P189 |
| | Carbamic acid, dimethyl-, 1-[(dimethyl-amino)carbonyl]- 5-methyl-1H- pyrazol-3-yl ester see P191 |
| | Carbamic acid, dimethyl-, 3-methyl-1-(1-methylethyl)-1H- pyrazol-5-yl ester see P192 |
| | Carbamic acid, methyl-, 3-methylphenyl ester see P190 |
| | Carbofuran see P127 |
| P022 | Carbon disulfide |
| | Carbonic dichloride see P095 |
| | Carbosulfan see P189 |
| | CERESAN see P092 |
| | CERESAN UNIVERSAL see P092 |
| | CHEMOX GENERAL see P020 |
| | CHEMOX P.E. see P020 |
| P023 | Chloroacetaldehyde |
| P024 | p-Chloroaniline |
| | 4-Chlorobenzenamine see P024 |
| | (Chloromethyl) benzene see P028 |
| P026 | 1-(o-Chlorophenyl)thiourea |
| | 3-Chloropropanenitrile see P027 |
| P027 | 3-Chloropropionitrile |
| P028 | alpha-Chlorotoluene |
| P029 | Copper cyanide |
| | CRETOX see P108 |
| | Coumadin see P001 |
| | Coumafen see P001 |
| | m-Cumenyl methylcarbamate see P202 |
| P030 | Cyanide salt mixtures not otherwise listed |
| P031 | Cyanogen |
| P033 | Cyanogen chloride |
| | Cyclodan see P050 |
| P034 | 2-Cyclohexyl-4,6-dinitrophenol |
| | D-CON see U001 |
| | DETHMOR see P001 |
| | DETHNEL see P001 |
| | DFP see P043 |
| | Dichloromethyl ether see P016 |
| P036 | Dichlorophenylarsine |
| | Dicyanogen See P031 |
| P037 | Dieldrin |
| | DIELDREX see P037 |

| P038 | Diethylarsine |
| P039 | O,O-Diethyl-S-(2-ethylthioethyl) ester of phosphorothioic acid |
|  | Diethyl-p-nitrophenyl phosphate see P041 |
| P040 | O,O-Diethyl-O-(2-pyrazinyl) phosphorothioate |
| P041 | O,O-Diethyl phosphoric acid, O-p-nitrophenyl ester |
| P042 | 3,4-Dihydroxy-alpha-(methylamino)-methyl benzyl alcohol |
| P043 | Di-iso-propylfluorophosphate |
|  | DIMETANE see P044 |
|  | 1,4:5,8-Dimethanonaphthalene, 1,2,3,4,10,10-hexachloro-1,4,4a,5,8,8a-hexahydroendo,endo see P060 |
| P044 | Dimethoate |
|  | 2,3-Dimethoxystrychnidin-10-one see P018 |
|  | alpha,alpha-Dimethylbenzeneethanamine see P046 |
| P045 | 3,3-Dimethyl-1-(methylthio)-2-butanone-O-(methylaminocarbonyl) oxime |
| P046 | alpha,alpha-Dimethylphenethylamine |
|  | Dimetilan see P191 |
|  | Dinitrocyclohexyphenol see P034 |
| P047 | 4,6-Dinitro-o-cresol and salts |
| P048 | 2,4-Dinitrophenol |
|  | DINOSEB see P020 |
|  | DINOSEBE see P020 |
|  | Diphosphoric acid, tetraethyl ester see P111 |
|  | Disulfoton see P039 |
| P049 | 2,4-Dithiobiuret |
|  | 1,3-Dithiolane-2-carboxaldehyde, 2,4-dimethyl-, O-[(methylamino)- carbonyl]oxime see P185 |
|  | DNBP see P020 |
|  | DOLCO MOUSE CEREAL see P108 |
|  | DOW GENERAL see P020 |
|  | DOW GENERAL WEED KILLER see P020 |
|  | DOW SELECTIVE WEED KILLER see P020 |
|  | DYANACIDE see P092 |
|  | EASTERN STATES DUOCIDE see P001 |
|  | ELGETOL see P020 |
| P050 | Endosulfan |
|  | Endothall see P088 |
| P051 | Endrin and metabolites |
|  | Epinephrine see P042 |
|  | Ethanedinitrile see P031 |
|  | Ethanimidothioc acid, 2-(dimethylamino)-N-[[(methylamino) carbonyl]oxy]-2-oxo-, methyl ester see P194 |
|  | Ethyl cyanide see P101 |
| P054 | Ethyleneimine |
|  | Famphur see P097 |

|  | FASCO FASCRAT POWDER see P001 |
| P056 | Fluorine |
| P057 | 2-Fluoroacetamide |
| P058 | Fluoroacetic acid, sodium salt |
|  | FOLODOL-80 see P071 |
|  | FOLODOL M see P071 |
|  | Formetanate hydrochloride see P198 |
|  | Formparanate see P197 |
|  | FOSFERNO M 50 see P071 |
|  | FRATOL see P058 |
|  | Fulminate of mercury see P065 |
|  | FUNGITOX OR see P092 |
|  | FUSSOF see P057 |
|  | GALLOTOX see P092 |
|  | GEARPHOS see P071 |
|  | GERUTOX see P020 |
| P059 | Heptachlor |
|  | 1,4,5,6,7,8,8-Heptachloro-3a,4,7,7a-tetrahydro-4,7-methano-1H-indene see P059 |
| P060 | 1,2,3,4,10,10-Hexachloro-1,4,4a,5,8,8a-hexahydro-1,4:5,8-endo, endodimethanonaphthalene |
|  | 6,7,8,9,10,10-Hexachloro-1,5,5a,6,9,9a-hexahydro-6,9-methano-2,4,3-benzodioxathiepin 3-oxide see P050 |
|  | 1,4,5,6,7,7-Hexachloro-cyclic-5-norbornene-2,3-dimethanol sulfite see P050 |
|  | 3,4,5,6,9,9-Hexachloro-1a,2,2a,3,6,6a,7,7a-octahydro-2,7:3,6-dimethanonaphth (2,3-b) oxirene (1alpha, 2beta, 2aalpha, 3beta, 6beta, 6aalpha, 7beta, 7aalpha)-see P037 |
|  | 3,4,5,6,9,9-Hexachloro-1a,2,2a,3,6,6a,7,7a-octahydro-2,7:3,6-dimethanonaphth (2,3-b) oxirene (1alpha, 2 beta, 2abeta, 3alpha, 6alpha, 6abeta, 7beta, 7aalpha), and metabolites see P051 |
| P062 | Hexaethyl tetraphosphate |
|  | HOSTAQUICK see P092 |
|  | HOSTAQUIK see P092 |
|  | Hydrazinecarbothioamide see P116 |
|  | Hydrazomethane see P068 |
| P063 | Hydrocyanic acid |
|  | Hydrogen cyanide see P063 |
|  | Hydrogen phosphide see P096 |
|  | (R)-4-(1-Hydroxy-2-(methylamino)ethyl)-1,2-benzenediol see P042 |
|  | 2-Hydroxy-2-methylpropanenitrile see P069 |
|  | 4-Hydroxy-3-(3-oxo-1-phenyl-butyl)-2H-1-benzopyran-2-one and salts, when present at concentrations greater than 0.3 percent see P001 |
|  | ILLOXOL see P037 |
|  | INDOCI (Registered) see P025 |
|  | Indomethacin see P025 |
|  | INSECTOPHENE see P050 |
|  | Isocyanatomethane see P064 |

ADD. 44

| P064 | Isocyanic acid, methyl ester |
|---|---|
| | Isodrin see P060 |
| | Isolan see P192 |
| | 3-Isopropylphenyl N-methylcarbamate see P202 |
| | KILOSEB see P020 |
| | KOP-THIODAN see P050 |
| | KWIK-KIL see P108 |
| | KWIKSAN see P092 |
| | KUMADER see P001 |
| | KYPFARIN see P001 |
| | LEYTOSAN see P092 |
| | LIQUIPHENE see P092 |
| | MALIK see P050 |
| | Manganese, bis(dimethylcarbamodithioato-S,S')-, see P196 |
| | Manganese dimethyldithiocarbamate see P196 |
| | MAREVAN see P001 |
| | MAR-FRIN see P001 |
| | MARTIN'D MAR-FIN see P001 |
| | MAVERAN see P001 |
| | MEGATOX see P005 |
| P065 | Mercury fulminate (R), (T) |
| | MERSOLITE see P092 |
| | METACID 50 see P071 |
| | METAFOS see P071 |
| | METAPHOR see P071 |
| | METAPHOS see P071 |
| | METASOL 30 see P092 |
| | Methanimidamide, N,N-dimethyl-N'-[3-[[(methylamino)-carbonyl]oxy]phenyl]-, monohydrochloride see P198 |
| | Methanimidamide, N,N-dimethyl-N'-[2-methyl-4-[[(methylamino)carbonyl]oxy]phenyl]- see P197 |
| | Methiocarb see P199 |
| P066 | Methomyl |
| | N-[((Methylamino) carbonyl) oxy]-ethanimidothioic acid, methyl ester see P066 |
| P067 | 2-Methylaziridine |
| | 2-Methyl-4,6-dinitrophenol and salts see P047 |
| | METHYL-E 605 see P071 |
| P068 | Methyl hydrazine |
| | Methyl isocyanate see P064 |
| P069 | 2-Methyllactonitrile |
| P070 | 2-Methyl-2-(methylthio) propionaldehyde-o-(methylcarbonyl) oxime |
| | METHYL NIRON see P042 |
| | N-Methyl-N-nitrosovinylamine see P084 |

ADD. 45

| P071 | Methyl parathion |
|------|------------------|
| | 2-(1-Methylpropyl)-4,6-dinitrophenol see P020 |
| | 3-(1-methyl-2-pyrrolidinyl)-pyridine (S) and salts see P075 |
| | Metolcarb see P190 |
| | METRON see P071 |
| | Mexacarbate see P128 |
| | MOLE DEATH see P108 |
| | MOUSE-NOTS see P108 |
| | MOUSE-RID see P108 |
| | MOUSE TOX see P108 |
| | MUSCIMOL see P007 |
| P072 | 1-Naphthyl-2-thiourea |
| P073 | Nickel carbonyl |
| P074 | Nickel cyanide |
| P075 | Nicotine and salts |
| P076 | Nitric oxide |
| P077 | p-Nitroaniline |
| | 4-Nitrobenzenamine see P077 |
| P078 | Nithrogen dioxide |
| P081 | Nitroglycerine (R) |
| P082 | N-Nitrosodimethylamine |
| P084 | N-Nitrosomethylvinylamine |
| | NYLMERATE see P092 |
| | OCTALOX see P037 |
| | Octamethyldiphosphoramide see P085 |
| P085 | Octamethyl pyrophosphoramide |
| | OCTAN see P092 |
| | OMPA see P085 |
| | OMPACIDE see P085 |
| | OMPAX see P085 |
| P087 | Osmium tetroxide |
| P088 | 7-Oxabicyclo (2.2.1) heptane-2,3-dicarboxylic acid |
| | Oxamyl see P194 |
| | Oxybis (chloro) methane see P016 |
| | PANIVARFIN see P001 |
| | PANORAM D-31 see P037 |
| | PANTHERINE see P007 |
| | PANWARFIN see P001 |
| P089 | Parathion |
| | PENNCAP-M see P071 |
| | PENOXYL CARBON N see P048 |
| | |

| | Pentachlorophenate see P090 |
|---|---|
| | PENTA KILL see P090 |
| | PENTASOL see P090 |
| | PENWAR see P090 |
| | PERMICIDE see P090 |
| | PERMAGUARD see P090 |
| | PERMATOX see P090 |
| | PERMITE see P090 |
| | PERTOX see P090 |
| | PESTOX III see P085 |
| | PHENMAD see P092 |
| | Phenol, 4-(dimethylamino)-3,5-dimethyl-, methylcarbamate (ester) see P128 |
| | Phenol, (3,5-dimethyl-4-(methylthio)-, methylcarbamate see P199 |
| | Phenol, 3-(1-methylethyl)-, methyl carbamate see P202 |
| | Phenol, 3-methyl-5-(1-methylethyl)-, methyl carbamate see P201 |
| | PHENOTAN see P020 |
| | Phenylarsonous dichloride see P036 |
| | Phenyl mercaptan see P014 |
| P092 | Phenylmercury acetate |
| P093 | N-Phenylthiourea |
| | PHILIPS 1861 see P008 |
| | PHIX see P092 |
| P094 | Phorate |
| P095 | Phosgene |
| P096 | Phosphine |
| | Phosphorodithioic acid, O,O-diethyl S-[2-(ethylthio) ethyl] ester see P039 |
| | Phosphorodithioic acid, O,O-diethyl S-[(ethylthio) methyl] ester see P094 |
| | Phosphorodithioic acid, O,O-diethyl O-(4-(nitrophenyl) ester see P089 |
| | Phosphorodithioic acid, O,O-diethyl O-pyrazinyl ester see P040 |
| | Phosphorodithioic acid, O,O-dimethyl S-[2-(methylamino)-2-oxoethyl] ester see P044 |
| | Phosphorofluoridic acid, bis(1-methylethyl) ester see P043 |
| P097 | Phosphorothioic acid, O,O-dimethyl-O-ester |
| | Phosphorothioic acid, O,O-dimethyl-O-(p-nitrophenyl) ester see P071 |
| | Physostigmine see P204 |
| | Physostigmine salicylate see P188 |
| | PIED PIPER MOUSE SEED see P108 |
| P098 | Potassium cyanide |
| P099 | Potassium silver cyanide |
| | PREMERGE see P020 |
| | Promecarb see P201 |
| | Propanal, 2-methyl-2-(methyl-sulfonyl)-, O-[(methylamino)carbonyl] oxime see P203 |

| | |
|---|---|
| | Propanenitrile see P101 |
| | 1,2,3-Propanetriol, trinitrate (R) see P081 |
| | Propargyl alcohol see P102 |
| | 2-Propenal see P003 |
| | 2-Propen-1-ol—see P005 |
| P101 | Propionitrile |
| | 1,2-Propylenimine see P067 |
| P102 | 2-Propyn-1-ol |
| | PROTHROMADIN see P001 |
| | 4-Pyridinamine see P008 |
| | Pyrrolo[2,3-b]indol-5-ol, 1,2,3,3a,8,8a-hexahydro-1,3a,8-trimethyl-, methylcarbamate (ester), (3aS-cis)-see P204 |
| | QUICKSAM see P092 |
| | QUINTOX see P037 |
| | RAT AND MICE BAIT see P001 |
| | RAT-A-WAY see P001 |
| | RAT-B-GON see P001 |
| | RAT-O-CIDE #2 see P001 |
| | RAT-GUARD see P001 |
| | RAT-KILL see P001 |
| | RAT-MIX see P001 |
| | RATS-NO-MORE see P001 |
| | RAT-OLA P001 |
| | RATOREX see P001 |
| | RATTUNAL see P001 |
| | RAT-TROL see P001 |
| | RO-DETH see P001 |
| | RO-DEX see P108 |
| | ROSEX see P001 |
| | ROUGH & READY MOUSE MIX see P001 |
| | SANASEED see P108 |
| | SCHRADAN see P085 |
| P103 | Selenourea |
| P104 | Silver cyanide |
| | SMITE see P105 |
| P105 | Sodium azide |
| | Sodium coumadin see P001 |
| P106 | Sodium cyanide |
| | Sodium fluoroacetate see P056 |
| | SODIUM WARFARIN see P001 |
| | SOLFARIN see P001 |
| | SOLFOBLACK BB see P048 |

ADD. 48

| | |
|---|---|
| | SOLFOBLACK SB see P048 |
| | SPARIC see P020 |
| | SPOR-KIL see P092 |
| | SPRAY-TROL BRAND RODEN-TROL see P001 |
| | SPURGE see P020 |
| | Strychnidin-10-one and salts see P108 |
| P108 | Strychnine and salts |
| | SUBTEX see P020 |
| | Sulfuric acid, dithallium (1+) salt see P115 |
| | SYSTAM see P085 |
| | TAG FUNGICIDE see P092 |
| | TEKWAISA see P071 |
| | TEMIC see P070 |
| | TEMIK see P070 |
| P109 | Tetraethyldithiopyrophosphate |
| | Tetraethylplumbane see P110 |
| P110 | Tetramethyl lead |
| P111 | Tetraethylpyrophosphate |
| P112 | Tetranitromethane (R) |
| | Tetraphosphoric acid, hexaethyl ester see P062 |
| | TETROSULPHUR BLACK PB see P048 |
| | TETROSULPHUR PBR see P048 |
| P113 | Thallic oxide |
| | Thallium oxide see P113 |
| P114 | Thallium (I) selenite |
| P115 | Thallium (I) sulfate |
| | THIFOR see P092 |
| | THIMUL see P092 |
| | THIODAN see P050 |
| | Thiodiphosphoric acid, tetraethyl ester see P109 |
| | Thiofanox see P045 |
| | THIOFOR see P050 |
| | Thioimidodicarbonic diamide see P049 |
| | THIOMUL see P050 |
| | THIONEX see P050 |
| | THIOPHENIT see P071 |
| | Thiophenol see P014 |
| P116 | Thiosemicarbazide |
| | Thiosulfan tionel see P050 |
| | TIOVEL see P050 |
| | Tirpate see P185 |
| | |

|      | Toxaphene see P123 |
|------|--------------------|
| P118 | Trichloromethanethiol |
|      | 2,4,6-Trinitrophenol, ammonium salt (R) see P009 |
|      | TWIN LIGHT RAY AWAY see P001 |
|      | USAF RH-8 see P069 |
|      | USAF EK-4890 see P002 |
| P119 | Vanadic acid, ammonium salt |
| P120 | Vanadium pentoxide |
|      | VOFATOX see P071 |
|      | WANADU see P120 |
|      | WARCOUMIN see P001 |
|      | Warfarin, and salts, when present at concentrations greater than 0.3 percent see P001 |
|      | WARFICIDE see P001 |
|      | WOFOTOX see P072 |
|      | YANOCK see P057 |
|      | YASOKNOCK see P058 |
|      | ZIARNIK see P092 |
|      | Zinc, bis(dimethylcarbamodithioato-S,S')-, see P205 |
| P121 | Zinc cyanide |
| P122 | Zinc phosphide when present at concentrations greater than 10 percent (R,T) |
|      | Ziram see P205 |
|      | ZOOCOUMARIN see P001 |
| P123 | Toxaphene |
| P127 | 7-Benzofuranol, 2,3-dihydro-2,2-dimethyl-, methylcarbamate |
| P128 | Mexacarbate |
| P185 | 1,3-Dithiolane-2-carboxaldehyde, 2,4-dimethyl-, O- [(methylamino)- carbonyl]oxime |
| P188 | Benzoic acid, 2-hydroxy-, compd. with (3aS-cis)-1,2,3,3a,8,8a-hexahydro-1,3a,8-trimethylpyrrolo[2,3- b] indol-5-yl methylcarbamate ester (1:1) |
| P189 | Carbamic acid, [(dibutylamino)- thio]methyl-, 2,3-dihydro-2,2-dimethyl- 7-benzofuranyl ester |
| P190 | Carbamic acid, methyl-, 3-methylphenyl ester |
| P191 | Carbamic acid, dimethyl-, 1-[(dimethyl-amino)carbonyl]- 5-methyl-1H- pyrazol-3-yl ester |
| P192 | Carbamic acid, dimethyl-, 3-methyl-1- (1-methylethyl)-1H- pyrazol-5-yl ester |
| P194 | Ethanimidothioc acid, 2-(dimethylamino)-N-[[(methylamino) carbonyl]oxy]-2-oxo-, methyl ester |
| P196 | Manganese, bis(dimethylcarbamodithioato-S,S')-, |
| P197 | Formparanate |
| P198 | Formetanate hydrochloride |
| P199 | Methiocarb |
| P201 | Phenol, 3-methyl-5-(1-methylethyl)-, methyl carbamate |
| P202 | m-Cumenyl methylcarbamate |
| P203 | Aldicarb sulfone |
| P204 | Physostigmine |
| P205 | Zinc, bis(dimethylcarbamodithioato-S,S')-, |

ADD. 50

*The Department included in those trade names of which it was aware. An omission of a trade name does not imply that it is not hazardous. The material is hazardous if it is listed under its generic name.

F. Additionally, the following wastes are identified as acute hazardous (H) and are subject to the small quantity exclusion defined in Regulation .05C:

| M001 | Polychlorinated biphenyls (PCB)(above 500 ppm) |

G. The commercial chemical products, manufacturing chemical intermediates, or off-specification commercial chemical products, referred to in §§A—D of this regulation, are identified as toxic wastes (T) unless otherwise designated and are subject to the small quantity exclusion defined in Regulation .05A and C of this chapter. These wastes and their corresponding EPA Hazardous Waste Numbers are:

| Hazardous Waste Number | Substance* |
| --- | --- |
| | A2213 see U394 |
| U001 | AAF see U005 |
| | Acetaldehyde (I) |
| | Acetic acid, ethyl ester (I) see U112 |
| | Acetic acid, lead (2+) salt see U144 |
| | Acetic acid, thallium (1+) salt see U214 |
| U002 | Acetone (I) |
| U003 | Acetonitrile (I,T) |
| U004 | Acetophenone |
| U005 | 2-Acetylaminofluorene |
| | 8-Acetyl-10[(3-amino-2,3-6-trideoxy-alpha-L-lyxo-hexopyranosyl) oxyl-7,8,9,10-tetrahydro-6,8,11-trihydroxy-1-methoxy-5,12-naphthacenedione, (8S-cis)- see U-059 |
| U006 | Acetyl chloride (C,R,T) |
| U007 | Acrylamide |
| | Acetylene tetrachloride see U209 |
| | Acetylene trichloride see U228 |
| U008 | Acrylic acid (I) |
| U009 | Acrylonitrile |
| | AEROTHENE IT see U226 |
| | 3-Amino-5-(p-acetamidophenyl) 1H-1,2,4-triazole, hydrate see U011 |
| | 6-Amino-8-[[(aminocarbonyl)oxy]methyl]-1,1a,2,8,8a,8b-hexahydro-8a-methoxy-5-methyl-azirino (2',3':3,4) pyrrolo (1,2-a) indole-4,7-dione, [1aS-(1aalpha, 8beta, 8aalpha, 8balpha)]- see U010 |
| U010 | 6-Amino-1,1a,2,8,8a,8b-hexahydro-8-(hydroxymethyl)8-methoxy-5-methylcarbamate azirino (2',3':3,4) pyrrolo (1,2-a)indole-4,7-dione (ester) |
| | 2-Amino-1-methylbenzene see U328 |
| | 4-Amino-1-methylbenzene see U353 |
| U011 | Amitrole |
| U012 | Aniline (I,T) |
| | Ar-methylbenzenediamine see U221 |
| U014 | Auramine |
| U015 | Azaserine |

| | |
|---|---|
| | Barban see U280 |
| | Bendiocarb see U278 |
| | Bendiocarb phenol see U364 |
| | Benomyl see U271 |
| U016 | Benz(c)acridine |
| U017 | Benzal chloride |
| U018 | Benz(a)anthracene |
| | Benzeneamine (I,T) see U012 |
| U019 | Benzene (I,T) |
| | 1,2-Benzenedicarboxylic acid, bis (2-ethylhexyl) ester see U-028 |
| | 1,2-Benzenedicarboxylic acid, dibutyl ester see U069 |
| | 1,2-Benzenedicarboxylic acid, diethyl ester see U088 |
| | 1,2-Benzenedicarboxylic acid, dimethyl ester see U102 |
| | 1,2-Benzenedicarboxylic acid, dioctyl ester see U107 |
| | 1,3-Benzenediol see U201 |
| U020 | Benzenesulfonyl chloride (C,R) |
| U021 | Benzidine |
| | 1,2-Benzisothiazolin-3-one,1,1-dioxide see U202 |
| | Benzo(a)anthracene see U018 |
| | 1,3-Benzodioxol-4-ol, 2,2-dimethyl-, methyl carbamate see U278 |
| | 1,3-Benzodioxol-4-ol, 2,2-dimethyl-, see U364 |
| | 7-Benzofuranol, 2,3-dihydro-2,2-dimethyl- see U367 |
| | Benzo(rst)pentaphene see U064 |
| U022 | Benzo(a)pyrene |
| U023 | Benzotrichloride (C,R,T) |
| | 2,2'-Bioxirane see U085 |
| | (1,1'-Biphenyl)-4,4'-diamine see U021 |
| | Bis(acetato-O)tetrahydroxytri-lead see U146 |
| U024 | Bis(2-chloroethoxy) methane |
| | 4-[Bis(2-chloroethyl) amino] benzenebutanoic acid U035 |
| | 4-[Bis(2-chloroethyl) amino]-L-phenylalanine see U150 |
| | 5-[Bis(2-chloroethyl) amino]-2,4-(1H,3H)-pyrimidinedione see U237 |
| U025 | Bis(2-chloroethyl) ether |
| U026 | N,N-Bis(2-chloroethyl)-2-naphthylamine |
| | N,N-Bis(2-chloroethyl) tetrahydro-2H-1,3,2-oxazaphosphorin-2-amine, 2-oxide see U-058 |
| U027 | Bis(2-chloroisopropyl) ether |
| U028 | Bis(2-ethylhexyl) phthalate |
| | Bis(1-methylethyl)-carbamothioic acid, S-(2,3-dichloro-2-propenyl) ester see U062 |
| | Bromoform see U225 |
| U029 | Bromomethane |
| | 1-Bromo-4-phenoxybenzene see U030 |

| U030 | 4-Bromophenyl phenyl ether |
| | 2-Butanone (I,T) see U159 |
| | 2-Butanone, peroxide (R,T) see U160 |
| | 2-Butenal see U-053 |
| | 2-Butenoic acid, 2-methyl-,7-[[2,3-dihydroxy-2-(1-methoxyethyl)-3-methyl-1-oxobutoxy] methyl] -2,3,5,7a-tetrahydro-1H-pyrrolizin-1-yl ester, [1S-[1alpha(Z), 7(2S*, 3R*),7aalpha]] see U143 |
| U031 | n-Butyl alcohol (I) |
| | Cacodylic acid see U136 |
| U032 | Calcium chromate |
| | Carbamic acid, 1H-benzimidazol-2-yl, methyl ester see U372 |
| | Carbamic acid, [1-[(butylamino)carbonyl]-1H-benzimidazol-2-yl]-, methyl ester see U271 |
| | Carbamic acid, (3-chlorophenyl)-, 4-chloro-2-butynyl ester see U280 |
| | Carbamic acid, ethyl ester see U238 |
| | Carbamic acid, phenyl-, 1-methylethyl ester see U373 |
| | Carbamic acid, [1,2-phenylenebis (iminocarbonothioyl)]bis-, dimethyl ester see U409 |
| | Carbamothioic acid, bis(1-methylethyl)-, S-(2,3,3-trichloro-2-propenyl) ester see U389 |
| | Carbamothioic acid, dipropyl-, S-(phenylmethyl) ester see U387 |
| | Carbaryl see U279 |
| | Carbendazim see U372 |
| | Carbofuran phenol see U367 |
| | Carbolic acid see U188 |
| | Carbon tetrachloride see U211 |
| | Carbonic difluoride see U033 |
| | 4,4'-Carbonimidoylbis[N,N-dimethyl-benzenamine] see U014 |
| | Carbonochloridic acid, methyl ester (I,T) see U156 |
| | Carbon oxyfluoride (R,T) see U033 |
| U033 | Carbonyl fluoride (R,T) |
| U034 | Chloral |
| U035 | Chlorambucil |
| U036 | Chlordane |
| | Chlornaphazin see U026 |
| U037 | Chlorobenzene |
| U038 | Chlorobenzilate |
| | 4-Chloro-alpha-(4-chlorophenyl)-alpha-hydroxybenzeneacetic acid, ethyl ester see U038 |
| U039 | p-Chloro-m-cresol |
| U041 | 1-Chloro-2,3-epoxypropane |
| | CHLOROETHENE NU see U226 |
| U042 | Chloroethyl vinyl ether |
| U043 | Chloroethene |
| U044 | Chloroform |
| U045 | Chloromethane (I,T) |
| | Chloromethoxymethane see U046 |

| | |
|---|---|
| | 4-Chloro-2-methylbenzeneamine hydrochloride see U049 |
| U046 | Chloromethyl methyl ether |
| | (Chloromethyl)-oxirane see U041 |
| | 4-Chloro-3-methylphenol see U039 |
| U047 | 2-Chloronaphthalene |
| U048 | 2-Chlorophenol |
| U049 | 4-Chloro-o-toluidine hydrochloride |
| | Chromic acid, calcium salt see U032 |
| U050 | Chrysene |
| | C.I. 23060 see U073 |
| U051 | Creosote |
| U052 | Cresylic acid |
| U053 | Crotonaldehyde |
| U055 | Cumene (I) |
| | Cyanogen bromide see U246 |
| | Cyanomethane see U003 |
| | 2,5-Cyclohexadiene-1,4-dione see U197 |
| U056 | Cyclohexane (I) |
| U057 | Cyclohexanone (I) |
| U058 | Cyclophosphamide |
| U059 | Daunomycin |
| U060 | DDD |
| U061 | DDT |
| | 1,1a,3,3a,4,5,5,5a,5b,6-Decachlorooctahydro-1,3,4-metheno-2H-cyclobuta[cd]pentalen-2-one see U142 2-Deoxy-2-[[(methylnitrosoamino)-carbonyl]amino]-D-glucose see U206 |
| | 2-Deoxy-2-(3-methyl-3-nitrosoureido)-D-glucopyranose see U206 |
| U062 | Diallate |
| U063 | Dibenz(a,h)anthracene |
| | Dibenzo(a,h)anthracene see U063 |
| U064 | Dibenzo(a,i)pyrene |
| U066 | 1,2-Dibromo-3-chloropropane |
| U067 | 1,2-Dibromoethane |
| U068 | Dibromomethane |
| | 2,3-Dibromo-1-propanol phosphate (3:1) see U235 |
| U069 | Di-n-butyl phthalate |
| U070 | 1,2-Dichlorobenzene |
| U071 | 1,3-Dichlorobenzene |
| U072 | 1,4-Dichlorobenzene |
| U073 | 3,3'-Dichlorobenzidine |
| U074 | 1,4-Dichloro-2-butene (I,T) |
| | 3,3'-Dichloro-4,4'-diaminobiphenyl see U073 |
| U075 | Dichlorodifluoromethane |

| | |
|---|---|
| | 3-5-Dichloro-N-(1,1-dimethyl-2-propynyl)-benzamide see U192 |
| U076 | 1,1-Dichloroethane |
| U077 | 1,2-Dichloroethane |
| U078 | 1,1-Dichloroethylene |
| U079 | 1,2-trans-Dichloroethylene |
| | Dichloroethyl ether see U025 |
| | Dichloroisopropyl ether see U027 |
| U080 | Dichloromethane |
| | Dichloromethoxy ethane see U024 |
| | Dichloromethylbenzene see U017 |
| U081 | 2,4-Dichlorophenol |
| U082 | 2,6-Dichlorophenol |
| | (2,4-Dichlorophenoxy)-acetic acid, salts and esters see U240 |
| U083 | 1,2-Dichloropropane |
| U084 | 1,3-Dichloropropene |
| U085 | 1,2:3,4-Diepoxybutane (I,T) |
| | Diethylene glycol, dicarbamate see U395 |
| | 1-4-Diethyleneoxide see U108 |
| | 4,4'-(1,2-Diethyl-1,2-ethenediyl) bisphenol, (E)- see U089 |
| | Diethylhexyl phthalate see U028 |
| U086 | 1,2-Diethylhydrazine |
| U087 | O,O-Diethyl-S-methyl ester of phosphorodithioic acid |
| U088 | Diethyl phthalate |
| U089 | Diethylstilbestrol |
| | 1,2-Dihydro-3-methylbenz(j)aceanthrylene see U157 |
| | 2,3-Dihydro-6-methyl-2-thioxo-4(1H)-pyrimidinone see U164 |
| | 1,2-Dihydro-3,6-pyridazinedione see U148 |
| U090 | Dihydrosafrole |
| | 1,3-Diisocyanatomethylbenzene (R,T) see U223 |
| U091 | 3,3'-Dimethoxybenzidine |
| | 11,17-Dimethoxy-18-[(3,4,5-trimethoxybenzoyl)oxy]-yohimban-16-carboxylic acid, methyl ester, (3beta, 16beta, 17alpha, 18beta, 20alpha)- see U200 |
| U092 | Dimethylamine (I) |
| U093 | p-Dimethylaminoazobenzene |
| | Dimethylarsinic acid see U136 |
| U094 | 7,12-Dimethylbenz(a)anthracene |
| | Dimethylbenzene (I,T) see U239 |
| U095 | 3,3'-Dimethylbenzidine |
| U096 | alpha,alpha-Dimethylbenzylhydroperoxide (R) 3,3'-[(3,3'-Dimethyl[1,1'-diphenyl]-4,4'-diyl) bis (azo) bis [5-amino-4-hydroxy] 2,7-naphthalenedisulfonic acid, tatrasodium salt see U236 |
| U097 | Dimethylcarbamoyl chloride |

| U098 | 1,1-Dimethylhydrazine |
| U099 | 1,2-Dimethylhydrazine |
| U101 | 2,4-Dimethylphenol |
| | N,N-Dimethyl-4-(phenylazo)-benzenamine see U093 |
| U102 | Dimethyl phthalate |
| | N,N-Dimethyl-N'-2-pyridinyl-N'-(2-thienylmethyl)-1,2-ethanediamine see U155 |
| U103 | Dimethyl sulfate |
| U105 | 2,4-Dinitrotoluene |
| U106 | 2,6-Dinitrotoluene |
| U107 | Di-n-octyl phthalate |
| U108 | 1,4-Dioxane |
| U109 | 1,2-Diphenylhydrazine |
| U110 | Dipropylamine (I) |
| U111 | Di-n-propylnitrosamine |
| | EBDC see U114 |
| | Epichlorohydrine see U041 |
| | 1,4-Expoxybutane see U213 |
| | Ethanal (I) see U001 |
| | Ethanamine, N,N-diethyl- see U404 |
| | 1,2-Ethanediylbiscarbamodithioic acid, salts and esters see U114 |
| | Ethanethioamide see U218 |
| | Ethanimidothioic acid, N,N'- [thiobis[(methylimino)carbonyloxy]]bis-, dimethyl ester see U410 |
| | Ethanimidothioic acid, 2-(dimethylamino)-N-hydroxy-2-oxo-, methyl ester see U394 |
| | Ethanol, 2,2'-oxybis-, dicarbamate see U395 |
| | 2-Ethoxyethanol see U359 |
| | N-(4-Ethoxyphenyl)-acetamide see U187 |
| U112 | Ethyl acetate (I) |
| U113 | Ethyl acrylate (I) |
| U114 | Ethylenebisdithiocarbamate acid, salts and esters |
| | Ethylene dibromide see U067 |
| | Ethylene dichloride see U077 |
| | Ethylene glycol monoethyl ether see U359 |
| U115 | Ethylene oxide (I,T) |
| U116 | Ethylene thiourea |
| U117 | Ethyl ether (I) |
| | Ethylidene dichloride see U076 |
| U118 | Ethylmethacrylate |
| U119 | Ethyl methanesulfonate |
| | Ethylnitrile see U003 |
| | N-Ethyl-N-nitrosoethanamine see U174 |
| | N-Ethyl-N-nitrosourea see U176 |

26.13.02.19                                                          Page 18 of 24

| | Firemaster T23P see U235 |
|---|---|
| U120 | Fluoranthene |
| | N-9H-Fluoren-2-yl-acetamide see U005 |
| U121 | Flouorotrichloromethane |
| U122 | Formaldehyde |
| U123 | Formic acid (C,T) |
| U124 | Furan (I) |
| | 2-Furancarboxaldehyde (I) see U125 |
| | 2,5-Furandione see U147 |
| U125 | Furfural (I) |
| | Furfuran (I) see U124 |
| U126 | Glycidylaldehyde |
| U127 | Hexachlorobenzene |
| U128 | Hexachlorobutadiene |
| U129 | Hexachlorocyclohexane |
| U130 | Hexachlorocyclopentadiene |
| U131 | Hexachloroethane |
| U132 | Hexachlorophene |
| | Hexahydrobenzene (I) see U056 |
| U133 | Hydrazine (R,T) |
| U134 | Hydrofluoric acid (C,T) |
| U135 | Hydrogen sulfide |
| | Hydroxybenzene see U188 |
| U136 | Hydroxydimethyl arsine oxide |
| | 4-Hydroxy-3-(3-oxo-1-phenyl-butyl)-2H-1-benzopyran-2-one and salts, when present at concentrations of 0.3 percent or less see U248 |
| | 2-Imidazolidinethione see U116 |
| | 4,4'-(Imidocarbonyl)bis(N,N-dimethyl)aniline see U014 |
| U137 | Indeno(1,2,3-cd)pyrene |
| U138 | Iodomethane |
| | 1,3-Isobenzofurandione see U190 |
| U140 | Isobutyl alcohol (I,T) |
| U141 | Isosafrole |
| U142 | Kepone |
| U143 | Lasiocarpine |
| U144 | Lead acetate |
| U145 | Lead phosphate |
| U146 | Lead subacetate |
| | Lindane see U129 |
| U147 | Maleic anhydride |
| U148 | Maleic hydrazide |
| U149 | Malononitrile |

ADD. 57

|       | MEK peroxide see U160 |
|-------|---------------------------------------------------------------|
| U150  | Melphalan |
| U151  | Mercury |
| U152  | Methacrylonitrile (I,T) |
|       | Methanesulfonic acid, ethyl ester see U119 |
| U153  | Methanethiol (I,T) |
| U154  | Methanol (I) |
| U155  | Methapyrilene |
|       | Methyl alcohol see U154 |
|       | 2-Methylbenzenamine see U328 |
|       | 4-Methylbenzenamine see U353 |
|       | 2-Methylbenzenamine hydrochloride see U222 |
|       | Methylbenzene see U220 |
|       | Methyl bromide see U029 |
|       | 1-Methylbutadiene (I) see U186 |
|       | Methyl chloride (I,T) see U045 |
| U156  | Methyl chlorocarbonate (I,T) |
|       | Methyl chloroform see U226 |
|       | Methyl chloroformate see U156 |
| U157  | 3-Methylcholanthrene |
|       | 1-Methyl-2,4-dinitrobenzene see U105 |
|       | 2-Methyl-1,3-dinitrobenzene see U106 |
| U158  | 4,4'-Methylene-bis-(2-chloroaniline) |
|       | 1,1'-[Methylenebis(oxy)]bis[2-chloroethane] see U024 |
|       | 2,2'-Methylenebis (3,4,6-trichlorophenol) see U132 |
|       | Methylene bromide see U068 |
|       | Methylene chloride see U080 |
|       | (1-Methylethyl)-benzene (I) see U055 |
| U159  | Methyl ethyl ketone (MEK) (I,T) |
| U160  | Methyl ethyl ketone peroxide (R,T) |
|       | Methyl iodide see U138 |
| U161  | Methyl isobutyl ketone (I) |
| U162  | Methyl methacrylate (I,T) |
|       | N-Methylmethanamine (I) see U092 |
|       | 2-Methyl-5-nitrobenzenamine see U181 |
| U163  | N-Methyl-N'-nitro-N-nitro-soguanidine |
|       | Methylnitrosocarbamic acid, ethyl ester see U178 |
|       | N-Methyl-N-nitrosourea see U177 |
|       | 4-Methylpentanol see U161 |
|       | 4-Methyl-2-pentanone (I) see U161 |
|       | Methylphenol see U052 |

ADD. 58

| | |
|---|---|
| | 1-Methyl-1-phenylethylhydroperoxide (R) see U096 |
| | 2-Methyl-1-propanol (I,T) see U140 |
| | 2-Methyl-2-propenenitrile (I,T) see U152 |
| | 2-Methyl-2-propenoic acid, ethyl ester see U118 |
| | 2-Methyl-2-propenoic acid, methyl ester (I,T) see U162 |
| | 2-Methylpyridine see U191 |
| U164 | Methylthiouracil |
| | Mitomycin C see U010 |
| | MNNG see U163 |
| U165 | Naphthalene |
| | 1-Naphthalenol, methylcarbamate see U279 |
| U166 | 1,4-Naphthaquinone |
| U167 | 1-Naphthylamine |
| U168 | 2-Naphthylamine |
| U169 | Nitrobenzene (I,T) |
| | Nitrobenzol see U169 |
| U170 | 4-Nitrophenol |
| U171 | 2-Nitropropane (I,T) |
| U172 | N-Nitrosodi-n-butylamine |
| U173 | N-Nitrosodiethanolamine |
| U174 | N-Nitrosodiethylamine |
| | 2,2'-(Nitrosoimino) bisethanol see U173 |
| U176 | N-Nitroso-n-ethylurea |
| U177 | N-Nitroso-n-methylurea |
| U178 | N-Nitroso-n-methylurethane |
| U179 | N-Nitrosopiperidine |
| | N-Nitroso-N-propyl-1-propanamine see U111 |
| U180 | N-Nitrosopyrrolidine |
| U181 | 5-Nitro-o-toluidine |
| | 1,2-Oxathiolane, 2,2-dioxide see U193 |
| | Oxirane (I,T) see U115 |
| | Oxiranecarboxyaldehyde see U126 |
| | 1,1'-Oxybis[2-chloroethane] see U025 |
| | 2,2'-Oxybis[2-chloropropane] see U027 |
| | 1,1'-Oxybisethane (I) see U117 |
| U182 | Paraldehyde |
| | PCNB see U185 |
| U183 | Pentachlorobenzene |
| U184 | Pentachloroethane |
| U185 | Pentachloronitrobenzene |
| | Pentachlorophenol see F027 |
| | |

26.13.02.19                                                    Page 21 of 24

| U186 | 1,3-Pentadiene (I) |
| | Perc see U210 |
| | Perchlorethylene see U210 |
| U187 | Phenacetin |
| U188 | Phenol |
| | Phenol, 2-(1-methylethoxy)-, methylcarbamate see U411 |
| | Phenol, pentachloro- see F027 |
| | Phenol, 2,3,4,6-tetrachloro- see F027 |
| | Phenol, 2,4,5-trichloro- see F027 |
| | Phenol, 2,4,6-trichloro- see F027 |
| | 1-Phenylethanone see U004 |
| U189 | Phosphorous sulfide (R) |
| U190 | Phthalic anhydride |
| U191 | 2-Picoline |
| U192 | Pronamide |
| U193 | 1,3-Propane sultone |
| | Propane, 2-nitro (I,T) see U171 |
| | Propanedinitrile see U149 |
| | Propanoic acid 2-(2,4,5-trichlorophenoxy) see F027 |
| | 2-Propanone (I) see U002 |
| | 2-Propenamide see U007 |
| | 2-Propenitrile see U009 |
| | 2-Propenoic acid (I) see U008 |
| | 2-Propenoic acid, ethyl ester (I) see U113 |
| | 5-(2-Propenyl)-1,3-benzodioxole see U203 |
| | 5-(1-Propenyl)-1,3-benzodioxole see U141 |
| | Propham see U373 |
| | Propoxur see U411 |
| U194 | n-Propylamine (I,T) |
| | 5-Propyl-1,3-benzodioxole see U090 |
| | Propylene dichloride see U083 |
| | N-Propyl-1-propanamine (I) see U110 |
| U196 | Pyridine |
| U197 | p-Benzoquinone |
| U200 | Reserpine |
| U201 | Resorcinol |
| U202 | Saccharin and salts |
| U203 | Safrole |
| U204 | Selenious acid |
| | Selenium dioxide see U204 |
| U205 | Selenium sulfide (R,T) |

ADD. 60

| | |
|---|---|
| | L-Serine, diazoacetate (ester) see U015 |
| | Silvex (2,4,5-TP) see F027 |
| U206 | Streptozotocin |
| | Sulfuric acid, dimethyl ester see U103 |
| | Sulfur phosphide (R) see U189 |
| | 2,4,5-T see F027 |
| U207 | 1,2,4,5-Tetrachlorobenzene |
| U208 | 1,1,1,2-Tetrachloroethane |
| U209 | 1,1,2,2-Tetracholorethane |
| U210 | Tetrachloroethene |
| | Tetrachloroethylene see U210 |
| U211 | Tetrachloromethane |
| | 2,3,4,6-Tetrachlorophenol see F027 |
| U213 | Tetrahydrofuran (I) |
| | Tetramethylthioperoxydicarbonicdiamide see U244 |
| U214 | Thallium (I) acetate |
| U215 | Thallium (I) carbonate |
| U216 | Thallium (I) chloride |
| U217 | Thallium (I) nitrate |
| U218 | Thioacetamide |
| | Thiodicarb see U410 |
| | Thiomethanol (I,T) see U153 |
| U219 | Thiourea |
| | Thiophanate-methyl see U409 |
| U220 | Toluene |
| U221 | Toluenediamine |
| | o-Toluidine see U328 |
| | p-Toluidine see U353 |
| U222 | o-Toluidine hydrochloride |
| U223 | Toluene diisocyanate (R,T) |
| | 2,4,5-TP see F027 |
| | Triallate see U389 |
| | 1H-1,2,4-Triazol-3-amine see U011 |
| U225 | Tribromomethane |
| | Trichloroacetaldehyde see U034 |
| U226 | 1,1,1-Trichloroethane |
| U227 | 1,1,2-Trichloroethane |
| U228 | Trichloroethene |
| | Trichloroethylene see U228 |
| | 1,1'-(2,2,2-Tricholorethylidene)bis[4-chlorobenzene] see U061 |
| | 1,1'-(2,2,2-Tricholorethylidene)bis[4-methoxybenzene] see U247 |

ADD. 61

|  | Trichlorofluoromethane see U121 |
|---|---|
|  | Trichloromethane see U044 |
|  | (Trichloromethyl)-benzene see U023 |
|  | Trichloromonofluoromethane see U121 |
|  | 2,4,5-Trichlorophenol see F027 |
|  | 2,4,6-Trichlorophenol see F027 |
|  | 2,4,5-Trichlorophenoxyacetic acid see F027 |
|  | 2-(2,4,5-Trichlorophenoxy)-propanoic acid see F027 |
|  | alpha,alpha,alpha-Trichlorotoluene see U023 |
|  | TRI-CLENE see U228 |
|  | Triethylamine see U404 |
|  | 2,4,6-Trimethyl-1,3,5-trioxane see U182 |
| U234 | Trinitrobenzene (R,T) |
| U235 | Tris(2,3-dibromopropyl) phosphate |
| U236 | Trypan blue |
| U237 | Uracil mustard |
| U238 | Ethyl carbamate (urethane) |
|  | Vinyl chloride see U043 |
|  | Vinylidene chloride see U078 |
| U239 | Xylene (I) |
| U240 | 2,4-Dichlorophenoxyacetic acid and associated salts and esters |
| U243 | Hexachloropropene |
| U244 | Thiram |
| U246 | Cyanogen bromide |
| U247 | Methoxychlor |
| U248 | Warfarin and salts, when present at concentrations of 0.3 percent or less |
| U249 | Zinc phosphide, when present at concentrations of 10 percent or less |
| U271 | Benomyl |
| U278 | Bendiocarb |
| U279 | Carbaryl |
| U280 | Barban |
| U328 | o-Toluidine |
| U353 | p-Toluidine |
| U359 | 2-Ethoxyethanol |
| U364 | Bendiocarb phenol |
| U367 | 7-Benzofuranol, 2,3-dihydro-2,2-dimethyl- |
| U372 | Carbamic acid, 1H-benzimidazol-2-yl, methyl ester |
| U373 | Carbamic acid, phenyl-, 1-methylethyl ester |
| U387 | Carbamothioic acid, dipropyl-, S-(phenylmethyl) ester |
| U389 | Carbamothioic acid, bis(1-methylethyl)-, S-(2,3,3-trichloro-2-propenyl) ester |
| U394 | A2213 |

Appeal: 14-1825    Doc: 27    Filed: 10/15/2014    Pg: 126 of 140

| U395 | Diethylene glycol, dicarbamate |
| U404 | Ethanamine, N,N-diethyl- |
| U409 | Carbamic acid, [1,2-phenylenebis (iminocarbonothioyl)]bis-, dimethyl ester |
| U410 | Ethanimidothioic acid, N,N'- [thiobis[(methylimino)carbonyloxy]]bis-, dimethyl ester |
| U411 | Phenol, 2-(1-methylethoxy)-, methylcarbamate |

H. Additionally, the following wastes are identified as Maryland Toxic (MT) and are subject to the same provisions as those identified in Regulation .19G:

| Hazardous Waste Number | Substance* |
| --- | --- |
| MT01 | Polychlorinated biphenyls (50 to 500 ppm) |

WestlawNext

**Rule 12. Defenses and Objections: When and How Presented; Motion for Judgment on the Pleadings; Consolidati...**
United States Code Annotated    Federal Rules of Civil Procedure for the United States District Courts    *(Approx. 4 pages)*

**NOTES OF DECISIONS** (4074)

GENERALLY
MOTION TO DISMISS GENERALLY
MOTION TO DISMISS FOR LACK OF
JURISDICTION GENERALLY
MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION
MOTION TO DISMISS FOR LACK OF
PERSONAL JURISDICTION
MOTION TO DISMISS FOR
INSUFFICIENCY OF SERVICE OF
PROCESS
MOTION TO DISMISS FOR FAILURE TO
STATE CLAIM GENERALLY

United States Code Annotated
 Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
  Title III. Pleadings and Motions

Federal Rules of Civil Procedure Rule 12

Rule 12. Defenses and Objections: When and How Presented; Motion for
Judgment on the Pleadings; Consolidating Motions; Waiving Defenses;
Pretrial Hearing

Currentness

<Notes of Decisions for 28 USCA Federal Rules of Civil Procedure Rule 12 are
displayed in two separate documents. Notes of Decisions for subdivisions I to VII
are contained in this document. For Notes of Decisions for subdivisions VIII to end,
see second document for 28 USCA Federal Rules of Civil Procedure Rule 12.>

**(a) Time to Serve a Responsive Pleading.**

**(1)** *In General.* Unless another time is specified by this rule or a federal statute, the time
for serving a responsive pleading is as follows:

**(A)** A defendant must serve an answer:

**(i)** within 21 days after being served with the summons and complaint; or

**(ii)** if it has timely waived service under Rule 4(d), within 60 days after the request for
a waiver was sent, or within 90 days after it was sent to the defendant outside any
judicial district of the United States.

**(B)** A party must serve an answer to a counterclaim or crossclaim within 21 days after
being served with the pleading that states the counterclaim or crossclaim.

**(C)** A party must serve a reply to an answer within 21 days after being served with an
order to reply, unless the order specifies a different time.

**(2)** *United States and Its Agencies, Officers, or Employees Sued in an Official
Capacity.* The United States, a United States agency, or a United States officer or
employee sued only in an official capacity must serve an answer to a complaint,
counterclaim, or crossclaim within 60 days after service on the United States attorney.

**(3)** *United States Officers or Employees Sued in an Individual Capacity.* A United
States officer or employee sued in an individual capacity for an act or omission occurring
in connection with duties performed on the United States' behalf must serve an answer to
a complaint, counterclaim, or crossclaim within 60 days after service on the officer or
employee or service on the United States attorney, whichever is later.

**(4)** *Effect of a Motion.* Unless the court sets a different time, serving a motion under this
rule alters these periods as follows:

**(A)** if the court denies the motion or postpones its disposition until trial, the responsive
pleading must be served within 14 days after notice of the court's action; or

**(B)** if the court grants a motion for a more definite statement, the responsive pleading
must be served within 14 days after the more definite statement is served.

**(b) How to Present Defenses.** Every defense to a claim for relief in any pleading must be
asserted in the responsive pleading if one is required. But a party may assert the following
defenses by motion:

**(1)** lack of subject-matter jurisdiction;

**(2)** lack of personal jurisdiction;

**(3)** improper venue;

**(4)** insufficient process;

**(5)** insufficient service of process;

**(6)** failure to state a claim upon which relief can be granted; and

**(7)** failure to join a party under Rule 19.

A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.

**(c) Motion for Judgment on the Pleadings.** After the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings.

**(d) Result of Presenting Matters Outside the Pleadings.** If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

**(e) Motion for a More Definite Statement.** A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired. If the court orders a more definite statement and the order is not obeyed within 14 days after notice of the order or within the time the court sets, the court may strike the pleading or issue any other appropriate order.

**(f) Motion to Strike.** The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:

**(1)** on its own; or

**(2)** on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

**(g) Joining Motions.**

**(1)** *Right to Join.* A motion under this rule may be joined with any other motion allowed by this rule.

**(2)** *Limitation on Further Motions.* Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.

**(h) Waiving and Preserving Certain Defenses.**

**(1)** *When Some Are Waived.* A party waives any defense listed in Rule 12(b)(2)-(5) by:

**(A)** omitting it from a motion in the circumstances described in Rule 12(g)(2); or

**(B)** failing to either:

**(i)** make it by motion under this rule; or

**(ii)** include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course.

**(2)** *When to Raise Others.* Failure to state a claim upon which relief can be granted, to join a person required by Rule 19(b), or to state a legal defense to a claim may be raised:

**(A)** in any pleading allowed or ordered under Rule 7(a);

**(B)** by a motion under Rule 12(c); or

**(C)** at trial.

**(3)** *Lack of Subject-Matter Jurisdiction.* If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.

**(i) Hearing Before Trial.** If a party so moves, any defense listed in Rule 12(b)(1)-(7)--whether made in a pleading or by motion--and a motion under Rule 12(c) must be heard and decided before trial unless the court orders a deferral until trial.

**CREDIT(S)**

(Amended December 27, 1946, effective March 19, 1948; January 21, 1963, effective July 1, 1963; February 28, 1966, effective July 1, 1966; March 2, 1987, effective August 1, 1987; April 22, 1993, effective December 1, 1993; April 17, 2000, effective December 1, 2000; April 30, 2007, effective December 1, 2007; March 26, 2009, effective December 1, 2009.)

**ADVISORY COMMITTEE NOTES**
1937 Adoption

**Note to Subdivision (a). 1.** Compare [former] Equity Rules 12 (Issue of Subpoena--Time for Answer) and 31 (Reply--When Required--When Cause at Issue); 4 Mont.Rev.Codes Ann. (1935) §§ 9107, 9158; N.Y.C. P.A. (1937) § 263; N.Y.R.C.P. (1937) Rules 109-111.

**2.** U.S.C., Title 28, § 763 (now § 547) (Petition in action against United States; service; appearance by district attorney) provides that the United States as a defendant shall have 60 days within which to answer or otherwise defend. This and other statutes which provide 60 days for the United States or an officer or agency thereof to answer or otherwise defend are continued by this rule. In so far as any statutes not excepted in rule 81 provide a different time for a defendant to defend, such statutes are modified. See U.S.C., Title 28, [former] § 45 (District courts; practice and procedure in certain cases under the interstate commerce laws) (30 days).

**3.** Compare the last sentence of [former] Equity Rule 29 (Defenses--How Presented) and N.Y.C.P.A. (1937) § 283. See Rule 15(a) for time within which to plead to an amended pleading.

**Note to Subdivisions (b) and (d). 1.** See generally [former] Equity Rules 29 (Defenses--How Presented), 33 (Testing Sufficiency of Defense), 43 (Defect of Parties--Resisting Objection), and 44 (Defect of Parties--Tardy Objection); N.Y.C.P.A. (1937) §§ 277-280; N.Y.R.C.P. (1937) Rules 106-112; *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 25, r.r. 1-4; Clark, *Code Pleading,* 1928, pp. 371-381.

**2.** For provisions authorizing defenses to be made in the answer or reply see *English Rules Under the Judicature Act,* (The Annual Practice, 1937) O. 25, r.r. 1-4; 1 Miss.Code Ann. (1930) §§ 378, 379. Compare Equity Rule 29 (Defenses--How Presented); U.S.C.A., Title 28, [former] § 45 (District Courts; practice and procedure in certain cases under the interstate commerce laws). U.S.C., Title 28, [former] § 45, substantially continued by this rule, provides: "No replication need be filed to the answer, and objections to the sufficiency of the petition or answer as not setting forth a cause of action or defense must be taken at the final hearing or by motion to dismiss the petition based on said grounds, which motion may be made at any time before answer is filed." Compare Calif.Code Civ.Proc., (Deering, 1937) § 433; 4 Nev.Comp.Laws (Hillyer, 1929) § 8600. For provisions that the defendant may demur and answer at the same time, see Calif.Code Civ.Proc. (Deering, 1937) § 431; 4 Nev.Comp.Laws (Hillyer, 1929) § 8598.

**3.** [Former] Equity Rule 29 (Defenses--How Presented) abolished demurrers and provided that defenses in point of law arising on the face of the bill should be made by motion to dismiss or in the answer, with further provision that every such point of law going to the whole or material part of the cause or causes stated might be called up and disposed of before final hearing "at the discretion of the court." Likewise many state practices have abolished the demurrer, or retain it only to attack substantial and not formal defects. See 6 Tenn.Code Ann. (Williams, 1934) § 8784; Ala.Code Ann. (Michie, 1928) § 9479; 2 Mass.Gen.Laws (Ter.Ed., 1932) ch. 231, §§ 15-18; Kansas Gen.Stat.Ann. (1935) §§ 60-705, 60-706.

**Note to Subdivision (c).** Compare [former] Equity Rule 33 (Testing Sufficiency of Defense); N.Y.R.C.P. (1937) Rules 111 and 112.

**Note to Subdivisions (e) and (f).** Compare [former] Equity Rules 20 (Further and Particular Statement in Pleading May be Required) and 21 (Scandal and Impertinence); *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 19, r.r. 7, 7a, 7b, 8; 4 Mont.Rev.Codes Ann. (1935) §§ 9166, 9167; N.Y.C.P.A. (1937) § 247; N.Y.C.P.A. (1937) Rules 103, 115, 116, 117; Wyo.Rev.Stat.Ann. (Courtright, 1931) §§ 89-1033, 89-1034.

**Note to Subdivision (g).** Compare Rules of the District Court of the United States for the District of Columbia (1937) Equity Rule 11; N.M. Rules of Pleading, Practice and Procedure, 38 N.M.Rep. vii. [105-406] (1934); Wash.Gen.Rules of the Superior Courts, 1 Wash.Rev.Stat.Ann. (Remington, 1932) p. 160, Rule VI(e) and (f).

**Note to Subdivision (h).** Compare Calif.Code Civ.Proc. (Deering, 1937) § 434; 2 Minn.Stat. (Mason, 1927) § 9252; N.Y.C.P.A. (1937) §§ 278 and 279; Wash.Gen.Rules of the Superior Courts, 1 Wash.Rev.Stat.Ann. (Remington, 1932) p. 160, Rule VI(e). This rule continues U.S.C.A., Title 28, former § 80 [now 1359, 1447, 1919] (Dismissal or remand) (of action over which district court lacks jurisdiction), while U.S.C.A., Title 28, § 399 (Amendments to show diverse citizenship) is continued by Rule 15.

1946 Amendment

**Note. Subdivision (a).** Various minor alterations in language have been made to improve the statement of the rule. All references to bills of particulars have been stricken in accordance with changes made in subdivision (e).

**Subdivision (b).** The addition of defense (7), "failure to join an indispensable party", cures an omission in the rules which are silent as to the mode of raising such failure. See Commentary, *Manner of Raising Objection of Non-Joinder of Indispensable Party*, 1940, 2 Fed.Rules Serv. 658, and, 1942, 5 Fed.Rules Serv. 820. In one case, *United States v. Metropolitan Life Ins. Co.*, E.D.Pa.1941, 36 F.Supp. 399, the failure to join an indispensable party was raised under Rule 12(c).

Rule 12(b)(6), permitting a motion to dismiss for failure of the complaint to state a claim on which relief can be granted, is substantially the same as the old demurrer for failure of a pleading to state a cause of action. Some courts have held that as the rule by its terms refers to statements in the complaint, extraneous matter on affidavits, depositions or otherwise, may not be introduced in support of the motion, or to resist it. On the other hand, in many cases the district courts have permitted the introduction of such material. When these cases have reached circuit courts of appeals in situations where the extraneous material so received shows that there is no genuine issue as to any material question of fact and that on the undisputed facts as disclosed by the affidavits or depositions, one party or the other is entitled to judgment as a matter of law, the circuit courts, properly enough, have been reluctant to dispose of the case merely on the face of the pleading, and in the interest of prompt disposition of the action have made a final disposition of it. In dealing with such situations the Second Circuit has made the sound suggestion that whatever its label or original basis, the motion may be treated as a motion for summary judgment and disposed of as such. *Samara v. United States*, C.C.A.2, 1942, 129 F.2d 594, certiorari denied 63 S.Ct. 258, 317 U.S. 686, 87 L.Ed. 549; *Boro Hall Corp. v. General Motors Corp.*, C.C.A.2, 1942, 124 F.2d 822, certiorari denied 63 S.Ct. 436, 317 U.S. 695, 87 L.Ed. 556. See, also, *Kithcart v. Metropolitan Life Ins. Co.*, C.C.A.8, 1945, 150 F.2d 997.

It has also been suggested that this practice could be justified on the ground that the federal rules permit "speaking" motions. The Committee entertains the view that on motion under Rule 12(b)(6) to dismiss for failure of the complaint to state a good claim, the trial court should have authority to permit the introduction of extraneous matter, such as may be offered on a motion for summary judgment, and if it does not exclude such matter the motion should then be treated as a motion for summary judgment and disposed of in the manner and on the conditions stated in Rule 56 relating to summary judgments, and, of course, in such a situation, when the case reaches the circuit court of appeals, that court should treat the motion in the same way. The Committee believes that such practice, however, should be tied to the summary judgment rule. The term "speaking motion" is not mentioned in the rules, and if there is such a thing its limitations are undefined. Where extraneous matter is received, by tying further proceedings to the summary judgment rule the courts have a definite basis in the rules for disposing of the motion.

The Committee emphasizes particularly the fact that the summary judgment rule does not permit a case to be disposed of by judgment on the merits on affidavits, which disclose a conflict on a material issue of fact, and unless this practice is tied to the summary judgment, rule, the extent to which a court, on the introduction of such extraneous matter, may resolve questions of fact on conflicting proof would be left uncertain.

The decisions dealing with this general situation may be generally grouped as follows: (1) cases dealing with the use of affidavits and other extraneous material on motions; (2) cases reversing judgments to prevent final determination on mere pleading allegations alone.

Under group (1) are: *Boro Hall Corp. v. General Motors Corp.*, C.C.A.2, 1942, 124 F.2d 822, certiorari denied 1943, 63 S.Ct. 436, 317 U.S. 695, 87 L.Ed. 556; *Gallup v. Caldwell*, C.C.A.3, 1941, 120 F.2d 90; *Central Mexico Light & Power Co. v. Munch*, C.C.A.2, 1940, 116 F.2d 85; *National Labor Relations Board v. Montgomery Ward & Co.*, 1944, 144 F.2d 528, 79 U.S.App.D.C. 200, certiorari denied 1944, 65 S.Ct. 134, 323 U.S. 774, 89 L.Ed. 619; *Urquhart v. American-La France Foamite Corp.*, 1944, 144 F.2d 542, 79 U.S.App.D.C. 219; *Samara v. United States*, C.C.A.2, 1942, 129 F.2d 594; *Cohen v. American Window Glass Co.*, C.C.A.2, 1942, 126 F.2d 111; *Sperry Products Inc. v. Association of American Railroads*, C.C.A.2, 1942, 132 F.2d 408; *Joint Council Dining Car Employees Local 370 v. Delaware, Lackawanna and Western R. Co.*, C.C.A.2, 1946, 157 F.2d 417; *Weeks v. Bareco Oil Co.*, C.C.A.7, 1941, 125 F.2d 84; *Carroll v. Morrison Hotel Corp.*, C.C.A.7, 1945, 149 F.2d 404; *Victory v. Manning*, C.C.A.3, 1942, 128 F.2d 415; *Locals No. 1470, No. 1469, and No. 1512 of International Longshoremen's Association v. Southern Pacific Co.*, C.C.A.5, 1942, 131 F.2d 605; *Lucking v. Delano*, C.C.A.6, 1942, 129 F.2d 283; *San Francisco Lodge No. 68 of International Association of Machinists v. Forrestal*, Cal.1944, 58 F.Supp. 466; *Benson v. Export Equipment Corp.*, 1945, 164 P.2d 380, 49 N.M. 356, construing New Mexico rule identical with Rule 12(b)(6); *F. E. Myers & Bros. Co. v. Gould Pumps, Inc.*, W.D.N.Y.1946, 9 Fed.Rules Serv. 12b.33, Case 2, 5 F.R.D. 132. Cf. *Kohler v. Jacobs*, C.C.A.5, 1943, 138 F.2d 440; *Cohen v. United States*, C.C.A.8, 1942, 129 F.2d 733.

Under group (2) are: *Sparks v. England*, C.C.A.8, 1940, 113 F.2d 579; *Continental Collieries, Inc. v. Shober*, C.C.A.3, 1942, 130 F.2d 631; *Downey v. Palmer*, C.C.A.2, 1940, 114 F.2d 116; *DeLoach v. Crowley's Inc.*, C.C.A.5, 1942, 128 F.2d 378; *Leimer v. State Mutual Life Assurance Co. of Worcester, Mass.*, C.C.A.8, 1940, 108 F.2d 302; *Rossiter v. Vogel*, C.C.A.2, 1943, 134 F.2d 908, compare s.c., C.C.A.2, **1945**, 148 F.2d 292; *Karl Kiefer Machine Co. v. United States Bottlers Machinery Co.*, C.C.A.7, 1940, 113 F.2d 356; *Chicago Metallic Mfg. Co. v. Edward Katzinger Co.*, C.C.A.7, 1941, 123 F.2d 518; *Louisiana Farmers' Protective Union, Inc. v. Great Atlantic & Pacific Tea Co. of America, Inc.*, C.C.A.8, 1942, 131 F.2d 419; *Publicity Bldg. Realty Corp. v. Hannegan*, C.C.A.8, 1943, 139 F.2d 583; *Dioguardi v. Durning*, C.C.A.2, 1944, 139 F.2d 774; *Package Closure Corp. v. Sealright Co., Inc.*, C.C.A.2, 1944, 141 F.2d 972; *Tahir Erk v. Glenn L. Martin Co.*, C.C.A.4, 1941, 116 F.2d 865; *Bell v. Preferred Life Assurance Society of Montgomery, Ala.*, 1943, 64 S.Ct. 5, 320 U.S. 238, 88 L.Ed. 15.

The addition at the end of subdivision (b) makes it clear that on a motion under Rule 12(b)(6) extraneous material may not be considered if the court excludes it, but that if the court does not exclude such material the motion shall be treated as a motion for summary judgment and disposed of as provided in Rule 56. It will also be observed that if a motion under Rule 12(b)(6) is thus converted into a summary judgment motion, the amendment insures that both parties shall be given a reasonable opportunity to submit affidavits and extraneous proofs to avoid taking a party by surprise through the conversion of the motion into a motion for summary judgment. In this manner and to this extent the amendment regularizes the practice above described. As the courts are already dealing with cases in this way, the effect of this amendment is really only to define the practice carefully and apply the requirements of the summary judgment rule in the disposition of the motion.

**Subdivision (c).** The sentence appended to subdivision (c) performs the same function and is grounded on the same reasons as the corresponding sentence added in subdivision (b).

**Subdivision (d).** The change here was made necessary because of the addition of defense (7) in subdivision (b).

**Subdivision (e).** References in this subdivision to a bill of particulars have been deleted, and the motion provided for is confined to one for more definite statement to be obtained only in cases where the movant cannot reasonably be required to frame an answer or other responsive pleading to the pleading in question. With respect to preparations for trial, the party is properly relegated to the various methods of examination and discovery provided in the rules for that purpose. *Slusher v. Jones*, E.D.Ky.1943, 7 Fed.Rules Serv. 12e.231, Case 5, 3 F.R.D. 168; *Best Foods, Inc. v. General Mills, Inc.*, D.Del.1943, 7 Fed.Rules Serv. 12e.231, Case 7, 3 F.R.D. 275; *Braden v. Callaway*, E.D.Tenn.1943, 8 Fed.Rules Serv. 12e.231, Case 1 (". . . most courts . . . conclude that the definiteness required is only such as will be sufficient for the party to prepare responsive pleadings"). Accordingly, the reference to the 20 day time limit has also been eliminated, since the purpose of this present provision is to state a time period where the motion for a bill is made for the purpose of preparing for trial.

Rule 12(e) as originally drawn has been the subject of more judicial rulings than any other part of the rules, and has been much criticized by commentators, judges and members of the bar. See general discussion and cases cited in 1 Moore's *Federal Practice*, 1938, Cum.Supplement, § 12.07, under "Page 657"; also, Holtzoff, *New Federal Procedure and the Courts*, 1940, 35-41. And compare vote of Second Circuit Conference of Circuit and District Judges, June 1940, recommending the abolition of the bill of particulars; *Sun Valley Mfg. Co. v. Mylish*, E.D.Pa.1944, 8 Fed.Rules Serv. 12e.231, Case 6 ("Our experience . . . has demonstrated not only that 'the office of the bill of particulars is fast becoming obsolete' . . . but that in view of the adequate discovery procedure available under the Rules, motions for bills of particulars should be abolished altogether."); *Walling v. American Steamship Co.*, W.D.N.Y.1945, 4 F.R.D. 355, 8 Fed.Rules Serv. 12e.244, Case 8 (". . . the adoption of the rule was ill advised. It has led to confusion, duplication and delay.") The tendency of some courts freely to grant extended bills of particulars has served to neutralize any helpful benefits derived from rule 8, and has overlooked the intended use of the rules on depositions and discovery. The words "or to prepare for trial"--eliminated by the proposed amendment--have sometimes been seized upon as grounds for compulsory statement in the opposing pleading of all the details which the movant would have to meet at the trial. On the other hand, many courts have in effect read these words out of the rule. See *Walling v. Alabama Pipe Co.*, W.D.Mo.1942, 3 F.R.D. 159, 6 Fed.Rules Serv. 12e.244, Case 7; *Fleming v. Mason & Dixon Lines, Inc.*, E.D.Tenn.1941, 42 F.Supp. 230; *Kellogg Co. v. National Biscuit Co.*, D.N.J.1941, 38 F.Supp. 643; *Brown v. H. L. Green Co.*, S.D.N.Y.1943, 7 Fed.Rules Serv. 12e.231, Case 6; *Pedersen v. Standard Accident Ins. Co.*, W.D.Mo.1945, 8 Fed.Rules Serv. 12e.231, Case 8; *Bowles v. Ohse*, D.Neb.1945, 4 F.R.D. 403, 9 Fed.Rules Serv. 12e.231, Case 1; *Klages v. Cohen*, E.D.N.Y.1945, 9 Fed.Rules Serv. 8a.25, Case 4; *Bowles v. Lawrence*, D.Mass.1945, 8 Fed.Rules Serv. 12e.231, Case 19; *McKinney Tool & Mfg. Co. v. Hoyt*, N.D.Ohio 1945, 9 Fed.Rules Serv. 12e.235, Case 1; *Bowles v. Jack*, D.Minn.1945, 5 F.R.D. 1, 9 Fed.Rules Serv. 12e.244, Case 9. And it has been urged from the bench that the phrase be stricken, *Poole v. White*, N.D.W.Va.1941, 5 Fed.Rules Serv. 12e.231, Case 4, 2 F.R.D. 40. See also *Bowles v. Gabel*, W.D.Mo.1946, 9 Fed.Rules Serv. 12e.244, Case 10. ("The courts have never favored that portion of the rules which undertook to justify a motion of this kind for the purpose of aiding counsel in preparing his case for trial.").

**Subdivision (f).** This amendment affords a specific method of raising the insufficiency of a defense, a matter which has troubled some courts, although attack has been permitted in one way or another. See *Dysart v. Remington-Rand, Inc.*, D.Conn.1939, 31 F.Supp. 296; *Eastman Kodak Co. v. McAuley*, S.D.N.Y.1941, 4 Fed.Rules Serv., 12f.21, Case 8, 2 F.R.D. 21; *Schenley Distillers Corp. v. Renken*, E.D.S.C.1940, 34 F.Supp. 678; *Yale Transport Corp. v. Yellow Truck & Coach Mfg. Co.*, S.D.N.Y.1944, 3 F.R.D. 440; *United States v. Turner Milk Co.*, N.D.Ill.1941, 4 Fed.Rules Serv. 12b.51, Case 3, 1 F.R.D. 643; *Teiger v. Stephan Oderwald, Inc.*, S.D.N.Y.1940, 31 F.Supp. 626; *Teplitsky v. Pennsylvania R. Co.*, N.D.Ill.1941, 38 F.Supp. 535; *Gallagher v. Carroll*, E.D.N.Y.1939, 27 F.Supp. 568; *United States v. Palmer*, S.D.N.Y.1939, 28 F.Supp. 936. And see *Indemnity Ins. Co. of North America v. Pan American Airways, Inc.*, S.D.N.Y.1944, 58 F.Supp. 338; Commentary, *Modes of Attacking Insufficient Defenses in the Answer*, 901, 1939, 1 Fed.Rules Serv. 669, 1940, 2 Fed.Rules Serv. 640.

**Subdivision (g).** The change in title conforms with the companion provision in subdivision (h).

The alteration of the "except" clause requires that other than provided in subdivision (h) a party who resorts to a motion to raise defenses specified in the rule, must include in one motion all that are then available to him. Under the original rule defenses which could be raised by motion were divided into two groups which could be the subjects of two successive motions.

**Subdivision (h).** The addition of the phrase relating to indispensable parties is one of necessity.

1963 Amendment

This amendment conforms to the amendment of Rule 4(e). See also the Advisory Committee's Note to amended Rule 4(b).

1966 Amendment

**Subdivision (b)(7).** The terminology of this subdivision is changed to accord with the amendment of Rule 19. See the Advisory Committee's Note to Rule 19, as amended, especially the third paragraph therein before the caption "Subdivision (c)."

**Subdivision (g).** Subdivision (g) has forbidden a defendant who makes a preanswer motion under this rule from making a further motion presenting any defense or objection which was available to him at the time he made the first motion and which he could have included, but did not in fact include therein. Thus if the defendant moves before answer to dismiss the complaint for failure to state a claim, he is barred from making a further motion presenting the defense of improper venue, if that defense was available to him when he made his original motion. Amended subdivision (g) is to the same effect. This required consolidation of defenses and objections in a Rule 12 motion is salutary in that it works against piecemeal consideration of a case. For exceptions to the requirement of consolidation, see the last clause of subdivision (g), referring to new subdivision (h)(2).

**Subdivision (h).** The question has arisen whether an omitted defense which cannot be made the basis of a second motion may nevertheless be pleaded in the answer. Subdivision (h) called for waiver of "* * * defenses and objections which he [defendant] does not present * * * by motion * * *" or, if he has made no motion, in his answer * * *." If the clause "if he has made no motion," was read literally, it seemed that the omitted defense was waived and could not be pleaded in the answer. On the other hand, the clause might be read as adding nothing of substance to the preceding words; in that event it appeared that a defense was not waived by reason of being omitted from the motion and might be set up in the answer. The decisions were divided. Favoring waiver, see *Keef v. Derounian,* 6 F.R.D. 11 (N.D.Ill.1946); *Elbinger v. Precision Metal Workers Corp.,* 18 F.R.D. 467 (E.D.Wis.1956); see also *Rensing v. Turner Aviation Corp.,* 166 F.Supp. 790 (N.D.Ill.1958); *P. Beiersdorf & Co. v. Duke Laboratories, Inc.,* 10 F.R.D. 282 (S.D.N.Y.1950); *Neset v. Christensen,* 92 F.Supp. 78 (E.D.N.Y.1950). Opposing waiver, see *Phillips v. Baker,* 121 F.2d 752 (9th Cir.1941); *Crum v. Graham,* 32 F.R.D. 173 (D.Mont.1963) (regretfully following the Phillips case); see also *Birnbaum v. Birrell,* 9 F.R.D. 72 (S.D.N.Y.1948); *Johnson v. Joseph Schlitz Brewing Co.,* 33 F.Supp. 176 (E.D.Tenn.1940); cf. *Carter v. American Bus Lines, Inc.,* 22 F.R.D. 323 (D.Neb.1958).

Amended subdivision (h)(1)(A) eliminates the ambiguity and states that certain specified defenses which were available to a party when he made a preanswer motion, but which he omitted from the motion, are waived. The specified defenses are lack of jurisdiction over the person, improper venue, insufficiency of process, and insufficiency of service of process (see Rule 12(b)(2)-(5) ). A party who by motion invites the court to pass upon a threshold defense should bring forward all the specified defenses he then has and thus allow the court to do a reasonably complete job. The waiver reinforces the policy of subdivision (g) forbidding successive motions.

By amended subdivision (h)(1)(B), the specified defenses, even if not waived by the operation of (A), are waived by the failure to raise them by a motion under Rule 12 or in the responsive pleading or any amendment thereof to which the party is entitled as a matter of course. The specified defenses are of such a character that they should not be delayed and brought up for the first time by means of an application to the court to amend the responsive pleading.

Since the language of the subdivisions is made clear, the party is put on fair notice of the effect of his actions and omissions and can guard himself against unintended waiver. It is to be noted that while the defenses specified in subdivision (h)(1) are subject to waiver as there provided, the more substantial defenses of failure to state a claim upon which relief can be granted, failure to join a party indispensable under Rule 19, and failure to state a legal defense to a claim (see Rule 12(b)(6), (7), (f) ), as well as the defense of lack of jurisdiction over the subject matter (see Rule 12(b)(1) ), are expressly preserved against waiver by amended subdivision (h)(2) and (3).

1987 Amendment

The amendments are technical. No substantive change is intended.

1993 Amendment

Subdivision (a) is divided into paragraphs for greater clarity, and paragraph (1)(B) is added to reflect amendments to Rule 4. Consistent with Rule 4(d)(3), a defendant that timely waives service is allowed 60 days from the date the request was mailed in which to respond to the complaint, with an additional 30 days afforded if the request was sent out of the

country. Service is timely waived if the waiver is returned within the time specified in the request (30 days after the request was mailed, or 60 days if mailed out of the country) and before being formally served with process. Sometimes a plaintiff may attempt to serve a defendant with process while also sending the defendant a request for waiver of service; if the defendant executes the waiver of service within the time specified and before being served with process, it should have the longer time to respond afforded by waiving service.

The date of sending the request is to be inserted by the plaintiff on the face of the request for waiver and on the waiver itself. This date is used to measure the return day for the waiver form, so that the plaintiff can know on a day certain whether formal service of process will be necessary; it is also a useful date to measure the time for answer when service is waived. The defendant who returns the waiver is given additional time for answer in order to assure that it loses nothing by waiving service of process.

2000 Amendment

Rule 12(a)(3)(B) is added to complement the addition of Rule 4(i)(2)(B). The purposes that underlie the requirement that service be made on the United States in an action that asserts individual liability of a United States officer or employee for acts occurring in connection with the performance of duties on behalf of the United States also require that the time to answer be extended to 60 days. Time is needed for the United States to determine whether to provide representation to the defendant officer or employee. If the United States provides representation, the need for an extended answer period is the same as in actions against the United States, a United States agency, or a United States officer sued in an official capacity.

An action against a former officer or employee of the United States is covered by subparagraph (3)(B) in the same way as an action against a present officer or employee. Termination of the relationship between the individual defendant and the United States does not reduce the need for additional time to answer.

**GAP Report**

No changes are recommended for Rule 12 as published.

2007 Amendment

The language of Rule 12 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

Former Rule 12(a)(4)(A) referred to an order that postpones disposition of a motion "until the trial on the merits." Rule 12(a)(4) now refers to postponing disposition "until trial." The new expression avoids the ambiguity that inheres in "trial on the merits," which may become confusing when there is a separate trial of a single issue or another event different from a single all-encompassing trial.

2009 Amendments

The times set in the former rule at 10 or 20 days have been revised to 14 or 21 days. See the Note to Rule 6.

---

Notes of Decisions containing your search terms (0)    View all 4074

Fed. Rules Civ. Proc. Rule 12, 28 U.S.C.A., FRCP Rule 12
Amendments received to 7-1-14

---

**End of Document**    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext. © 2014 Thomson Reuters    1-800-REF-ATTY (1-800-733-2889)

 THOMSON REUTERS

| United States Code Annotated |
| Federal Rules of Appellate Procedure (Refs & Annos) |
| Title VII. General Provisions |

Federal Rules of Appellate Procedure Rule 32, 28 U.S.C.A.

Rule 32. Form of Briefs, Appendices, and Other Papers

Currentness

**(a) Form of a Brief.**

**(1) Reproduction.**

**(A)** A brief may be reproduced by any process that yields a clear black image on light paper. The paper must be opaque and unglazed. Only one side of the paper may be used.

**(B)** Text must be reproduced with a clarity that equals or exceeds the output of a laser printer.

**(C)** Photographs, illustrations, and tables may be reproduced by any method that results in a good copy of the original; a glossy finish is acceptable if the original is glossy.

**(2) Cover.** Except for filings by unrepresented parties, the cover of the appellant's brief must be blue; the appellee's, red; an intervenor's or amicus curiae's, green; any reply brief, gray; and any supplemental brief, tan. The front cover of a brief must contain:

**(A)** the number of the case centered at the top;

**(B)** the name of the court;

**(C)** the title of the case (see Rule 12(a));

**(D)** the nature of the proceeding (e.g., Appeal, Petition for Review) and the name of the court, agency, or board below;

**(E)** the title of the brief, identifying the party or parties for whom the brief is filed; and

**(F)** the name, office address, and telephone number of counsel representing the party for whom the brief is filed.

**(3) Binding.** The brief must be bound in any manner that is secure, does not obscure the text, and permits the brief to lie reasonably flat when open.

**(4) Paper Size, Line Spacing, and Margins.** The brief must be on 8 ½ by 11 inch paper. The text must be double-spaced, but quotations more than two lines long may be indented and single-spaced. Headings and footnotes may be single-spaced. Margins must be at least one inch on all four sides. Page numbers may be placed in the margins, but no text may appear there.

**(5) Typeface.** Either a proportionally spaced or a monospaced face may be used.

**(A)** A proportionally spaced face must include serifs, but sans-serif type may be used in headings and captions. A proportionally spaced face must be 14-point or larger.

**(B)** A monospaced face may not contain more than 10 ½ characters per inch.

**(6) Type Styles.** A brief must be set in a plain, roman style, although italics or boldface may be used for emphasis. Case names must be italicized or underlined.

**(7) Length.**

**(A) Page limitation.** A principal brief may not exceed 30 pages, or a reply brief 15 pages, unless it complies with Rule 32(a)(7)(B) and (C).

**(B) Type-volume limitation.**

**(i)** A principal brief is acceptable if:

ADD. 73

• it contains no more than 14,000 words; or

• it uses a monospaced face and contains no more than 1,300 lines of text.

**(ii)** A reply brief is acceptable if it contains no more than half of the type volume specified in Rule 32(a)(7)(B)(i).

**(iii)** Headings, footnotes, and quotations count toward the word and line limitations. The corporate disclosure statement, table of contents, table of citations, statement with respect to oral argument, any addendum containing statutes, rules or regulations, and any certificates of counsel do not count toward the limitation.

**(C) Certificate of compliance.**

**(i)** A brief submitted under Rules 28.1(e)(2) or 32(a)(7)(B) must include a certificate by the attorney, or an unrepresented party, that the brief complies with the type-volume limitation. The person preparing the certificate may rely on the word or line count of the word-processing system used to prepare the brief. The certificate must state either:

• the number of words in the brief; or

• the number of lines of monospaced type in the brief.

**(ii)** Form 6 in the Appendix of Forms is a suggested form of a certificate of compliance. Use of Form 6 must be regarded as sufficient to meet the requirements of Rules 28.1(e)(3) and 32(a)(7)(C)(i).

**(b) Form of an Appendix.** An appendix must comply with Rule 32(a)(1), (2), (3), and (4), with the following exceptions:

**(1)** The cover of a separately bound appendix must be white.

**(2)** An appendix may include a legible photocopy of any document found in the record or of a printed judicial or agency decision.

**(3)** When necessary to facilitate inclusion of odd-sized documents such as technical drawings, an appendix may be a size other than 8 ½ by 11 inches, and need not lie reasonably flat when opened.

**(c) Form of Other Papers.**

**(1) Motion.** The form of a motion is governed by Rule 27(d).

**(2) Other Papers.** Any other paper, including a petition for panel rehearing and a petition for hearing or rehearing en banc, and any response to such a petition, must be reproduced in the manner prescribed by Rule 32(a), with the following exceptions:

**(A)** A cover is not necessary if the caption and signature page of the paper together contain the information required by Rule 32(a)(2). If a cover is used, it must be white.

**(B)** Rule 32(a)(7) does not apply.

**(d) Signature.** Every brief, motion, or other paper filed with the court must be signed by the party filing the paper or, if the party is represented, by one of the party's attorneys.

**(e) Local Variation.** Every court of appeals must accept documents that comply with the form requirements of this rule. By local rule or order in a particular case a court of appeals may accept documents that do not meet all of the form requirements of this rule.

**CREDIT(S)**

(As amended Apr. 24, 1998, eff. Dec. 1, 1998; Apr. 29, 2002, eff. Dec. 1, 2002; Apr. 25, 2005, eff. Dec. 1, 2005.)

**ADVISORY COMMITTEE NOTES**

1967 Adoption

Only two methods of printing are now generally recognized by the circuits--standard typographic printing and the offset duplicating process (multilith). A third, mimeographing, is permitted in the Fifth Circuit. The District of Columbia, Ninth, and Tenth Circuits permit records to be reproduced by copying processes. The Committee feels that recent and impending advances in the arts of duplicating and copying warrant experimentation with less costly forms of reproduction than those now generally authorized. The proposed rule permits, in effect, the use of any process other than the carbon copy process which produces a clean, readable page. What constitutes such in first instance to the parties and ultimately to the court to determine. The final sentence of the first paragraph of subdivision (a) is added to allow the use of multilith, mimeograph, or other forms of copies of the reporter's original transcript whenever such are available.

ADD. 75

Appeal: 14-1825    Doc: 27      Filed: 10/15/2014     Pg: 139 of 140

Interpretation of Industrial Wastewater Discharge Exclusion..., OSWER 9441.1995(05)...

OSWER 9441.1995(05), 1995 WL 911821

Environmental Protection Agency

Office of Solid Waste and Emergency Response
OSWER Directive

INTERPRETATION OF INDUSTRIAL WASTEWATER DISCHARGE
EXCLUSION FROM THE DEFINITION OF SOLID WASTE

February 17, 1995

**From:**
  *1  Michael H. Shapiro
Director
Office of Solid Waste (5301)
Lisa K. Friedman
Associate General Counsel
Solid Waste and Emergency Response Division(2366)


TO:

Waste Management Division Directors, Regions I-X

## MEMORANDUM

This memorandum is to clarify that the Resource Conservation and Recovery Act (RCRA) requirements apply to discharges of leachate into groundwater from leaking waste management units, even when the groundwater provides a direct hydrologic connection to a nearby surface water of the United States. The definition of solid waste in RCRA section 1004(27) excludes certain industrial discharges which are point sources subject to permits under the Clean Water Act (CWA); and EPA has said that CWA jurisdiction (under section 402) extends to point source discharges to groundwater where there is a direct hydrologic connection between the point source and nearby surface waters of the United States. However, discharges of leachate from waste management units to groundwater are not excluded from the definition of solid waste in RCRA section 1004(27), because the exclusion extends only to "traditional," pipe outfall-type point source discharges, and not to discharges upstream of that point. (This memorandum interprets the meaning of "point source discharge" solely for the purposes of RCRA section 1004(27), and not for CWA purposes.)

Discussion

RCRA section 1004(27) excludes from the definition of solid waste "solid or dissolved materials in … industrial discharges which are point sources subject to permits [section 402 of the Clean Water Act]." For the purposes of the RCRA program, EPA has consistently interpreted the language "point sources subject to permits under [section 402 of the Clean Water Act]" to mean point sources that should have a NPDES permit in place, whether in fact they do or not. Under EPA's interpretation of the "subject to" language, a facility that should, but does not, have the proper NPDES permit is in violation of the CWA, not RCRA.

In interpreting and implementing this exclusion, the Agency promulgated a rule at 40 C.F.R. § 261.4 (a)(2) that states:
The following materials are not solid wastes for the purpose of this part:

**Interpretation of Industrial Wastewater Discharge Exclusion..., OSWER 9441.1995(05)...**

... Industrial wastewater discharges that are point source discharges subject to regulation under section 402 of the Clean Water Act, as amended.

EPA's interpretation of the rule's narrow scope is set out in an explanatory "Comment" that also appears in the Code of Federal Regulations following the final rule language:

> This exclusion applies only to the actual point source discharge. It does not exclude industrial wastewaters while they are being collected, stored or treated before discharge, nor does it exclude sludges that are generated by industrial wastewater treatment.

**\*2**  40 C.F.R. § 261.4(a)(2) (comment) (emphasis added). This explanatory comment to the rule emphasizes that the exclusion is a modest and narrow one. Moreover, the comment reflects EPA's intent, at the time it promulgated the rule, that the exclusion apply solely to the traditional pipe outfall-type situation (i.e., ultimate release to waters of the United States). As EPA explained in the preamble:

> The obvious purpose of the industrial point source discharge exclusion in section 1004(27) was to avoid duplicative regulation of point source discharges under RCRA and the Clean Water Act. Without such a provision, the discharge of wastewater into navigable waters would be "disposal" of solid waste, and potentially subject to regulation under both the Clean Water Act and RCRA Subtitle C. These considerations do not apply to industrial wastewaters prior to discharge since most of the environmental hazards posed by wastewaters in treatment and holding facilities -- primarily groundwater contamination -- cannot be controlled under the Clean Water Act or other EPA statutes.

45 Fed Reg. 33098 (May 19, 1980) (emphasis added).

Thus, EPA based this exclusion on the need to avoid duplicative regulation under two statutes for discharges that occur at the end-of-the-pipe (i.e., discharges directly to surface water). EPA did not intend that the exclusion cover groundwater discharges from treatment processes that occur prior to the "end-of-the-pipe" discharge. Thus, this exclusion only covers a subset of point sources regulated under the CWA.

Therefore, wastewater releases to groundwater from treatment and holding facilities do not come within the meaning of the RCRA exclusion in 40 C.F.R. § 261.4(a)(2), but rather remain within the jurisdiction of RCRA. In addition, such groundwater discharges are subject to CWA jurisdiction, based on EPA's interpretation that discharges from point sources through groundwater where there is a direct hydrologic connection to nearby surface waters of the United States are subject to the prohibition against unpermitted discharges, and thus are subject to the NPDES permitting requirements. See 55 Fed. Reg. 47990, 47997 (Nov. 16, 1990) (storm water permit application regulations); 56 Fed. Reg. 64876, 64892 (Dec. 12, 1991) (Indian water quality standards regulations); 58 Fed. Reg. 7610, 7631 (Feb. 8, 1993) (Region 6 general permit for feedlots).

If you have any questions on this memorandum, please call Kathy Nam of OGC at (202) 260-2737 or Mitch Kidwell of OSW at (202) 260-4805.

OSWER 9441.1995(05), 1995 WL 911821

---

**End of Document**                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.